**ORIGINAL**  *Recpt #57631AA*

45

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

**FILED**

SEP - 7 2005

CLERK'S OFFICE
U.S. DISTRICT COURT
ANN ARBOR, MI

SHAREE MILLER, *#326122*

Petitioner,

-vs-

CLARICE STOVALL, Warden,
Robert Scott Correctional Facility,

Respondent.

No.
Hon.

# 05-73447

VICTORIA A. ROBERTS

**MAGISTRATE JUDGE KOMIVES**

_____/

## PETITION FOR WRIT OF HABEAS CORPUS

By:   **Bridget M. McCormack (P58537)**
      **Kimberly Thomas (P66643)**
      Attorneys for Petitioner
      University of Michigan Law School
      Michigan Clinical Law Program
      363 Legal Research Building
      801 Monroe Street
      Ann Arbor, MI 48109
      (734) 763-4319

      **David Nickola (P43203)**
      Of Counsel for Petitioner
      1015 Church Street
      Flint, MI 48502
      (810) 767-5420

      **Ryan T. McFarland**
      Student Attorney for Petitioner

      **Quinn O'Keefe**
      Student Attorney for Petitioner

## PETITION FOR A WRIT OF HABEAS CORPUS

Petitioner Sharee Miller, by and through her attorneys, Bridget McCormack and

Kimberly Thomas and in support for writ of habeas corpus states as follows:

1. Petitioner Sharee Miller is incarcerated at the Robert Scott Correctional Facility,

   47500 Five Mile Road, Plymouth, MI 48170.

2. Her Inmate number is 326122.

3. On December 22, 2000, after a plea of not guilty, a jury in the Genesee County Circuit

   Court convicted Mrs. Miller of conspiracy to commit first-degree murder, MCL Sec.

   750.157a and MCL Sec. 750.316, and murder in the second degree as an aider and

   abettor. MCL 750.317.

4. Mrs. Miller was sentenced to life imprisonment without the possibility of parole and is

   currently serving that sentence.

5. In her direct appeal as of right to the Michigan Court of Appeals, Mrs. Miller raised

   the following issues:

I.      THE TRIAL COURT VIOLATED THE RULES OF EVIDENCE AND MRS.
        MILLER'S CONFRONTATION CLAUSE RIGHTS BY ALLOWING THE
        PROSECUTION, OVER OBJECTION TO INTRODUCE HEARSAY
        TESTIMONY IN A SUICIDE NOTE, A.O.L. INSTANT MESSAGE, AND E-
        MAILS BETWEEN MRS. MILLER AND MR. CASSADAY.

III.    THE TRIAL COURT VIOLATED MRS. MILLER'S DUE PROCESS CLAUSE
        RIGHT TO A FAIR TRIAL BY ADMITTING INTO EVIDENCE, OVER
        OBJECTION, E-MAILS INCLUDING SEMI-NUDE AND EROTIC
        PHOTOGRAPHS AND VIDEO TAPE OF MRS. MILLER, WHICH THE
        COURT OPINED IN THE PRESENCE OF THE JURY AS
        "PORNOGRAPHIC."

IV.     THE PROSECUTOR AND THE TRIAL COURT VIOLATED MRS. MILLER'S
        DUE PROCESS CLAUSE RIGHT TO A FAIR TRIAL BY ADMITTING INTO
        EVIDENCE, OVER OBJECTION, GRUESOME PHOTOGRAPHS OF MR.

2

CASSADAY DEPICTING A BULLET HOLE IN HIS HEAD WHILE
SIT[T]ING IN A RECLINER WITH AN OPEN BIBLE IN HIS LAP.

6. On June 24, 2003, in an unpublished opinion in case # 233018, the Court of Appeals
affirmed Mrs. Miller's conviction.

7. Mrs. Miller applied to the Michigan Supreme Court for leave to appeal, presenting the
same issues that were raised on direct appeal.

8. In April 2004, The Michigan Supreme Court denied leave to appeal.  469 Mich. 1029
(2004).

9. Two justices would have granted leave to appeal.  469 Mich. 1029, 629 N.W.2d 66
(Table) (2004).

10. In April 2004, Mrs. Miller filed a motion for reconsideration of the Michigan
Supreme Court's denial of leave to appeal.

11. This motion specifically cited the United States Supreme Court case of *Crawford v.
Washington*, 541 U.S. 36, 124 S.Ct. 1354 (2004), and stated:

   1) Admission of the suicide note violated Mrs. Miller's Rights under the Sixth
Amendment Confrontation Clause.

   2) Admission of the AOL Instant Message violated Mrs. Miller's Rights under the
Sixth Amendment Confrontation Clause.

   3) Admission of e-mails against Defendant violated Mrs. Miller's Rights under the
Sixth Amendment Confrontation Clause.

12. On June 30, 2004, the Michigan Supreme Court denied the motion for
reconsideration.  469 Mich. 1029, 682 N.W.2d 93 (2004).

13. Other than the above appeals, there have been no other petitions, applications, or
motions with respect to judgments in any court, state or federal.

14. Mrs. Miller is being held unlawfully for the reasons set forth in the Brief in Support
of the Petition for Habeas Corpus filed on this day.

3

15. The decision of the Michigan Courts is based on an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States. 28 U.S.C. § 2254(d)(1).

16. The decision of the Michigan Courts is based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d)(2).

17. There are not other petitions, motions, or appeals pending anywhere attacking this conviction.

18. Mrs. Miller was represented at her trial by:

> David Nickola (P43203)
> 1015 Church St
> Flint, MI 48502
> (810) 767-5420

19. On her direct appeal and his discretionary application for leave appeal to the Michigan Supreme Court from that adverse decision, Mrs. Miller was represented by:

> David Nickola (P43203)
> 1015 Church St
> Flint, MI 48402
> (810) 767-5420

20. Petitioner is being held unlawfully for the following reasons:

    a. SHAREE MILLER WAS DENIED HER SIXTH AMENDMENT RIGHT TO CONFRONTATION WHEN THE MICHIGAN COURTS DECIDED CONTRARY TO, AND UNREASONABLY APPLIED, CLEARLY ESTABLISHED FEDERAL LAW AND MADE UNREASONABLE FINDINGS OF FACT IN ADMITTING TESTIMONIAL HEARSAY EVIDENCE.

        i. The Michigan state court failed to apply the clearly established rule of *Crawford v. Washington* to Mrs. Miller's case.

        ii. The Michigan state court unreasonably applied clearly    established federal law requiring sufficient guarantees of trustworthiness and made an unreasonable determination of facts when it admitted the hearsay evidence.

4

b. THE CUMULATIVE EFFECT OF PREJUDICIAL EVIDENCE
IMPROPERLY INTRODUCED AT TRIAL VIOLATED SHAREE
MILLER'S RIGHT TO A FAIR TRIAL UNDER THE DUE PROCESS
CLAUSE

    i. The state court violated Mrs. Miller's due process right to a fiar trial
when it admitted highly prejudicial but irrelevant evidence at her trial.

    ii. The combined effect of admission of these pieces of evidence
violated Mrs. Miller's right to a fair trial.

**WHEREFORE**, Petitioner asks this Court:

A. That Respondent be required to appear and answer the allegations of this petition;

B. That after full consideration this Court relieve Petitioner of the unconstitutional

restraint on her liberty;

C. That this Court grant such other, further and different relief as the Court may

deem just and proper under the circumstances.

Respectfully Submitted,

MICHIGAN CLINICAL LAW PROGRAM


Bridget M. McCormack (P58537)
Attorney for Petitioner
Michigan Clinical Law Program
361 Legal Research Building
801 Monroe Street
Ann Arbor, MI 48109
(734) 747-4319


Kimberly Thomas (P66643)
Attorney for Petitioner
Michigan Clinical Law Program
363 Legal Research Building
801 Monroe Street
Ann Arbor, MI 48109
(734) 747-4319


Ryan McFarland
Student Attorney for Petitioner

Quinn O'Keefe
Student Attorney for Petitioner

5

ORIGINAL

**FILED**

SEP - 7 2005

CLERK'S OFFICE
U.S. DISTRICT COURT
ANN ARBOR, MI

### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF MICHIGAN

SHAREE PAULETTE MILLER

     Petitioner,

-vs-

CLARICE STOVALL, Warden,
Scott Correctional Facility,

     Respondent.

_____/

No. **05-73447**
Hon.
**VICTORIA A. ROBERTS**
MAGISTRATE JUDGE KOMIVES

### MEMORANDUM OF LAW IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS

By:    **Bridget M. McCormack (P58537)**
**Kimberly Thomas (P66643)**
Attorneys for Petitioner
University of Michigan Law School
Michigan Clinical Law Program
363 Legal Research Building
801 Monroe Street
Ann Arbor, MI 48109
(734) 763-4319

**David Nickola (P43203)**
Of Counsel for Petitioner
1015 Church St
Flint, MI 48502
(810) 767-5420

**Ryan T. McFarland**
Student Attorney for Petitioner

**Quinn O'Keefe**
Student Attorney for Petitioner

## TABLE OF CONTENTS

TABLE OF CONTENTS........................................................................................................2

TABLE OF AUTHORITIES ..............................................................................................4

INTRODUCTION ..............................................................................................................7

FACTS ................................................................................................................................9

STANDARD OF REVIEW ...............................................................................................14

JURISDICTIONAL STATEMENT ..................................................................................15

ARGUMENT ....................................................................................................................16

    I.    **SHAREE MILLER WAS DENIED HER 6TH AMENDMENT RIGHT TO CONFRONTATION WHEN THE MICHIGAN COURTS DECIDED CONTRARY TO AND UNREASONABLY APPLIED, CLEARLY ESTABLISHED FEDERAL LAW AND MADE UNREASONABLE FINDINGS OF THE FACTS IN ADMITTING TESTIMONIAL HEARSAY EVIDENCE** ...........................................................16

        **A.**  **The Michigan State Court Failed to Apply The Clearly Established Rule of *Crawford v. Washington* to Mrs. Miller's Case**................17

            **i.**  **Cassaday's Letter to the Authorities Was Testimonial** ..............................18

            **ii.**  **Cassaday's IM Print-Outs Were Testimonial** ............................................20

        **B.**  **The Michigan State Court Unreasonably Applied Clearly Established Federal Law Requiring Sufficient Guarantees Of Trustworthiness And Made An Unreasonable Determination Of Facts When It Admitted The Hearsay Evidence**........................................................21

            **i.**  **Cassaday's Typed Letter Lacked Sufficient Guarantees Of Trustworthiness To Justify Its Admission, Absent Cross-Examination** ..................................................................................22

            **ii.**  **The IM Print-Out Did Not Fall Within Firmly Rooted Hearsay Exceptions Or Bear Sufficient Guarantees Of Trustworthiness To Warrant Its Admission Into Evidence** .................26

    **II.**  **THE CUMULATIVE EFFECT OF PREJUDICIAL EVIDENCE IMPROPERLY INTRODUCED AT TRIAL VIOLATED SHAREE MILLER'S RIGHT TO A FAIR TRIAL UNDER THE DUE PROCESS CLAUSE** ..................................................................................30

A. The State Court Violated Mrs. Miller's Due Process Right to A Fair Trial When It Admitted Highly Prejudicial But Irrelevant Evidence at her Trial...............................................................................................................31

    i.  Theatrical Reading of Erotic Emails ......................................................31

    ii.  Pornographic Homemade Video: "For Jerry's Eyes Only" ...............33

    iii.  Sexually Explicit Photographs of Mrs. Miller .......................................34

    iv.  The Graphic Picture of Cassaday's Suicide and Evidence that He was Reading the Bible before his Death....................................35

B. The Combined Effect Of Admission Of These Pieces Of Evidence Violated Mrs. Miller's Right To A Fair Trial ................................................................35

RELIEF ..............................................................................................................37

# TABLE OF AUTHORITIES

**Constitution**

U.S. Const. amend. VI ........................................................................................................16
U.S. Const. amend. XIV ........................................................................................... 8, passim


**Cases**

Abela v. Martin, 348 F.3d 164 (6th Cir. 2003) ................................................................15

Allen v. Yukins, 366 F.3d 396 (6th Cir. 2004) ...........................................................15, 17

Alvarez v. Boyd 225 F.3d 820 (7th Cir. 2000) ................................................................36

Anderson v. Harless, 459 U.S. 4 (1982) .........................................................................15

Bruton v. United States, 391 U.S. 123 (1968) ...........................................................21, 26

Calvert v. Wilson, 288 F.3d 823 (6th Cir. 2002) .............................................................22

Crawford v. Washington, 541 U.S. 36 (2004) .................................................. 7, passim

Dudley v. Duckworth, 854 F.2d 967 (7th Cir.1988).........................................................30

Hill v. Hofbauer, 195 F. Supp 2d 871 (E.D. Mich., 2001) ...................................28, 29, 30

Horton v. Allen, 370 F.3d 75 (1st Cir. 2004)...................................................................23

Idaho v. Wright, 497 U.S. 805 (1990) .............................................................................24

Jones v. Cunningham, 371 U.S. 236 (1963) ....................................................................15

Kirby v. Dutton, 831 F.2d 1280 (6th Cir. 1987)...............................................................36

Lee v. Illinois, 476 U.S. 530 (1986) ................................................................................25

Lesko v. Owens, 881 F.2d 44 (3d Cir. 1989)..............................................................30, 31

Lilly v. Virginia, 527 U.S. 116 (1999)................................................................ 17, passim

Neill v. Gibson, 278 F.3d 1044 (10th Cir 2001).............................................................32

Ohio v. Roberts, 448 U.S. 56 (1980) ....................................................................17, 21, 22

Panzavecchia v. Wainwright, 658 F.2d 337 (5th Cir.1981)............................................30

People v. Geno, 683 N.W.2d 687 (Mich. Ct. App. 2004).................................................................23

People v. Miller, No. 233018, slip op. (Mich. Ct. App. 2003) ...............................................23, 27

Picard v. Connor, 404 U.S. 270 (1971).................................................................................15

Rios v. Lansing, 116 Fed. Appx. 983 (10th Cir. 2004)..................................................................23

Schriro v. Summerlin, 124 S. Ct. 2519 (2004) ..........................................................................17

Tucker v. Prelesnik, 181 F.3d 747 (6th Cir. 1999) ......................................................................14

United States v. Angleton, 269 F.Supp.2d 878 (S.D. Texas 2003) ....................................23, 24, 25

United States v. Arnold, 410 F.3d 895 (6th Cir. 2005)...................................................................19

United States v. Ashworth, 836 F.2d 260 (6th Cir. 1988) ...................................................30, 35, 36

United States v. Barlow, 693 F.2d 954 (6th Cir. 1982) ..................................................................22

United States ex rel. Bibbs v. Twomey, 506 F.2d 1220 (7th Cir. 1974) .........................................33

United States v. Cromer, 389 F.3d 662 (6th Cir. 2004)..................................................................19

United States v. Fowlie, 24 F.3d 1059 (9th Cir. 1994)...................................................................27

United States v. Guerrero, 803 F.2d 783 (10th Cir. 1986)..............................................................31

United States v. Lemonakis, 485 F.2d 941 (D.C. Cir. 1973)....................................................24, 27

United States v. Saget, 377 F.3d 223 (2d Cir. 2004) ....................................................................23

United States v. Ward, 190 F.3d 483 (6th Cir 1999) .....................................................................36

Vincent v. Seabold, 226 F.3d 681 (6th Cir. 2000).........................................................................22

Walker v. Engle, 703 F.2d 959 (6th Cir. 1983) ............................................................................30

White v. Illinois, 502 U.S. 346 (1992).......................................................................................25

Williams v. Taylor, 529 U.S. 362 (2000) ...................................................................................14

Williamson v. United States, 512 U.S. 594 (1994).................................................................25, 29

**Statutes**

28 USC §2254 (1996) .......................................................................................................14, 15, 30

28 USC §2244 (1996) ...........................................................................................................14, 15

**Other Authority**

Michigan Rules of Evidence 801(d)(2)……...................................................................................26

Michigan Rules of Evidence 804(b)(3)…………………………………………………………...26, 27, 28

## INTRODUCTION

Sharee Miller was convicted of conspiracy to commit first degree murder and murder in the second degree of her husband, Bruce Miller, on December 22, 2000. She has been serving a life sentence since then. Mrs. Miller's conviction was based on testimonial hearsay evidence that was prepared for law enforcement by Mrs. Miller's jilted lover, Jerry Cassaday. Only two pieces of evidence linked Mrs. Miller to the crime, and both were collected at the scene of Cassaday's suicide. The first was a suicide letter. Ostensibly addressed to Cassaday's parents, but by Cassaday's own admission intended for law enforcement, the Letter contained a confession to the murder of Bruce Miller and an accusation that Mrs. Miller instigated and planned the crime. The other piece of evidence was an Instant Message printout that purported to be a record of Mrs. Miller planning the murder, conveying the plan to Cassaday, and working with Cassaday to carry it out. Aside from these two pieces of testimonial hearsay, there was no other evidence at trial that Mrs. Miller had any involvement in her husband's death or even that Cassaday murdered Bruce Miller.

After her conviction, but before that judgment was final, the Supreme Court of the United States issued its decision in *Crawford v. Washington* 541 U.S. 36 (2004). In *Crawford*, the Court held that testimonial hearsay evidence is inadmissible at trial unless there has been a prior opportunity to adequately cross examine the declarant regarding his testimonial statements. Apart from in his suicide letter, Cassaday never admitted killing Bruce Miller, nor did he accuse Mrs. Miller of being involved in the murder; thus, he was never questioned regarding his statements prior to trial. By the time of Mrs. Miller's trial, Cassaday had been dead for 10 months, and so was unavailable for cross-examination.

In addition to admitting testimonial hearsay over defense counsel's objection, the Michigan court also admitted unfairly prejudicial sexually graphic emails, video and photographs of Mrs. Miller that held little probative value to the prosecution's case. Also over defense

7

counsel's objection, the Michigan court admitted a graphic photograph of Cassaday's suicide and testimony that he died with a Bible in his lap.  The photograph and testimony were entirely irrelevant to Bruce Miller's murder, and were unfairly prejudicial toward Mrs. Miller. The cumulative effect of the email printouts, video, and photographs were sufficiently prejudicial so as to deny Mrs. Miller her constitutional due process right to a fair trial as protected by 14th Amendment of the U.S. Constitution.

Mrs. Miller's incarceration is thus a continued violation of her liberty interest without due process of law.

**FACTS**

Approximately 9:00 p.m. on November 8, 1999, Bruce Miller was found dead at B&D Auto, the business he owned in Mt. Morris, Michigan. That evening, Bruce had been working alone at B&D. His wife, Sharee, was taking care of the children and expecting Bruce home at 6:30 p.m. with dinner. When he failed to show up, Mrs. Miller called Bruce's brother, Chuck, who drove to B&D and discovered Bruce Miller's body. The police determined that Bruce Miller had been killed by a single blast from a shotgun at close range between 6:20 p.m. and 7:13 p.m., earlier that evening (Transcript I, 224). The murder weapon has never been found.

Within 24 hours of Bruce Miller's death the police had a suspect: John Hutchinson. Both Hutchinson and Bruce Miller were the targets of an ongoing criminal investigation by the Genesee County Auto Investigation Network for tampering with Vehicle Identification Numbers (VIN). Though Hutchinson denied any involvement with the VIN switching, he was ultimately charged with two felony counts before pleading guilty to a misdemeanor charge (Transcript IV, 1170-1171). Harold Hutchinson, John Hutchinson's brother and an employee at B&D, testified that prior to the murder, John Hutchinson had threatened to "dispose of" Bruce Miller because of both the criminal investigation and a dispute over a loan (Transcript IV 1191-1192, 1203-1204). Harold Hutchinson also testified that around 7:00 p.m. on the night of the murder, John Hutchinson told Harold Hutchinson on the phone that he had "disposed of Bruce Miller." Harold Hutchinson understood John to mean that John had killed Bruce Miller. (Transcript IV, 1187).

The morning after the murder, before learning of Bruce Miller's death, John Hutchinson's step-son Anthony Birch told police that, on the night of the murder, John Hutchinson was not home between 5:30 and 7:30, and that when John Hutchinson returned home he was acting "strange" (Transcript IV, 1143, 1146-7).

9

The prosecution successfully barred Mrs. Miller from introducing into evidence results of a polygraph test that indicates John Hutchinson was "deceptive" when denying his involvement in Bruce Miller's murder (Motion Regarding Evidence December 2, 2000 "MRE", 93).

Three months after Miller's death, on February 11, 2000, former police officer Jerry Cassaday killed himself in his Odessa, Missouri apartment with a .22 rifle (Transcript I, 232-234). In the course of cleaning up Cassaday's apartment, his brother Mike Cassaday found a briefcase under the bed with four sealed envelopes attached to it. Three of the envelopes were addressed to various family members, and the fourth was addressed to Cassaday's attorney, John O'Connor, and bore Jerry Cassaday's handwritten instruction: "Mike, do not open alone" (Transcript II, 347). Mike Cassaday testified that three months earlier Jerry had told Mike, "anything ever happens to me there is – there is a briefcase under – under the bed at home. . . . [G]et a hold of the briefcase and you will know what to do with it then" (Transcript II, 356). In compliance with Jerry's handwritten instructions, Mike Cassaday did not open the briefcase until he was in the presence of Cassaday's attorney.

Inside the briefcase was a nine-page printout of an alleged Instant Message conversation between Cassaday and Mrs. Miller. The message purported to be a record of Cassaday's and Mrs. Miller's plan to murder Bruce Miller. At Mrs. Miller's trial, Paul Albee, who examined Mr. Cassaday's computer and documents recovered therefrom, was asked whether such an Instant Message record could be forged or otherwise manipulated, and if so, on a scale from one to ten, how difficult such a manipulation would be. Mr. Albee responded, "I'd say that it's about two, you simply need to know the existence of the option to save it and probably a three to actually make the changes. If you're familiar with the word processor, you can make these changes." (Transcript IV, 1082). Atop the Instant Message printout, Cassaday had handwritten the alleged date and time of the Instant Message conversation as well as the time he purportedly

left Missouri to kill Bruce Miller. Also found inside the briefcase were various computer disks with saved images of Mrs. Miller (Transcript III, 675).

In one of the envelopes attached to the briefcase, Cassaday had enclosed a letter confessing to, without detailing, the murder of Bruce Miller. Rather, his letter points the finger at Mrs. Miller's alleged involvement in the murder: "I drove there and killed him. Sharee was involved and helped set it up. I have all the proof and am sending it to the police. She will get what's coming" (Transcript II, 352). At trial, the prosecution read the letter into evidence over defense counsel's objection (Transcript II, 351-353), and emphasized it in summation (Transcript V, 1376). The trial court, also over defense counsel's objection, admitted the Instant Message print-out and hearsay testimony from Mike Cassaday regarding Jerry's instructions about the briefcase and letters (Defendant's Objection to Mike Cassaday's testimony, MRE, 61-68) (IM, Transcript II, 506) (Mike Cassaday hearsay testimony, Transcript II, 356). There was no other evidence presented at trial that Cassaday murdered Bruce Miller or that Mrs. Miller had anything to do with the death of her husband: no murder weapon, no gas receipts from Cassaday's purported drive from Missouri to Michigan. Also, there was no detail included in Cassaday's "evidence" regarding the murder that was not publicly reported.

At the time of Bruce Miller's death, Bruce and Sharee Miller had been together for a relatively short time: they began dating in the Fall of 1998 and married in April 1999 (Transcript V, 1226). The marriage was the fourth for Bruce and the third for Sharee, and Sharee brought her three young children with her into the union (Transcript V, 1218 -1223). According to Mrs. Miller's testimony, Bruce was different than her previous husbands - he provided stability, support and family (Transcript V, 1226). Soon after their wedding Bruce and Sharee retained a lawyer, Mr. Peter Doerr, so that Bruce could legally adopt two of Sharee's children (Transcript IV, 1103). According to Mr. Doerr's testimony, Bruce was killed approximately one month before the adoption proceeding could take place (Transcript IV, 1106).

Mrs. Miller first met Cassaday in July 1999 in Reno, Nevada while she was vacationing with a friend (Transcript III, 582). Cassaday was an ex-police officer with a history of drug abuse, alcohol abuse and depression that began long before he and Mrs. Miller met (Transcript II, 402). He was also experienced in computer technology, spent hours online, and had multiple on-line sexual relationships with many different people (Transcript IV, 1073-1074).

At their initial meeting, Mrs. Miller lied to Cassaday that she was a wealthy business owner. This began a pattern of fantastic lying Mrs. Miller would continue throughout their relationship. After Mrs. Miller returned to Michigan, she and Cassaday began exchanging emails. Through their online relationship, Mrs. Miller's stories about her wealth, her husband, and her relationship with her husband grew more and more fanciful. Cassaday and Mrs. Miller's relationship became physical two months after their initial meeting when Mrs. Miller returned for a brief vacation to Nevada (Transcript V, 1238 – 1242).

Mrs. Miller and Cassaday continued to communicate on-line after they began their sexual relationship, and Mrs. Miller continued to lie to him about her lifestyle (Transcript V, 1238). Despite having received a tubal ligation in 1995 (Transcript V, 1302), Mrs. Miller told Cassaday twice that she was pregnant with his child, and twice she told him she lost the baby after Bruce physically abused her (Transcript V, 1234). In addition to these lies, the on-line communications were often extremely sexual in content. Mrs. Miller even sent Cassaday photographs and a video entitled "For Jerry's Eyes Only," in which she filmed herself masturbating (Transcript III, 695). During the trial and over defense counsel's objection, the prosecution had a male and a female deputy read some of the sexually explicit emails exchanged between Mrs. Miller and Cassaday into evidence (Transcript IV, 955-1060). Also over defense counsel's objection, portions of the "For Jerry's Eyes Only" video were played for the jury. Finally, graphic sexual photographs of Mrs. Miller and a photograph of Cassaday's body at the suicide scene were also shown to the jury, despite defense counsel's objection.

While living in Reno and working at a casino, Cassaday was arrested twice in two months and lost custody of his son (Transcript V, 1248). After losing his son, Cassaday sank deeper into depression; prior to his death and fearing that he was becoming suicidal, Cassaday's family and Mrs. Miller persuaded him to move back to Missouri to enroll in a treatment program (Transcript II, 392).

Mrs. Miller tried to end her relationship with Cassaday after Bruce Miller's murder. Cassaday, already suffering from depression and alcoholism, sank deeper (Transcript V, 1247-1248). He attempted to continue their relationship over Mrs. Miller's rebuffs, and became increasing persistent through emails and phone calls. In early December, Cassaday showed up at Mrs. Miller's doorstep, drunk, and asked her to marry him. She refused, and Cassaday demanded that she give him money; she refused to give him money, but ultimately acquiesced after Cassaday threatened to give the "For Jerry's Eyes Only" video to Bruce Miller's mother. (Transcript V 1273-1277). That was the last time Mrs. Miller saw Cassaday. Mrs. Miller testified at trial that she did not think Cassaday killed her husband (Transcript V, 1278).

Mrs. Miller was convicted by the jury on Friday, December 22, 2000. The Michigan Court of Appeals affirmed her conviction on June 24, 2003, and she immediately appealed to the Michigan Supreme Court. The Michigan Supreme Court denied leave to appeal on April 1, 2004. Mrs. Miller filed a motion for reconsideration of the Michigan Supreme Court's denial of leave to appeal, but that motion was denied on June 30, 2004. Ninety days later, on September 28, 2004, Mrs. Miller's conviction became final.

## STANDARD OF REVIEW

The standard of review for a habeas petition is set forth in 28 U.S.C. § 2254(d).
That section provides that the writ may be granted if the state appeal:

> (1) resulted in a decision that was contrary to, *or* involved an unreasonable
>
> application of, clearly established Federal law, as determined by the Supreme
>
> Court of the United States, *or*
>
> (2) resulted in a decision that was based on an unreasonable determination in light
>
> of the evidence presented in the State court proceeding.

*Id.* (emphasis added).

To be granted habeas relief under the first category, involving a state decision "contrary
to" federal law, a Petitioner must show that "the state court arrive[d] at a conclusion opposite to
that reached by [the Supreme] Court on a question of law" or that the court "confront[ed] facts
that [were] materially indistinguishable from a relevant Supreme Court precedent" and obtained
a different result." *Williams v. Taylor*, 529 U.S. 362, 405 (2000).  Under the second category,
involving the "unreasonable application of" federal law by a state court, a federal habeas court
must ask whether the state court's application of clearly established federal law was "objectively
unreasonable."[1]  *Id.* at 409.  If the federal court finds that, viewed objectively, the state court has
identified the governing legal principle from the Supreme Court's decisions "but unreasonably
applie[d] it to the facts" of the specific case, it may grant the writ.  *Id.* at 407.

---

[1] In *Williams*, the Supreme Court rejected the Fourth Circuit's definition of an "unreasonable application" of the law
by reference to a "reasonable jurist."  529 U.S. at 409-10.  By implication, the standard for AEDPA review set forth
in *Tucker v. Prelesnik*, 181 F.3d 747, 752-53 (6th Cir. 1999) (stating that a writ will issue "if the unreasonableness
of the state court's application of clearly established precedent is not debatable among reasonable jurists") is also
overruled.

## JURISDICTIONAL STATEMENT

Mrs. Miller's claims are properly before this Court for review. All of the jurisdictional prerequisites for maintaining the instant action have been met: Mrs. Miller is in custody within the meaning of 28 U.S.C. §2254, she has exhausted her state remedies within the meaning of this statute, and this claim is brought within the one year statute of limitations established by 28 U.S.C. §2244(d). Mrs. Miller has not brought successive or multiple actions.

Mrs. Miller is presently serving a sentence on the charged offenses and is incarcerated at the Robert Scott Correctional Facility. There are no other charges for which she is serving her sentence, and she is not on bond for any charges. Therefore, she is in custody within the meaning of 28 U.S.C. § 2254. *Jones v. Cunningham*, 371 U.S. 236 (1963).

Mrs. Miller exhausted her state remedies. All issues raised were presented to the state's highest court for review. Therefore, the exhaustion doctrine as interpreted by the Supreme Court in *Anderson v. Harless*, 459 U.S. 4 (1982) and *Picard v. Connor*, 404 U.S. 270 (1971), has been satisfied. 28 U.S.C. 2244(d)(1) provides that "[a] 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from […] A) the date on which the judgment became final by the conclusion of the direct review or the expiration of the time for seeking such review." On June 30, 2004, Mrs. Miller's motion for reconsideration was denied by the Michigan Supreme Court. Ninety days later, on September 28, 2004, Mrs. Miller's conviction became final. *See Abela v. Martin*, 348 F.3d 164, 172-173 (6th Cir. 2003) (holding that 28 U.S.C. §2244(d)'s statute of limitations "is tolled . . . until the conclusion of the time for seeking Supreme Court review of the state's final judgment on that application independent of whether the petitioner actually petitions the Supreme Court to review the case") *and Allen v. Yukins*, 366 F.3d 396 (6th Cir. 2004) (holding that a motion for reconsideration tolls AEDPA's one year statute of limitations under AEDPA). Mrs. Miller's application for a writ of habeas corpus is timely filed.

15

## ARGUMENT

**I.     Sharee Miller Was Denied Her 6th Amendment Right To Confrontation When The Michigan Courts Decided Contrary To and Unreasonably Applied, Clearly Established Federal Law And Made Unreasonable Findings Of The Facts In Admitting Testimonial Hearsay Evidence.**

Jerry Cassaday's typed suicide letter (hereinafter "Letter") and the Instant Message print-out (hereinafter, "IM"), which is of questionable authenticity, are the only two pieces of evidence which "implicated" Sharee Miller in the murder of her husband, Bruce Miller. Cassaday committed suicide on February 11, 2000, and left the Letter and IM records to be discovered. Cassaday was unavailable as a witness in Mrs. Miller's trial. Because his accusations were not discovered until after his death, Mrs. Miller never had an opportunity to cross-examine Cassaday regarding those statements. Yet over Mrs. Miller's objection, both the Letter and the IM were introduced into evidence at trial.

The Confrontation Clause of the 6th Amendment of the U.S. Constitution states, "in all criminal prosecutions, the accused shall enjoy the right to . . . be confronted with the witnesses against him." Mrs. Miller never had the opportunity to confront Cassaday, her only accuser. The admission of the Letter and the IM into evidence is contrary to clearly established Federal law, as determined by the Supreme Court of the United States in *Crawford v. Washington*, 541 U.S. 36 (2004). *Crawford's* central holding is that "where testimonial evidence is at issue . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Crawford*, 541 U.S. 36, 68 (2004).

*Crawford* was decided in March 2004 while Mrs. Miller's case was pending on direct review and before her conviction was final. Thus, *Crawford* applies to Mrs. Miller's case, and the Michigan Court of Appeals' decision to uphold the introduction of the Letter and IM as

evidence in her trial was contrary to clearly established law as determined by the Supreme Court of the United States.[2]

In the event that this Court finds that the statements in the Letter or the IM are not testimonial, their admission into evidence nevertheless constituted an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States, pursuant to *Ohio v. Roberts*, 448 U.S. 56 (1980). Self-inculpatory hearsay statements by co-conspirators that attempt to shift or spread blame are inadmissible against defendants absent an opportunity for cross-examination. *Lilly v. Virginia*, 527 U.S. 116 (1999). Because the *Roberts* test applies to non-testimonial hearsay, the Michigan court unreasonably applied clearly established federal law in admitting the Letter and IM records.

### A. The Michigan State Court Failed to Apply The Clearly Established Rule of *Crawford v. Washington* to Mrs. Miller's Case.

According to *Crawford,* the principal mark of a testimonial statement is an accusation made to law enforcement or others with an eye toward the use of those statements in court. The Letter is as plain an accusation as possible and explicitly instructs the reader to take it "to the police" so that Mrs. Miller can "get what's coming." The IM is likewise an accusation made with an eye toward litigation, as it was carefully preserved with the Letter as part of the "proof" of Mrs. Miller's involvement in the murder of her husband which Cassaday was "sending to the police." Finally, the Michigan court's decision to admit testimony from John Michael Cassaday regarding the Letter and the briefcase was also erroneous; as it was also testimonial hearsay.

---

[2] *Crawford* was decided in March, 2004; the Michigan Supreme Court denied Mrs. Miller leave to appeal her conviction on April 1, 2004, and her conviction became final on September 28, 2004, 90 days after Mrs. Miller's Motion for Reconsideration, in which Mrs. Miller's attorney advised the Court of the recent *Crawford* decision, was denied by the Michigan Supreme Court. *Crawford* applies to all criminal cases pending on direct review at the time it was decided. *Allen v. Yukins,* 366 F.3d 396, 400 (6th Cir. 2004) *and Schriro v. Summerlin,* 124 S. Ct. 2519, 2522 (2004).

### i. Cassaday's Letter to the Authorities Was Testimonial

*Crawford* requires that when a declarant is unavailable for trial, his hearsay statements must be excluded from evidence 1) when the statements are "testimonial," and 2) when there has not been an opportunity for the defendant to cross-examine the declarant regarding his statement. *Crawford*, 541 U.S. at 68. Though formally addressed to his parents, Cassaday's Letter was intended for law enforcement authorities, as shown by the circumstances surrounding its creation and delivery to authorities, as well as the text of the letter itself.

First, Cassaday, a former police officer, left the Letter in a briefcase at his residence where he committed suicide and included in the briefcase a thorough work-up of the case, including other materials offered to prove the nature of his relationship with Mrs. Miller, such as the IM. Second, atop the briefcase Cassaday left a note warning, "do not open alone," along with the name, address, and phone number of Cassaday's attorney, John O'Connor (Transcript II, 347, 360). Third, Cassaday prepared the "evidence" of Mrs. Miller's involvement in her husband's murder well in advance of his death and preserved it for law enforcement: three months before his suicide, Cassaday told his brother that if anything should happen to him (Cassaday), that his brother was to get a briefcase under Cassaday's bed and that his brother would "know what to do with it then." (Transcript II, 356). Finally, the text of the Letter makes clear that Cassaday intended to send "proof" of the conspiracy to police so that Mrs. Miller would "get whats coming."

"Testimony," the *Crawford* Court stated, "is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" *Crawford*, 541 U.S. at 51. Cassaday's statements in his Letter implicating Mrs. Miller in the death of her husband plainly constitute a "solemn declaration or affirmation made for the purpose of establishing or

proving" his accusation. The Letter states:

> I drove there and killed him. Sharee was involved and set it up, I have all the proof and I am sending it to the police, she will get whats coming. I have been so stupid, but now you know the real story of why I went into such a state of depression . . . because I just couldn't tell anyone the truth. . . . [S]he just wanted all her money and no more husband, well she got her wish, but she is soon to learn that she cant do that to people. . . . [N]ow I know it was all just more lies and games from sharee, she didn't care what it took or who she hurt to get what she wanted. [sic]

(Transcript II, 350).

The "core class of 'testimonial' statements" can take the form of "pretrial statements that declarants would reasonably expect to be used prosecutorily . . .; extrajudicial statements . . . contained in formalized testimonial materials, such as . . . confessions . . .; [and] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Crawford,* 541 U.S. at 51-52. Cassaday's statements in the Letter fit squarely within this framework. First, Cassaday, a former police officer (Transcript V, 1248) would have anticipated that the statements in the Letter would be used prosecutorily, and indeed they were. Second, the Letter is a formalized, testimonial confession to a crime. Third, the statements in the Letter regarding Mrs. Miller's involvement in the crime were made in such a way as to "lead an objective witness reasonably to believe that [they] would be available for use at a later trial" *Crawford,* 541 U.S. at 52.  In writing the Letter and leaving it to be found along with an evidence work-up, Cassaday acted with an eye toward litigation.  *See United States v. Arnold*, 410 F.3d 895, 903-904 (6th Cir. 2005) ("[T]he decisive inquiry should be 'whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting the crime.'" (*quoting United States v. Cromer*, 389 F.3d 662, 675 (6th Cir. 2004)).  Likewise, John Michael Cassaday's hearsay testimony about his brother's instructions about the briefcase and Letter similarly violated the *Crawford* rule and require that the writ be granted.

The *Crawford* Court also suggested that letters to police or other governmental officials accusing someone of wrongdoing are testimonial. *Crawford*, 541 U.S. at 44. The Court described the conviction of Sir Walter Raleigh for treason as one of the "most notorious instances of civil-law examination" in which a defendant was convicted without being allowed to face his accuser. *Id.* Raleigh's conviction was based on a letter his accuser wrote to law enforcement; at trial, the letter was used to convict Raleigh, though Raleigh was not allowed to confront his accuser in open court. By leaving the Letter where it was sure to be discovered by law enforcement, Cassaday's Letter is just like the letter written by Sir Walter Raleigh's accuser, and just as that conviction is a notorious instance of "justice . . . degraded," *id.,* Mrs. Miller's conviction is an injustice for the same reason.

### ii. Cassaday's IM Print-Outs Were Testimonial

Like the Letter, the IM record is a confession by Cassaday to the murder of Bruce Miller. Cassaday carefully preserved the IM record with the Letter as part of the "proof" Cassaday was "sending . . . to the police" so that Mrs. Miller would "get whats coming." The statements in the IM purport to be directions given by Mrs. Miller to Cassaday on how to carry out the murder. But, it is not just the statements in the IM that stand as a declaration of Mrs. Miller's guilt; Cassaday's effort to preserve the IM underscores its text.

As proven at trial, instant messages are automatically erased when a conversation is finished – the only way to preserve them is to do so proactively – that is, by either printing them out or by saving them to disc (Transcript II, 501-504). If authentic, the IM was available for use as evidence precisely because Cassaday took the affirmative step of printing the IM out and preserving it in his briefcase along with the Letter, to be discovered after Cassaday committed suicide. As also proven at trial, Instant Messages are easily manipulated by anyone with basic word processing knowledge (Transcript III, 557-561). Not only did Cassaday print the alleged

20

IM record, but he hand wrote notes on the record to indicate the precise time that he concluded the IM conversation and the time he left Missouri for Michigan to commit the murder.

Cassaday's effort to preserve the IM record, at a time when his relationship with Mrs. Miller looked as if it would be permanent, is peculiar. If, in fact, Cassaday did murder Bruce Miller, the purported reason was so that Cassaday and Mrs. Miller could spend the rest of their lives together. But the only possible motive Cassaday could have had for preserving the IM record and then storing it with the Letter to be discovered was "establishing or proving" Sharee's culpability in the crime. Given that, the IM record is testimonial, and it should not have been admitted without the opportunity for cross examination. *Crawford,* 541 U.S. at 68.

The IM record contains "pretrial statements that [Cassaday] reasonably expect[ed] to be used prosecutorily." *Crawford*, 541 U.S. at 51. It was an extrajudicial statement "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id.* at 52. Cassaday's intent that the IM be used prosecutorily is manifest in his careful preservation of it with the other accusatory materials, including the Letter. The IM record is the kind of out-of-court accusation that the United States Supreme Court has always recognized as testimonial and, therefore, is "universally conceded to be constitutionally inadmissible against the accused." *Bruton v. Unites States,* 391 U.S. 123, 138 (1968) (Steward, J., concurring).

### B. The Michigan State Court Unreasonably Applied Clearly Established Federal Law Requiring Sufficient Guarantees Of Trustworthiness And Made An Unreasonable Determination Of Facts When It Admitted The Hearsay Evidence.

Even if the Court were to find that the Letter or the IM are not subject to the bright-line rule of *Crawford,* the Michigan courts unreasonably applied the clearly established Federal law governing the admission of such hearsay, as determined by the United States Supreme Court. For non-testimonial statements, *Ohio v. Roberts* requires that state courts find that the hearsay

evidence falls "within a firmly rooted hearsay exception," or that it bears "particularized guarantees of trustworthiness" before admitting the statements into evidence. *Ohio v. Roberts,* 448 U.S. 56, 66 (1980). The determination of whether hearsay evidence bears particularized guarantees of trustworthiness is a mixed question of law and fact warranting independent review by the federal court. *Lilly v. Virginia,* 527 U.S. 116, 137 (1999). The Michigan court admitted the Letter into evidence under the catch-all exception to the hearsay rule, and so was required to find particularized guarantees of trustworthiness.[3] Likewise, in finding that the IM record fell within firmly rooted hearsay exceptions, the Michigan Court made unreasonable findings of fact and law. "[T]he question whether statements fall within a firmly rooted hearsay exception for Confrontation Clause purposes is a question of federal law" *Calvert v. Wilson,* 288 F.3d 823, 830 (6th Cir. 2002). Statements by co-conspirators that seek to "shift or spread the blame to a criminal defendant" do not fall within a firmly rooted hearsay exception and do not bear particularized guarantees of trustworthiness and, therefore, are inadmissible against the defendant unless they have been subject to adversarial testing. *Lilly,* 527 U.S. at 133. Both the Letter and the IM attempt to shift or spread the blame for Bruce Miller's murder to Mrs. Miller; and, according to *Lilly,* both were improperly admitted.

### i. Cassaday's Typed Letter Lacked Sufficient Guarantees Of Trustworthiness To Justify Its Admission, Absent Cross-Examination.

The letter, admitted under the catch-all exception to the hearsay rule, lacked sufficient guarantees of trustworthiness. *See Ohio v. Roberts,* 448 U.S. 56 (1980). The Crawford Court, with respect to testimonial hearsay, resoundingly denounced the "particularized guarantees of trustworthiness" test of *Ohio v. Roberts. Crawford,* 541 U.S. at 62-63. However, the *Crawford* Court did not overrule *Roberts* with respect to non-testimonial hearsay statements. "[W]here

---

[3] The catch-all exception is by definition not a firmly rooted hearsay exception. *See Vincent v. Seabold,* 226 F.3d 681, 686 (6th Cir. 2000); *United States v. Barlow,* 693 F.2d 954, 964 (6th Cir. 1982).

nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law – as does *Roberts*." *Crawford,* 541 U.S. at 68. Michigan courts have continued to use the *Roberts* standard as a valid test for the admissibility of non-testimonial hearsay. *See People v. Geno,* 683 N.W.2d 687 (Mich. Ct. App. 2004), as have federal courts, *see Horton v. Allen,* 370 F.3d 75, 84 (1st Cir. 2004), *United States v. Saget,* 377 F.3d 223, 230 (2d Cir. 2004), and *Rios v. Lansing,* 116 Fed. Appx. 983 (10th Cir. 2004).

The Michigan Court of Appeals listed the following indicia as giving sufficient guarantees of trustworthiness to uphold the admission of Cassaday's Letter: "Cassaday's statements were (1) spontaneous and voluntary because he made them without prompting or inquiry, (2) consistent, (3) made fairly contemporaneously to his impending death, and (4) made from personal knowledge." *Miller,* No. 233018, at 3.

The first factor cited by the Michigan court, that the Letter was "spontaneous" is without support. By taking the time to write out his accusations and preserving them so that law enforcement would find them and prosecute Mrs. Miller, Cassaday's statements were anything but "spontaneous." Prior courts have held as much. Statements in a suicide letter are inadmissible hearsay precisely because "the aspect of control involved in an intended death clearly diminishes the spontaneity [of the statements] that is a critical part of the dying declaration exception." *U.S. v. Angleton,* 269 F.Supp.2d 878, 885 (S.D. Texas 2003). And, the Michigan court's observation that the statements in the Letter were made without prompting or inquiry has no bearing on trustworthiness for confrontation analysis. A declarant with a motive to falsely accuse someone can make those false accusatory statements without prompting or inquiry; indeed, such an accuser may find it easier to make false statements without prompting, and his false statements are more likely to be believed if they are not subject to searching inquiry. This, after all, is the purpose behind the confrontation clause.

The second factor cited by the Michigan court for finding Cassaday's Letter trustworthy, that the Letter is consistent, is similarly unavailing. Contrary to the Michigan court's findings, Cassaday's Letter is not consistent with any other evidence.  Further, that it may be read to be consistent with Cassaday's IM record is irrelevant[4] because the Supreme Court has "squarely rejected the notion that 'evidence corroborating the truth of a hearsay statement may properly support a finding that the statement bears "particularized guarantees of trustworthiness."'" *Lilly v. Virginia*, 527 U.S. 116, 137-138 (1999), *quoting Idaho v. Wright*, 497 U.S. 805, 822 (1990).

The third factor cited by the Michigan court for finding the Letter admissible was that it was "made fairly contemporaneously to his impending death."  But, this conclusion is neither supported by evidence nor relevant to the trustworthiness inquiry.  There was no evidence presented at trial as to when the Letter was written, and it is impossible to know how contemporaneously to his death Cassaday wrote it.  Suicide letters are not always or obviously written near the time of their author's death, and courts have held as much. *U.S. v. Lemonakis*, 485 F.2d 941, 957 (D.C. Cir. 1973); *see also Angleton*, 269 F.Supp.2d at 883.[5]

The final factor cited by the Michigan appellate court for upholding the admission of the Letter under the *Roberts* standard was that it was made from Cassaday's personal knowledge. By announcing that the Letter was written from Cassaday's personal knowledge, the court answers the very question the Letter was admitted to prove, namely, that Cassaday conspired with Mrs. Miller to murder Bruce Miller. But, there is strong reason to suggest that Cassaday was lying when he said that he killed Bruce Miller and that his accusations against Mrs. Miller are false. There was no other evidence presented at trial that Cassaday murdered Bruce Miller or that Mrs. Miller had anything to do with the death of her husband. Certainly one would expect that if

---

[4] The IM record itself was inadmissible testimonial evidence and was preserved by Cassaday under conditions that raise suspicion as to its authenticity (see infra, note 7).

[5] While *Crawford* left the door open to testimonial statements that were uttered as dying declarations, *Crawford*, 541 U.S. at 56, footnote 6, *Lemonakis* and *Angleton* stand for the rule that suicide letters can not be admitted as dying declarations; therefore, Cassaday's Letter can not be admitted as a dying declaration.

24

Cassaday had murdered Bruce Miller and wanted to implicate Mrs. Miller in the crime there would be some corroborative evidence: a murder weapon, gas receipts from the supposed drive from Missouri to Michigan – especially given Cassaday's law enforcement background, and careful preparation of computer "evidence."

Equally revealing is that in both the Letter and the IM record Cassaday spoke in generalities, such that he included only information that was publicly reported and no detail that was not reported. Thus, there was no evidence from which the state appellate court could reasonable draw the conclusion that Cassaday's statements were made from personal knowledge at all.

In addition, merely because a co-conspirator's out-of-court statements were made from personal knowledge is an insufficient justification for admission of the statements into evidence when those statements seek to inculpate the defendant. "[W]hen one person accuses another of a crime under circumstances in which the declarant stands to gain by inculpating another, the accusation is presumptively a suspect and must be subjected to the scrutiny of cross-examination." *Lilly* 527 U.S. at 132, *quoting Lee v. Illinois*, 476 U.S. 530, 541 (1986). *See also Williamson v. U.S.* 512 U.S. 594, 600 (1994) ("[S]elf-exculpatory statements are exactly the ones which people are most likely to make even when they are false; and mere proximity to other self inculpatory, statements does not increase the plausibility of the self-exculpatory statements"); *White v. Illinois,* 502 U.S. 346 (1992).

Suicide letters are inherently untrustworthy because "[i]f ever there is a time to put one's best face forward, it would be in a note that will literally stand for all eternity as one's last testament. A suicide note is the perfect opportunity to rewrite one's history in a way calculated to impress one's final audience." *Angleton*, 269 F.Supp.2d at 884-885 (internal citation omitted). Cassaday wanted to leave his family with as good an impression of him as he could, while at the same time seek vengeance on a lover who had jilted him. By accusing Mrs. Miller of

manipulating him to commit murder and by blaming his life's problems, and ultimately his own death, on her, he could accomplish both objectives.

Even prior to *Crawford,* out-of-court accusations were "universally conceded to be constitutionally inadmissible against the accused." *Bruton v. United States,* 391 U.S. 123, 138 (1968) (Steward, J., concurring). The Letter is a clear example of just such an out-of-court accusation; in fact, the IM and Letter are the *only* pieces of evidence implicating Mrs. Miller in the murder, and there is no evidence corroborating these out-of-court accusations. The Michigan Appellate Court's upholding Mrs. Miller's conviction violated this clearly established principle of Federal constitutional law and requires that the writ be granted.

### ii. The IM Print-Out Did Not Fall Within Firmly Rooted Hearsay Exceptions Or Bear Sufficient Guarantees Of Trustworthiness To Warrant Its Admission Into Evidence

In the event the Court finds that the IM record is not testimonial, its admission violated Mrs. Miller's 6th Amendment right to confront her accuser and her 14th Amendment due process right to a fair trial because there were insufficient guarantees of the IM's trustworthiness. The Michigan Court of Appeals upheld the IM record's admission because it held that those portions of the IM attributable to Mrs. Miller constituted an admission by a party opponent, under MRE 801(d)(2), the statements attributed to Cassaday were admissible as statements against interest under MRE 804(b)(3), and that the statements were sufficiently trustworthy so that admission did not violate Mrs. Miller's constitutional right to confrontation. *Miller* No. 233018, at 3-5.

To so hold the Michigan court necessarily determined that Mrs. Miller actually made those statements; however, there was strong evidence that the IM was forged, manipulated, or in other ways falsified by Cassaday to implicate Mrs. Miller in the murder of her husband. It was impossible, on the basis of this evidence, to conclusively determine that the statements in the IM were made by Mrs. Miller.

The statements by Cassaday in the IM record were not admissible under MRE 804(b)(3) and, more importantly, did not bear sufficient guarantees of trustworthiness. If the Court finds that the IM record is not a testimonial statement as defined by *Crawford,* the Confrontation Clause demands a showing of *particularized* guarantees of trustworthiness before hearsay statements from unavailable co-conspirators can be admitted into evidence. *Lilly* 527 U.S. at 124-125.[6]

The Michigan court upheld the admission of Cassaday's statements under MRE 804(b)(3), statements against interest.[7] But the penal interest is "an interest of no moment to a dead man." *Lemonakis*, 485 F.2d at 957, n.24. Cassaday intended the IM statements to be presented to the public, including law enforcement, only after his death. Because the IM record was preserved under circumstances in which Cassaday "would reasonably believe that he was under little or no threat of criminal liability when he made the statements" the IM record was not a statement against his penal interest. *United States v. Fowlie*, 24 F.3d 1059, 1068 (9th Cir. 1994).

Further, the statements by Cassaday did not bear guarantees of trustworthiness that would allow their admission. The admission of statements of an unavailable co-conspirator, where the defendant had no opportunity to cross examine the co-conspirator concerning his statements, violates the defendant's Confrontation Clause rights. *Lilly*, 527 U.S. at 139. Mrs. Miller was never given the opportunity to cross-examine Cassaday regarding the IM; therefore, the Michigan court's decision to uphold the admission of the IM record was an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States.

---

[6] Cassaday's Letter stated explicitly that "Sharee was involved and set [the murder] up, I have all the proof and I am sending it to the police, she will get what's coming." Cassaday's Letter and IM, the "proof" of Mrs. Miller's involvement in Bruce Miller's murder, were statements intended for law enforcement after Cassaday's body was discovered, and are, therefore, "hearsay declarations uttered by accomplices in law enforcement custody that inculpate a defendant." *Lilly*, 527 U.S. at 124-125.

[7] The language in the Michigan Rule is identical to Federal Rule of Evidence 804(b)(3).

First, the only corroborating evidence is Cassaday's own Letter, which, as argued above, is suspect. Therefore, there are no "corroborating circumstances" that "clearly indicate the trustworthiness" of the IM record. The Court in *Hill v. Hofbauer* addressed the question of the prosecution's use of a co-conspirator's statements against interest:

> The Michigan Court of Appeals' ruling reveals a misunderstanding of Rule 804(b)(3) and the Constitution's related Confrontation Clause concerns. In the vast majority of instances in which Rule 804(b)(3) is relied upon, it is the defendant who relies upon the Rule to admit a statement, otherwise hearsay, which operates to exculpate him by inculpating the statement's declarant. [citations omitted]. Under such circumstances, the out-of-court statement is marked by significant intrinsic indicia of reliability: a reasonable person who was not guilty of a crime would not normally falsely inculpate himself for the purpose of falsely exculpating another. However, where, as here, it is the prosecution which seeks to introduce a statement, otherwise hearsay, which incriminates its declarant but which, in its detail, also incriminates the defendant by spreading or shifting onto him some, much, or all of the blame, the out-of-court statement entirely lacks such indicia of reliability as to the defendant. It is ordinary hearsay as to the defendant and it does not lose that character merely because it in addition reliably inculpates the declarant.

*Hill*, 195 F.Supp.2d at 881-882.

The Michigan courts in this case made a similar unreasonable application of federal law. None of the factors suggested by the Michigan courts in support of admission -- that Cassaday's statements were voluntarily given, that they did not minimize his involvement in the crime, that they were near in time to the murder, and that they were not motivated by a desire to lie or distort -- provide sufficient guarantees of trustworthiness. That the IM statements were made voluntarily does not make them trustworthy for the same reasons that the statements in the Letter are not made trustworthy because they were made spontaneously and voluntarily, *supra*, page 25-26. Further, Cassaday only made the IM available once he was deceased. His interest was in seeing Mrs. Miller punished, more so than in minimizing his role in the murder of Bruce Miller. Because he made these available after his death -- when he could no longer be punished -- any suggestion that he did not minimize his role in the crime does not indicate that the statements are trustworthy.

Finally, the statement that there is "no evidence that Cassaday intended to deceive Mrs. Miller" in the IM record does not address the very real possibility that Cassaday forged the IM. *See Hill v. Hofbauer*, 195 F. Supp 2d 871, 882-883 (E.D. Mich. 2001). Nor does this conclusory statement point to any facts or evidence in support. It is a violation of Mrs. Miller's fundamental right to confront her accuser and to a fair trial to admit the IM when Cassaday was unavailable for cross-examination regarding the accuracy of the statements in it. That Cassaday would have both actively "preserved" an IM revealing the murderous conspiracy before the murder took place (so as to inculpate Mrs. Miller), but fail to preserve evidence of the actual murder, does not make sense, and this inconsistency is exactly what cross-examination could get to the bottom of. To permit Cassaday to testify through his IM record under such dubious conditions denied Mrs. Miller her 6th Amendment right to confront her accuser and her 14th amendment due process right to a fair trial. The Michigan court's assumption that Cassaday didn't appear to be trying to deceive Mrs. Miller in an IM record that he likely forged does not obviate Mrs. Miller's need to cross-examine him.

Cassaday carefully "preserved" the IM record with his Letter, emails, video, and other evidence of his relationship with Mrs. Miller. It is this careful work to "preserve" the record, given that it ordinarily would have been erased beyond recovery, that makes it confessional. Statements that are "technically against penal interest" are "suspect insofar as they inculpate other persons. That a person is making a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory parts." *Lilly*, 527 U.S. at 138-139. *See also Williamson*, 512 U.S. at 599. For this reason, statements collateral to self-inculpatory statements should be treated the same as other hearsay statements that are generally excluded.

Like in *Hill v. Hofbauer*, a case in which the Michigan courts gave the same canned reasons for admission of an alleged co-conspirators' statements, the Michigan decision admitting Cassaday's statement and finding no violation of Petitioner's Confrontation Clause rights is

objectively unreasonable.

> [T]he Court of Appeals found that [co-conspirator's] statements were voluntarily given, did not minimize his involvement in the crime, and were not motivated by a desire to lie or distort Petitioner's role in the crime. This Court finds that the Court of Appeals ruling that [co-conspirator's] statements used against Petitioner had sufficient indicia of reliability to satisfy Confrontation Clause concerns is objectively unreasonable and contrary to United States Supreme Court precedent.

*Hill*, 195 F.Supp.2d at 881.

### III. THE CUMULATIVE EFFECT OF PREJUDICIAL EVIDENCE IMPROPERLY INTRODUCED AT TRIAL VIOLATED MRS. MILLER'S RIGHT TO A FAIR TRIAL UNDER THE DUE PROCESS CLAUSE

The admission of highly prejudicial evidence violated Mrs. Miller's 14th Amendment right to due process because the prejudicial effect of the evidence substantially outweighed its probative value. Over the Defendant's objection, the court admitted irrelevant sexually explicit emails, sexually explicit homemade video, sexually explicit photographs and a photograph of Cassaday's suicide. While each of these errors individually may not amount to a due process violation, their cumulative effect violated Miller's 14th Amendment right to due process. *Walker v. Engle,* 703 F.2d 959, 968 (6th Cir. 1983) (finding that the cumulative effect of marginally relevant and highly prejudicial evidence was a deprivation of due process); *United States v. Ashworth,* 836 F.2d 260, 267 (6th Cir. 1988). "When it must be said that the probative value of such evidence, though relevant, is greatly outweighed by the prejudice to the accused from its admission, then use of such evidence by a state may rise to the posture of fundamental fairness and due process of law." *Lesko v. Owens,* 881 F.2d 44, 51 -52 (3d Cir. 1989) (internal citations omitted); *see also Walker v. Engle,* 703 F.2d 959, 968 (6th Cir. 1983); *Dudley v. Duckworth,* 854 F.2d 967, 972 (7th Cir.1988); *Panzavecchia v. Wainwright,* 658 F.2d 337, 341-42 (5th Cir.1981). Mrs. Miller requests relief under 28 U.S.C. 2254 because the evidence's probative value was so conspicuously outweighed by its inflammatory content that it violated Mrs. Miller's constitutional right to a fair trial.

Mrs. Miller's due process claim has been preserved for federal habeas review.

Whether an error reaches the magnitude of a constitutional violation it is an issue of law, subject to plenary review. *Lesko v. Owens*, 881 F.2d 44, 51-52 (3d Cir. 1989). Mrs. Miller, through counsel, objected to each item of evidence. The legal theory and the facts supporting this federal due process claim were submitted to the Michigan courts, where her claims were exhausted.

## A. The State Court Violated Mrs. Miller's Due Process Right to A Fair Trial When It Admitted Highly Prejudicial But Irrelevant Evidence at her Trial

The trial court, over defense objection, admitted multiple evidentiary items that depicted Mrs. Miller in a sexually deviant manner, including:  sexually explicit emails, a pornographic homemade video of Mrs. Miller masturbating, and nude erotic photos of her.  The trial court also erroneously admitted a photograph of Cassaday's suicide and testimony that he was reading the Bible before he shot himself. The prosecution argued that all of the sexual evidence was necessary to illustrate the "intensity" of the relationship between Mrs. Miller and Cassaday and the extent to which Mrs. Miller had manipulated Cassaday.  Evidence may be unfairly prejudicial if it "appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or otherwise may cause a jury to base its decision on something other than the established propositions of the case." *United States v. Guerrero*, 803 F.2d 783, 785 (10th Cir. 1986) (internal citation omitted).  That is exactly what happened here.  Each of these pieces of evidence, despite any probative valued  had an extreme prejudicial effect that violated Mrs. Miller's constitutional right to a fair trial under the Due Process Clause.

### i. Theatrical Reading of Erotic Emails

Over defense objection, two deputies (one female and one male) read aloud to the jury sexually explicit emails written by Mrs. Miller and Cassaday over the course of their relationship.  The theatrical reading lasted for two hours and twenty minutes and included

31

extremely erotic material, much of which would be objectionable to jurors.  The danger of unfair prejudice to Mrs. Miller is obvious.  While the prosecution argued that the emails were necessary to show the intensity of the relationship, the actual effect was to poison Mrs. Miller's character.

Sexual evidence has incredible potential to unfairly prejudice.  For example, statutes protect the sexual history of rape victims recognizing that jury bias against the victim's sexual activities may create an unfair, prejudicial effect.  In a different context, courts have been aware that the introduction of evidence that depicts a defendant as homosexual risks prejudicing the jury against the defendant.  "Although gays and lesbians face increasing acceptance in our culture, in the eyes of many, 'gay people remain second-class citizens.'  Today, almost half of all Americans continue to think that homosexuality should not be considered an acceptable lifestyle." *Neill v. Gibson*, 278 F.3d 1044, 1067 (10th Cir. 2001).  Sex is different.  While Mrs. Miller is not homosexual, nor is she a victim of a rape, the prolonged focus on her sexual escapades and fantasies in court unfairly prejudiced the trial and created the risk that the jurors would convict based on their emotional response to this evidence.  Listening to two deputies read explicit material in court necessarily distracted the jury from the question of whether there was evidence to convict Mrs. Miller.  It certainly could have led the jury to judge Mrs. Miller on facts other than those related to the evidence of the murder of Bruce Miller.

The emails held marginal probative value.  The prosecution read ample non-pornographic emails to show the "intensity" of the relationship between Mrs. Miller and Cassaday, and her alleged level of manipulation over him.  These included emails where Mrs. Miller lied to Cassaday about her marriage, her wealth, her pregnancy, her abusive relationship with her husband, and her husband's mafia connections.  The emails containing sexual fantasies were marginally probative when considering the ample amount of alternative evidence of the "intensity of the relationship" the prosecution presented to the jury that did not involve pornographic material.

Due process may also be denied where the manner of introduction of probative evidence

is prejudicial. *United States ex rel Bibbs v. Towney*, 506 F.2d 1220, 1223 (7th Cir. 1974)

("[prosecution's] reading of four court documents into record amounted to undue repetition,

excessive concentration and overdramatization of accused's previous convictions" and may

amount to a deprivation of fundamental fairness and due process when considering the totality of

the circumstances). In this case, the prosecution had two deputies read the sexually disturbing

emails into record for over two hours. Even if the emails were probative of the intense

relationship between Mrs. Miller and Cassaday, the prosecution's extreme embellishment of the

erotic material unfairly prejudiced Mrs. Miller.

Because the unfair prejudice of the emails highly outweighed their probative value, Mrs.

Miller's due process rights were violated.

### ii. Pornographic Homemade Video: "For Jerry's Eyes Only"

The prosecution, over defense objection, showed portions of an erotic homemade video

entitled "For Jerry's Eyes Only" in which Mrs. Miller videotaped herself masturbating to music.

The extremely unfair prejudicial effect of the video highly outweighed its probative value

violating Mrs. Miller's 14th Amendment right to due process. Again, the danger of unfair

prejudice is obvious. While the prosecution claims that it wanted to show the intense relationship

between Mrs. Miller and Cassaday and thereby depict her level of manipulation over him, the

practical effect of the video was to show that Mrs. Miller was immoral and promiscuous;

characteristics irrelevant to her guilt.

This prejudice was exacerbated by the manner in which the irrelevant evidence was

presented. The prosecution underscored the prejudice caused by the video by showing portions

of it that show Mrs. Miller stripping for the camera, to the jury, then having the judge describe

the rest of the video as "pornographic," and finally by asking Detective Shanilan to describe the film's contents:

> Briefly what the tape depicts is there is the first scene that you saw that was kind of cutoff, Sharee was wearing a bra and there was just like ten or twelve seconds, that's the same.  Then it goes into a spot where she is in her bedroom on a bed, candle lit, but it's pretty dark, and she masturbates through one song.  Then it stops, there is another short period where she is looking in a mirror at some candles, just her face, it's still dark in that period, then it- another song starts where she's—now the lights are on in that same bedroom area, she can see that she is dressed pretty scantily and then she masturbates through that whole period of a – of a song
> (Transcript III, 887)

The value of the videotape to the prosecution's argument that Mrs. Miller was responsible for the murder of her husband was marginal, at best, but the prejudice was extreme. Playing the pornographic movie to the jury did not add anything to the prosecutor's evidence of the crime charged; it only dramatized the sexual nature of the relationship between Mrs. Miller and Cassady – which Mrs. Miller conceded.

### iii.  Sexually Explicit Photographs of Mrs. Miller

In addition to the homemade erotic video and the pornographic emails, the prosecution admitted five sexually explicit photographs of the defendant.  These photos show Mrs. Miller modeling sexually provocative poses on her bed.  In some photographs her breasts are entirely exposed.  The photographs were stored on a floppy disk inside the briefcase found at Cassaday's apartment after his suicide (Transcript III, 677).

The prosecution's argument that the evidence was relevant to show the relationship between Mrs. Miller and Cassaday did not justify its admission (MRE, 82).  Mrs. Miller did not dispute this fact. The effect of the photos – plainly irrelevant to a conspiracy to commit murder -- was to humiliate Mrs. Miller and portray her as trashy or deviant.

### iv.  The Graphic Picture of Cassaday's Suicide and Evidence that He was Reading the Bible before his Death

Finally, over the defense's objection, the trial court admitted a photo of Cassaday's suicide into evidence. The photo depicts Cassaday slumped over in a chair with an unidentifiable book in his lap.  The prosecution admitted the photo in order to show that Cassaday killed himself (MRE, 196). The prosecution admitted evidence that the book on Cassaday's lap was the Bible through Sgt. Gillespie, "There is also a Bible that is opened up in his lap, and there was also another religious book there I believe" (Transcript I, 237).  The probative value of the photo and Bible testimony was negligible.  The fact of Cassaday's suicide was not in dispute.

But the suicide photo and evidence that Cassaday was reading the Bible before he died prejudiced Mrs. Miller by depicting Cassaday in a God-fearing and sympathetic light while making Mrs. Miller look even more immoral by comparison.  The photo and Bible testimony underscored that Mrs. Miller was sexually promiscuous and deviant and supported the argument that she should be condemned regardless of the evidence of guilt.

### B.  The Combined Effect Of Admission Of These Pieces Of Evidence Violated Mrs. Miller's Right To A Fair Trial

Errors that might not be prejudicial when viewed alone, may together produce a fundamentally unfair trial. *United States v. Ashworth*, 836 F.2d 260, 267 (6th Cir.1988).   The federal habeas review does not have to determine whether each of the alleged errors would, alone, reach the level of due process violation, because the cumulative effect of this evidence was so prejudicial to Mrs. Miller that she was denied a fundamentally fair trial.  The prosecution used the marginally probative evidence to inflame the jury.  By framing the focus of the trial on Mrs. Miller's sexual history than on the lack of evidence that she conspired to murder her husband the state denied Mrs. Miller due process in violation of the Constitution.

Because of the obvious "synergistic effect" of these errors, courts consider the whole greater than the sum of its parts. *Alvarez v. Boyd*, 225 F. 3d 820, 824 (7th Cir. 2000). "The cumulative effect analysis requires a petitioner to establish two elements: (1) at least two errors were committed in the course of the trial; (2) considered together, along with the entire record, the multiple errors so infected the jury's deliberation that they denied the petitioner a fundamentally fair trial." *Id.* The introduction of multiple pieces of irrelevant prejudicial evidence did just that

Additionally, where the question of the defendant's guilt is open to doubt, the cumulative admission of prejudicial evidence has a greater impact than when evidence implicating the defendant's guilt is overwhelming. *Kirby v. Dutton*, 831 F.2d 1280 (6th Cir. 1987). The government's case against Mrs. Miller was extremely weak. Apart from Cassaday's suicide letter, the prosecution relied heavily on the irrelevant but highly prejudicial bad character evidence against Mrs. Miller, presumably to convince the jury that she was the kind of person who would commit such a crime, given that it lacked evidence to show that she did so in this case. The balancing test between probative value and prejudicial weight is necessary to protect a defendant from this type of sexual smear when the prosecution's case is otherwise weak. *Walker v. Engel*, 703 F.2d 959 (6th Cir. 1983).

The state court's admission of sexually explicit emails, a sexually explicit video, sexually explicit photos and a photograph of Cassaday's suicide, over Mrs. Miller's objection violated Miller's right to due process according to the Fourteenth Amendment of the U.S. Constitution since the prejudicial effect of the evidence substantially outweighed its probative value. The cumulative effect of these errors violated Miller's right to due process according to the Fourteenth Amendment of the U.S. Constitution, *United States v. Ashworth*, 836 F.2d 260, 267 (6th Cir.1988); *United States v. Ward*, 190 F. 3d 483, 491 (6th Cir. 1999), and requires that the writ be granted.

36

## RELIEF

WHEREFORE, Petitioner asks this Court:

A.   That Respondent be required to appear and answer the allegations of this petition;

    B.   That after full consideration this Court relieves Petitioner of the unconstitutional restraint on her liberty;

    C.   That this Court grant a motion for an evidentiary hearing if it deems one necessary; and

    D.   That this Court grant such other, further and different relief as the Court may deem just and proper under the circumstances.

Respectfully submitted,

MICHIGAN CLINICAL LAW PROGRAM

Bridget M. McCormack (P58537)
Attorney for Petitioner

Kimberly Thomas (P66643)
Attorney for Petitioner

**Ryan T. McFarland**
Student Attorney for Petitioner
**Quinn O'Keefe**
Student Attorney for Petitioner

Michigan Clinical Law Program
801 Monroe Street
363 Legal Research Bldg.
Ann Arbor, MI 48109-1215
(734) 763-4319

JS 44 (Rev. 11/04)

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
MILLER, SHAREE

326122

**DEFENDANTS**
STOVALL, CLARICE, WARDEN,
ROBERT SCOTT CORRECTIONAL FACILITY

(b) County of Residence of First Listed Plaintiff   WAYNE
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   WAYNE
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
MICHIGAN CLINICAL LAW PROGRAM, BRIDGET MCCORMACK AND
KIMBERLY THOMAS, 801 MONROE STREET, 363 LEGAL RESEARCH BLDG.
ANN ARBOR, MI 48109 (734) 763-4319

Attorneys (If Known)

**05-73447**
VICTORIA A. ROBERTS
MAGISTRATE JUDGE KOMIVES

## II. BASIS OF JURISDICTION (Select One Box Only)

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Select One Box for Plaintiff
(For Diversity Cases Only) and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Select One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| &Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ■ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Determination Under |
| | Employment | ☐ 550 Civil Rights | | | Access to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN (Select One Box Only)

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from another district (specify)

☐ 6 Multidistrict Litigation

☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 USA 2254

Brief description of cause:
HABEAS CORPUS - SIXTH AMENDMENT & DUE PROCESS

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):
JUDGE     DOCKET NUMBER

DATE
September 7, 2005

SIGNATURE OF ATTORNEY OF RECORD
*Bridget McCrier*    *Kimberly Thomas*

**FOR OFFICE USE ONLY**

RECEIPT #    AMOUNT    APPLYING IFP    JUDGE    MAG. JUDGE

## PURSUANT TO LOCAL RULE 83.11

1.        Is this a case that has been previously dismissed?

☐ Yes
☑ No

If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____

2.        Other than stated above, are there any pending or previously discontinued or dismissed companion cases in this or any other court, including state court? (Companion cases are matters in which it appears substantially similar evidence will be offered or the same or related parties are present and the cases arise out of the same transaction or occurrence.)

☐ Yes
☑ No

If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____

Notes :

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**



**FILED**

SEP 0 7 2005

CLERK'S OFFICE
U.S. DISTRICT COURT
ANN ARBOR, MI

SHAREE PAULETTE MILLER

      Petitioner,

-vs-

CLARICE STOVALL, Warden,
Scott Correctional Facility,

      Respondent.

No. 05-73447
Hon.

VICTORIA A. ROBERTS

_____/

**APPENDIX VOLUME I OF IX**

**Jury Trial – December 13, 2000**



Original
Document
Placed on Shelf

By:    **Bridget M. McCormack (P58537)**
        **Kimberly Thomas (P66643)**
        Attorneys for Petitioner
        University of Michigan Law School
        Michigan Clinical Law Program
        363 Legal Research Building
        801 Monroe Street
        Ann Arbor, MI 48109
        (734) 763-4319


        **David Nickola (P43203)**
        Of Counsel for Petitioner
        1015 Church St
        Flint, MI 48502
        (810) 767-5420

        **Ryan T. McFarland**
        Student Attorney for Petitioner

        **Quinn O'Keefe**
        Student Attorney for Petitioner