233018

## STATE OF MICHIGAN
### SEVENTH JUDICIAL CIRCUIT COURT (COUNTY OF GENESEE)

THE PEOPLE OF THE STATE OF MICHIGAN,

    V

SHAREE PAULETTE MILLER,
        Defendant.

_____/

FILED
MAR 2 3 2006
CLERK'S OFFICE
DETROIT

00-6086-FC
HON. JUDITH A. FULLERTON

RECEIVED
NOV 1 9 2001
SECOND DISTRICT
SANDRA SCHULTZ MENGEL
CHIEF CLERK

### MOTION REGARDING EVIDENCE
BEFORE THE HONORABLE JUDITH A. FULLERTON, CIRCUIT JUDGE
Flint, Michigan - Saturday, December 2, 2000

APPEARANCES:

For the People:
        MARCIA MANN-MABRY (P-40016)
        ASSISTANT PROSECUTING ATTORNEY
        200 GENESEE COUNTY COURTHOUSE
        FLINT, MICHIGAN 48502
        (810) 257-3876

For Michigan Attorney
General's Office:
        PETER PLUMMER (P-25687)
        ASSISTANT ATTORNEY GENERAL
        1200 SIXTH STREET, STE 1700
        DETROIT, MICHIGAN 48823
        (313) 256-2892

For the Defendant:
        DAVID J. NICKOLA (P-43203)
        ATTORNEY AT LAW
        444 CHURCH STREET
        FLINT, MICHIGAN 48502
        (810) 767-5420

FILED
JUN 7 2001
GENESEE COUNTY CLERK
BY_____ DEPUTY CLERK

RECORDED BY:  DEBRA CHRISTMAN CER-0634
TRANSCRIBED BY:  JANET L. GIFFORD  CER-0638
        OFFICIAL COURT REPORTER
        501 GENESEE COUNTY COURTHOUSE
        FLINT, MICHIGAN 48502
        (810) 635-9299

```
 1                       TABLE OF CONTENTS
 2
 3
 4
 5
 6   WITNESSES:   NONE
 7
 8
 9
10
11
12
13   EXHIBITS:                    MARKED     RECEIVED
14   PX-1   SUICIDE NOTE              23
15   PX-2   INSTANT CHAT MESSAGE      23
16
17
18
19
20
21
22
23
24
25
26
```

1       Flint, Michigan

2       Saturday, December 2, 2000 - at 9:19 a.m.

3       THE COURT:  All right, this is the matter of

4   People versus Sharee Miller, case number 00-6086-FC.

5       Ms. Mabry appears for the People as well as Mr.

6   Plummer, and Mr. David Nickola present for the

7   defendant.

8       This is the date and time for a hearing on de-

9   fendant's motions.  The motions include the Motion to

10   Quash and a Motion in Limine.

11       The People also filed a Motion in Limine, but I

12   think the same issues really are at stake in all of the

13   motions, and the Motion to Quash deals with Judge

14   Hughes' decision to bind the case over to circuit court,

15   and the basic underlying objections filed by the defen-

16   dant and supported by the brief is the various hearsay

17   documents or statements were admitted during the pre-

18   liminary examination without which there would not have

19   been sufficient evidence to bind the defendant over to

20   circuit court.

21       The counsel were kind enough to provide the

22   transcript of the hearing before the district judge as

23   well as copies of the exhibits offered and received by

24   Judge Hughes.  So I think we are ready to proceed with

25   the arguments now on those motions.  Excuse me.

 1              For the People, Ms. Mann or Ms. Mabry.  Are you

 2      and Mr. Plummer going to divide the duties or how do you

 3      expect to do it?

 4              MS. MABRY:  Judge, as you know Mr. Plummer filed

 5      a brief memorandum today.  While I will have brief com-

 6      ments, he would also like to follow them up.

 7              MR. NICKOLA:  Judge, if I could--

 8              THE COURT:  Well, I only wanna have one person

 9      speak on one issue is what I guess I'm trying to get to

10      because it'll be very confusing if we breakdown every

11      issue and have two arguments, we will never get through

12      this one thing.

13              Are you going to split it up on each issue or

14      are you gonna, I mean, what--what do you wanna do?

15              Mr. Plummer, how do you wanna do it?

16              MR. PLUMMER:  Thank you, your Honor.

17              If we could, your Honor, I'd ask the Court to

18      consider Ms. Mabry as the lead prosecutor on these argu-

19      ments, and I would like to be allowed to speak to the

20      issues that deal directly with the--the electronic

21      pieces of evidence, the e-mails and the instant messages

22      if I could--

23              THE COURT:  Well, let me make this comment.  I

24      think those issues are foundation issues that deal with

25      a foundation that was laid before Judge Hughes.  I don't

4

1   perceive that as the issues that are before the Court

2   today.  He ruled those documents were admissible at the

3   time and assuming the foundation is laid at trial, I'm

4   assuming the foundation will be laid, and now we are

5   dealing with the documents that were retrieved from AOL

6   and/or from disks that I believe were found in Missouri,

7   that's where I think they were found.

8         MR. PLUMMER:  Thank you, your Honor.

9         In that case, Ms. Mabry would be arguing the

10   other issues, thank you.

11         THE COURT:  Mr. Nickola, just to be certain,

12   this morning I received for the first time two supple-

13   mental memoranda of law, really I don't think there is

14   anything we haven't heard about before today, but just

15   to be certain, did you get copies of each of those and

16   they were signed in this case by Mr. Plummer?

17         MR. NICKOLA:  Yes, your Honor, I--

18         THE COURT:  They appear to be the originals I

19   have received, so I'm assuming everybody got a copy.

20         MR. NICKOLA:  Yes, Judge, I--I received actually

21   two memorandums, one of which Mr. Plummer has repre-

22   sented to me and I have no reason to not accept that

23   representation, is a memorandum, it is titled Memorandum

24   of Law Regarding Admission of AOL Instant Message of

25   Cassaday Letter to Mom and Dad.  He has indicated that

1   this is very similar, if not virtually identical to the

2   brief that was at least submitted to me at the district

3   court level.  I--I don't know for a fact as to whether

4   that was filed at the district court level, but I do re-

5   call seeing that at the time.

6        Secondly, I have received as of this morning a

7   memorandum of law regarding application of U.S. versus

8   Canan, 48 Fed 3rd 954, 1995 case, to the Michigan Court

9   Rules of Evidence, that was given to me about five min-

10  utes before we started.

11       I also received some other information that ba-

12  sically detailed some of the issues from the prosecutor

13  and some proposed jury instructions, but for purposes--

14       THE COURT:  Right, I don't think that we are

15  gonna--today is definitely what we wanna cover is the

16  Motion to Quash and have that finished and if we have

17  time today we can discuss any other issues that we need

18  to cover prior to trial.  Anything you want.

19       Now, anyway, if we are ready to go, let's start.

20  I think the logical starting place to me would be to

21  deal with this so-called suicide note which was already

22  really briefed by Ms. Mann, but this motion or this

23  memorandum today, I think you call it the Cassaday let-

24  ter to mom and dad, I call it the suicide note and

25  whether--

6

1          MR. PLUMMER:   It is referred to as a suicide
2    note within the--the memorandum--
3          THE COURT:   That is what I think it has been
4    referenced as in the preliminary exam.
5          MR. PLUMMER:   That's correct.
6          THE COURT:   That seems to be a logical starting
7    point to me, so.
8          All right, Mr. Nickola, moving to quash go right
9    ahead if you wish, please, and then we will move--after
10   that one we will talk about the telephone conversation
11   of Jerry Cassaday to his--or with his brother, and then
12   we can go into the, I think it's 196 e-mails, etc.
13         MR. NICKOLA:   Thank you, Judge.
14         Judge, as it relates to the Motion to Quash, I
15   think that I had laid out many arguments in my brief to
16   the Court with attached exhibits as it relates to the
17   highlights, and a couple of additional matters because I
18   know that at least the Court provided us with some fed-
19   eral law the Court was interested in.
20         In--in this particular case, Judge, I believe
21   the judge, in a nutshell, abused his discretion in ad-
22   mitting the two crucial exhibits that he utilized to
23   bind the matter over.  I think that in reality where
24   this issue falls in is what has been described as a sui-
25   cide note as well as the AOL Chat Instant Message.

7

1     These are the two documents that the court obviously re-

2     lied on and I don't think that there was a whole lot of

3     argument that, absent those two documents, the prosecu-

4     tor had no direct proof that Jerry Cassaday had any in-

5     volvement in--in this homicide.

6          Now, where I believe the court was erroneous in

7     this particular case is--is that he relied on these two

8     hearsay statements off each other.  They were issues

9     that when he made his ruling that each of them should be

10    deemed inadmissible and he made a ruling that they were

11    admissible, but both of these documents are hearsay.

12         Now, as it relates to the suicide note, we be-

13    lieve that the court admitted it, did not follow the

14    proper analysis in this particular case.  We didn't be-

15    lieve that it was against Mr. Cassaday's penal interest,

16    I think that I laid that out as it relates to my case,

17    but I would also indicate as well that it--it was quite

18    obvious that in the suicide note in and of itself as he

19    admitted it under 804(b)(3), statement against interest,

20    the court did not delineate the factors, number one.  We

21    believe that Mr. Cassaday faced under the criteria set

22    forth in the Williamson versus U.S. case, 512 U.S. 594,

23    it's a 1996 case, that first of all he has got to show

24    that he is unavailable.  I don't think that there is too

25    much of a dispute regarding that but--

8

1          THE COURT:  There isn't any dispute, is there?

2          MR. NICKOLA:  No, not--not--not that he is

3     unavailable.

4          THE COURT:  The first--we have past the first

5     hurdle?

6          MR. NICKOLA:  Right.

7          The second issue, Judge, at that point is

8     whether or not it was against his penal interest, and

9     it's our position that it was not against his penal in-

10    terest for the reason and the simple fact is that at the

11    time of the making of the statement he had no penal in-

12    terest, there was no penalty that he was facing because

13    in and of itself, the suicide note says he is taking his

14    life and he is killing himself, that he is not going to

15    go to prison.  And so, we would suggest, and--and I

16    would cite in--in support of that the case of U.S. ver-

17    sus Fowlie, F-o-w-l-i-e, 24 Federal 3d 1059, 1994, that

18    was cited in the Burrera case that was supplied to the

19    Court, my understanding is late this week and to myself,

20    which indicated that the individual, who was out of the

21    country, had made a statement which would normally have

22    been recognized against his penal interest.  However,

23    because he was out of the country and was not facing any

24    type of criminal culpability, simply because he was out

25    of the country, that the declaration was not against his

9

1    penal interest.

2           We think in this particular case if I'm going to

3    commit suicide, then clearly I'm not facing any penal

4    interest.  I don't think that the court really did the

5    analysis as it relates to that, but we feel that in par-

6    ticular the 804(b)(3) statement against penal interest

7    was not applicable to the suicide note.

8           I--I believe also that he had allowed it in un-

9    der the catch-all exception, 804(b)(6), and again we

10   would indicate that he in--in both of these cases he

11   utilized the instant message and utilized the--the hear-

12   say suicide note against each other.  In other words,

13   both of these issues were up and he used both of these

14   hearsay statements basically as the primary source for

15   validating the other one in terms of corroborating evi-

16   dence.  I believe that the case law I have cited sug-

17   gests that's not something that the court can do, not

18   utilizing hearsay to gain hearsay access to admission.

19          I think that what was pretty clear, Judge, is

20   that the suicide note, in and of itself, for a variety

21   of different factors is not under the standard set forth

22   in Williamson versus U.S., something that is reliable or

23   has the indicia of reliability.  If we get to the factor

24   beyond the statement against penal interest, and the

25   Court feels that it was against his penal interest even

1    though he had--was clearly not going to be facing any
2    charges, we get to the issue of whether or not there is
3    reliability.  And the case law is very clear that the
4    reliability of this particular document must stand on
5    its own.  The court can't use corroborative evidence to
6    have that matter admitted.
7            And in this case it's a suicide note where an
8    individual just says, I did it.  I drove there and
9    killed him, and he goes on and on and on in terms of
10   blaming Sharee Miller and actions of, and so forth,
11   which are what I would consider to the Court non-
12   inculpatory statements, that's a shift of the blame and
13   as we saw in both the Williamson cases I previously cite
14   and U.S. versus Canan, 48 Federal 3d 954, 1995, that a
15   single declaratory that the Supreme Court held in the
16   Williamson case, a single declaration of inculpability
17   may be something that the Court can take into considera-
18   tion, but the court in its thorough analysis in the Wil-
19   liamson case felt that other statements that were not
20   directly inculpatory should not be taken into considera-
21   tion.  Judge Hughes definitely did that.  He went
22   through and--and--and had actually cited some of these
23   things about mother and father, and the person's sui-
24   cide.  And he did not focus on the one particular issue
25   in terms of the reliability of that document which was

11

1    the one inculpatory statement.

2    And I would also indicate that Justice Scalia

3    in the Williamson case provided particular detail in

4    terms of his belief that in, at least in that particular

5    case, that even though there is an inculpatory state-

6    ment, if it is so interwoven with other statements that

7    are not inculpatory, then it--it--the whole thing should

8    go out, and the only thing really that is inculpatory in

9    the suicide note on its face is the one separate sen-

10   tence that said that I drove there and killed him.  Eve-

11   rything else seeks to shift the responsibility and shift

12   the blame to Sharee Miller.  And that--very similar to

13   one of the cases that were cited by counsel, that being

14   the Barrera case, where this gentleman, Copeland, had

15   said yes, I stabbed a particular person, everybody else

16   was involved in it.  In that particular case, Judge, as

17   we see here, the other statements, everybody else is at

18   fault should never even have been analyzed, and no other

19   evidence should be utilized by the court to help but-

20   tress whether or not this document in and of itself is

21   reliable.  That is not what Judge Hughes did.  Judge

22   Hughes specifically utilized the instant message to help

23   buttress that.

24   I believe he also felt that as it relates to,

25   well, that's--that's what I have to argue in terms of

12

1     the--the why I believe Judge Hughes was--was erroneous

2     in terms of his bind over decision.  I don't think there

3     was a proper analysis.  I think he took the suicide note

4     as a whole, he didn't go through the process that was

5     delineated in Williamson, looking at the statement and

6     each inculpatory statement, and applied towards all the

7     other statements, and I think that that's fatal in this

8     particular case because if you simply take the whole

9     suicide note and admit it, then what we are dealing with

10    is a document that in and of itself is spent blaming

11    other people, shifting the responsibility and I think

12    that the case law that is before the Court clearly indi-

13    cates that that's an improper analysis.

14         I--I also would indicate that he is using other

15    evidence to help corroborate the credibility of Jerry

16    Cassaday.  I believe that's very clear in Canan that

17    that is--that is not the analysis the court should go

18    through.  A single declaration.  What we are dealing

19    with, 804(b)(3), is a single declaration or remark.

20    Sentence by sentence as the court had indicated.  And--

21    and in those particular cases, some of the cases that

22    are before the Court, in particular Canan, even though

23    as--as counsel correctly pointed out when I briefly

24    looked through the brief that was given to me before we

25    started here, in that particular case the majority had

13

1    said, well, this video deposition that was used by this

2    declarant in that particular case should be admitted.

3    They looked at the totality of the circumstances and

4    found that there was indicia of reliability.  So far

5    different, Judge, so far different in this particular

6    case than any example that is before this Court.

7    Whether it is the cases that the--the prosecutor has

8    dropped off here, the Michigan cases, whether the fed-

9    eral cases, all of these cases, and when you look to the

10   examples they are all so distinguishable because these

11   are statements made by other individuals and in this

12   particular case Mr. Cassaday is--is gone at his own

13   hand.  He is the one who killed himself.  He chose to

14   intentionally kill himself without giving any details in

15   this particular case regarding this suicide note.  And

16   as a result of not giving any details of the suicide

17   note, that in and of itself is something that should be

18   questionable because there should be an ample amount of

19   --of details.  And in reality, what the court had--the

20   court's function is, is that the Court as it relates to

21   the confrontational issue concerning that suicide note,

22   the Court must look and make a determination as to

23   whether my client's confrontational rights were violated

24   by finding if this matter is in fact--it does have the

25   trustworthiness, then the next aspect for the Court to

14

look at is whether or not my **rights, my client's rights**
to confrontation which is number one, to face the de-
clarant in court, and number two, have an opportunity to
cross-examine it, cross-examine the particular individ-
ual, whether or not that would not provide any addi-
tional questions as far as credibility is concerned.

And I would suggest to this Court that to--to say that
cross-examination would not--would not add or would not
cut into this just bold statement that I drove there and
killed him, Judge, is ridiculous.

It's my client's--I think that the Supreme Cou[rt]
and the federal cases that the Court has before it c[ertainly]
tainly discussed the critical and deepward(sic) i[mportance]
ture of--of cross-examination. And--and I think [that]
circumstances with these other cases where the[re]
have looked at it and said, hey, this is an o[pportunity]
that we think cross-examination would not h[ave]
the--the statement. The statement was tr[ue]
and of itself, are statements such as i[n]
where we are talking about a video dep[osition]
defendant was actually sitting there [and]
should have had an opportunity or [op-]
portunity to be sitting there li[stening]
['s] deposition. But in this [case]
[I] have no opportunit[y]

1    Cassaday.  Why; where; how; give me a gas receipt; give

2    me--where is your gun; what did you do; how did you do

3    it?  There is absolutely nothing, devoid of detail and

4    we are dealing here, Judge, with an--an individual as

5    well, and one of the key elements that the Court asks us

6    to look at is the spontaneity of it all.  The spontane-

7    ity and the time in which the declarant had made the

8    statement, and we are talking about three months after

9    his death.  Three months in which to concoct and con-

10   trive and to manipulate and to fabricate, and the lower

11   court record was clear from the testimony of Donald

12   Copely, that the instant message which Judge Hughes re-

13   lied upon to bring in the suicide note, the instant mes-

14   sage was subject to fabrication, manipulation, the

15   changing.  This individual had a relationship, I think

16   that the record did show that, the relationship appar-

17   ently had ended, but we know that Mr. Cassaday was an

18   alcoholic, we know that he was depressed.  He know--his

19   own mother said that he had been suicidal well before he

20   committed this suicide.  So we are obviously dealing

21   with a person who has got a serious psychological

22   problem.

23        So when we deal with these factors I don't be-

24   lieve that Judge Hughes did the proper analysis in bind-

25   ing this matter over before this Court.  He should have

16

1       gone through it line by line, and he would have seen

2       that only one line was inculpatory, but it was so inter-

3       twined with the other individual and shifting the blame

4       away from himself, that it should not have been brought

5       in at all.

6               And number two, he should have never used the

7       instant massage to buttress it because that is unreli-

8       able as well, that's hearsay.  In--in fact these are two

9       big issues that are--that are--as far as the analysis

10      are very similar as--as the Court knows, and as a result

11      of that it was improper to take that into consideration.

12              Now, I think that clearly looking at his bind

13      over that--and minus the suicide note, he can't buttress

14      the instant message because he also used the suicide

15      note to buttress the instant message.  So he is playing

16      these two documents that are unreliable and that are

17      generated or at least in the possession of Jerry Cas-

18      saday, this individual, to put this whole case together.

19              I believe that also there is an indication that

20      it showed a conspiracy and he allowed it in under that

21      aspect as well, but I would suggest, and I think that

22      the case law was clear, and I had cited People versus

23      Gay then and now in my brief and Motion to Quash, that

24      conspiracy cannot be maintained by hearsay evidence.

25      And the judge simply used hearsay evidence to support

17

1    the conspiracy because, Judge, in--in reality absent

2    these two hearsay documents and--and neither one of them

3    are--are--were admitted under any firmly rooted excep-

4    tion, absent these two hearsay documents, there is no

5    independent *prima facie* case of hearsay pursuant to--as

6    I had cited in the Vega case, and in longstanding People

7    versus Atley, they cannot support it, at all.  There is

8    never an indication; there is never a plan; there is

9    never a discussion; there is never like we're gonna get

10   him, anywhere else, and they are not going to argue

11   that, absent the instant message and absent the suicide

12   note.  So when the judge bound this matter over he did

13   not go as well through the instant message in the same

14   aspect, I don't need to go over it again, but in terms

15   of the analysis pursuant to Williamson and the analysis

16   pursuant to Canan which would require him to do so.  And

17   I believe that the--the Canan case also had indicated

18   that this analysis should be done to all the hearsay ex-

19   ceptions that are--are a part of the 804, the court must

20   make that analysis.  And for the same reasons that--that

21   the Williamson case was sent back to have the court do

22   that re-analysis, the same reasons that this Motion to

23   Quash should be granted, because Judge Hughes did not do

24   the proper analysis and he bound this matter over by

25   buttressing two hearsay statements against each other,

18

1    and I believe that that was abuse of discretion clearly,

2    and I think that that is supported by the cases that

3    I've relied upon.

4         So we'd ask the Court to grant the defendant's

5    Motion to Quash.

6         MR. PLUMMER:  If I may, your Honor, Peter Plum-

7    mer for the People.

8         I guess what I would like to do, your Honor, is,

9    first of all, I would be willing to concede that without

10   the suicide note and without the instant message the

11   People would agree--

12        THE COURT:  Well, let's be clear, when you say

13   that, there was more than one and I think you're refer-

14   ring to the one that appears to be dated November 8,

15   '99, is that correct--

16        MR. PLUMMER:  The instant message?

17        THE COURT:  Yes.

18        MR. PLUMMER:  That's correct, your Honor, at--

19        THE COURT:  I just wanna be sure we're all on

20   the same, because we haven't specifically referenced it

21   today.

22        MR. PLUMMER:  Thank you, your Honor.

23        The instant message I'm speaking of, I think the

24   testimony was that it appeared to be created in late

25   evening on November 6th, past midnight on November 7th--

19

1          THE COURT:  Well, maybe I'm looking, let's see

2     if I have it here, just a second.

3          Why don't you and Mr. Nickola have a copy of the

4     exact one you're looking at so I'm sure that I have the

5     one you're looking at.

6          The copies I have aren't marked, so I don't know

7     if they were the ones introduced or shown to the judge,

8     I have no way of knowing that right now, but--

9          (Court talking to clerk)

10         I'll show you what I have, I can't tell you, at

11    the bottom there is a date November and I think that's

12    the one you're referring to.

13         MR. PLUMMER:  Is it a six or an eight?

14         UNIDENTIFIED MALE:  It is actually an eight,

15    that is when it was printed--

16         MR. NICKOLA:  Yes, Judge, the--

17         THE CLERK:  Was printed out--

18         MR. NICKOLA:  --the document that the court of-

19    ficer possesses and is returning to the Court is the

20    document that when--when I--

21         THE COURT:  That you all are referring to?

22         MR. PLUMMER:  That's correct--

23         MR. NICKOLA:  In terms of my--

24         THE COURT:  Maybe we ought have, well, I don't

25    know, how you--do you have really clean copy of it that

1    you want to make ultimately the exhibit, I suppose we

2    could have Ms. Christman mark it now and it can maintain

3    that number through all the rest of the proceedings, if

4    that is agreeable?

5          MR. NICKOLA:  Sure.  That's--that's agreeable

6    with me, Judge.

7          THE COURT:  So we don't have to remark it and it

8    will stay the same number forever through these--this

9    case.

10         MR. NICKOLA:  And, Judge, just for purposes of

11   the record, when I had been arguing to the Court refer-

12   encing the instant--instant message, what is about to be

13   marked here I would agree is what I was talking about.

14   That's the chat as described in the lower court, Sharee

15   1013, and JLC 1006, and the suicide note I believe is

16   gonna be marked as well and I would agree that that has

17   been previously marked as Proposed Exhibit Number 8, I

18   believe, at the district court level, and then the in-

19   stant message chat was previously marked at the district

20   court level as Exhibit 9.

21         MR. PLUMMER:  Your Honor, if we could have the

22   suicide note marked as People's Evidentiary Exhibit 1.

23         THE COURT:  Let's have it be one, right.

24         MR. PLUMMER:  Okay.  And the instant chat as

25   Exhibit Number 2.

21

1       THE COURT:  All right, that's fine, she will do

2   that now and they will maintain those numbers throughout

3   these proceedings then.

4       (At 10:44 a.m. PX# 1 and 2 marked)

5       MR. PLUMMER:  Thank you, your Honor.

6       THE COURT:  Thanks, Mr. Plummer, sorry to inter-

7   rupt you, but I just wanna keep it clear.

8       MR. PLUMMER:  Rather get it straight from the

9   beginning, your Honor.

10      Your Honor, there is some discussion about the--

11  the whole fact of the unavailability of Jerry Cassaday,

12  I'm sure there is no one in this courtroom that would

13  deny that it would be better if Bruce Miller was alive

14  and Jerry Cassaday was alive and we probably wouldn't

15  even be here on this Saturday morning.  The fact is that

16  that's not the current case we face.

17      Your Honor, counsel speaks of the constitutional

18  right of confrontation of witnesses, but the courts his-

19  torically, your Honor, have recognized that if that was

20  taken literally we wouldn't have hearsay exceptions be-

21  cause the--by their very nature they're not subject to

22  cross-examination in a courtroom.  And so the mere fact

23  that--that something may impact the confrontational

24  right of the defendant doesn't in and of itself

25  automatically mean that they are therefore gonna be

1    inadmissible.

2           I would like to take defendant's argument per-

3    haps in two pieces, your Honor.  First of all, the Canan

4    related argument as to the examination of the suicide

5    note which I believe we are speaking to at this moment,

6    and then the Michigan approach to that same issue.

7           Your Honor, first of all, I'd like to point out

8    on the record that the Canan case when it is read, the

9    first opinion that is offered is actually the minority

10   opinion on this particular issue which I think was enti-

11   tled 4B in that opinion itself.  You read through the

12   case and at least for the first reading you're kind of

13   assuming you're reading the ultimate opinion of the

14   court, and then at the very end the judge says, of

15   course, the other two judges did not agree with me on

16   4B.  So you kind of have to go to the second portion to

17   find out the court's ruling on the section 4B dealing

18   with the admissibility of--of this particular item, and

19   in that case as counsel correctly pointed out was a

20   videotaped statement earlier made by a then deceased

21   witness.

22          And, your Honor, I think it is worth note, that

23   even under the analysis presented by defense counsel of

24   a line by line determination, I think it is a very worth

25   note that ultimately in Canan they allowed this entire

23

1       tape in, as near as can be told by the opinion, and so,

2       I would caution too much reliance on that statement of

3       the line by line examination of the statement sought to

4       be admitted.

5               And, of course, Canan relied in great part on

6       Williamson versus United States.  Williamson had actu-

7       ally I believe been appealed--or the appeal in Canan was

8       filed prior to the ruling in Williamson, but decided af-

9       ter the ruling in Williamson was published, so they were

10      very close in time.

11              The--the Supreme Court, U.S. Supreme Court in

12      Williamson simply defined the--the word statement and

13      looked to the commentary of the court rules and other

14      case law and said that under the federal rules, as a

15      matter of federal law, the--the term statement would be

16      each individual part that tended to either be ex--or in-

17      culpatory to the declarant or non-inculpatory to the de-

18      clarant, and that once you have established that as the

19      definition, then it required federal courts to look at

20      each portion of the statement.  And as Canan said, it's

21      not to see that each portion is self-inculpatory, but

22      the line by line determination is to--to make a determi-

23      nation based on the totality of the circumstances that

24      each line has some indicia of reliability and trustwor-

25      thiness, and then either portions or all of that

24

1    statement could be admitted.

2         I think even under that more narrow reading,

3    your Honor, this suicide statement would come in because

4    I think that the parts of the statement that are not

5    self-inculpatory are--have indicia of reliability and

6    trustworthiness.  I mean, the very nature of a suicide

7    note, and in fact, we argued at the district court level

8    that this suicide note, one of the theories of admission

9    is that it's a--a statement under belief of impending

10   death, and your Honor, I would reassert that today for

11   the record that it is our position that's--

12        THE COURT:  I was gonna say, wasn't that your

13   principal theory and I thought it was from Ms. Mabry's

14   submissions before.

15        MR. PLUMMER:  It--it was a basis for the Peo-

16   ple's argument, we wound up arguing in the alternative,

17   and the judge chose one of those other alternatives, but

18   it's our--and if the Court would like me to speak to

19   that very briefly I would like to summarize at least

20   just so there is a record of why we believe it was still

21   admissible under that.

22        And that is, that it was a statement made under

23   a belief of impending death by the declarant about the

24   cause or circumstances surrounding that death.

25        The--the only legal issue that was raised in

25

1    terms of that particular exception was that there is

2    some--there is some statements made by some Michigan

3    courts that one of the elements for that admission is

4    that the statement of course has to be offered for ad-

5    mission during a homicide proceeding, and--and some

6    courts have at least referred to the concept that the

7    statement has to be referred under a homicide proceeding

8    regarding the death of that declarant.  But, your Honor,

9    two things about that last element.

10       Number one is, every time that I could find that

11   it was stated in a case in Michigan that was not an is-

12   sue, those cases were cases where the--it was the de-

13   clarant's death that was the element of the trial at

14   hand.

15       And second of all, all the courts that I could

16   find relied on a case that was decided prior to the

17   Michigan Rules of Evidence being made applicable in

18   Michigan.

19       So for those two reasons we would claim that

20   those statements were *dicta* in those cases and that

21   there is no indication of that requirement in the Michi-

22   gan Rules of Evidence themselves, and therefore, the

23   suicide note should be admitted under 804(b)(2).

24       But if not, your Honor, they should be admitted,

25   it should be admitted under 803(3) a statement against

26

1    interest, and more specifically, a statement against pe-

2    nal interest, and that is where I would like to take the

3    Court from Canan to the Michigan law.  Michigan did have

4    a chance to contemplate Williamson versus United States

5    as it was interpreted by Canan, and the Michigan Supreme

6    Court in People versus Poole, P-o-o-l-e, cited in our

7    brief, made reference to Williamson and specifically--

8    and looked at the commentary under the proposed court

9    rules before they were enacted and the rules--the com-

10   mentary presented after they were enacted and simply

11   came to a different conclusion then the U.S. Supreme

12   Court about Michigan's Rule of Evidence and about how

13   statements should be interpreted in Michigan.  And the

14   court was very clear and I point that out in my memoran-

15   dum to the Court and counsel, the court was very clear

16   in stating that that is not a consideration in Michigan,

17   that the statement is the statement in--in its entirety,

18   and that was supported, Poole was supported and followed

19   in Beasley, cited in the brief, and it was also in

20   Schutte, S-c-h-u-t-t-e, cited in our brief, and I be-

21   lieve there may have been some reference in People ver-

22   sus Ronald Lee that was also cited in our brief.

23        But, your Honor, under Michigan the analysis is

24   not one of line by line, and in Michigan the analysis is

25   to look at the statement to determine if the declarant

1   inculpated him or herself in the statement, and your

2   Honor, I--I would like to make an aside here about the

3   Barrera case mentioned by defense counsel a couple

4   times.

5        I think one should be cautious in relying on

6   Barrera in the case that we are talking about here be-

7   cause in Barrera what was offered was a statement to ex-

8   culpate the defendant and there is an entire--

9              THE COURT:  Right--

10             MR. PLUMMER:  --different set of circumstances

11  in analyzing that--

12             THE COURT:  Correct.

13             MR. PLUMMER:  And, but back to a statement that

14  inculpates the declarant, your Honor, here we have a man

15  who says I drove there and killed him.  I don't think it

16  can be any more in--self-inculpatory then that.  Now, he

17  goes on to say that Sharee was involved and helped set

18  it--helped set it up.

19             Counsel makes much, your Honor, of the fact that

20  the declarant in this case appeared to be upset with the

21  current defendant, Sharee Miller.  I believe there is a

22  footnote in Poole that the--that the declarant in Poole

23  was upset with the defendant as well and had written to

24  the prosecutor to talk about cutting some sort of deal

25  to testify.  So I don't think that in and of itself is

1    determinative.

2           Also, there was some mention made about the fact

3    that he refers that he is going to tell the police and

4    that she will get hers, and that one of the criteria

5    mentioned in Poole is whether a person makes a statement

6    to a colleague or family or friend versus law enforce-

7    ment.  Well, this statement was addressed to mom and

8    dad, obviously, a close relative which would be in favor

9    of admission under Poole.

10          To the extent he makes reference to law enforce-

11   ment, I think the Court needs to remember that in Canan

12   the statement was given to--I think it was a U.S. Attor-

13   ney, who is obviously involved in law enforcement.

14          And in one of the cases relied on, either Canan

15   itself or one of the cases relied on by Canan, the court

16   goes to some extent to offer that an--an indicia of re-

17   liability in that case was that the declarant knew that

18   his statement was going to law enforcement and they

19   would be investigating it as though it were an element

20   to cause an--an addition to the indicia of reliability

21   not a detraction from it.  So I think that must be taken

22   in stride.

23          Counsel talks about using Exhibit--Proposed Ex-

24   hibit 1 and Number 2 to corroborate each other as being

25   inappropriate.

29

1       Well, under <u>Poole</u> and the cases that followed,
2   your Honor, the court said that, a court in deciding
3   whether or not to admit a statement has to look at the
4   totality of the circumstances.  And I think the totality
5   of the circumstances are in this case are the one, there
6   was a suicide note to mom and dad that--where the de-
7   clarant inculpated himself in a--in a murder and a ref-
8   erence to the defendant herein Sharee Miller.
9       Your Honor, once you take that, and once you un-
10  derstand that he is writing this note as his suicide
11  note, I think that that gives this statement under the
12  totality of the circumstances an indicia of reliability.
13  There is--there is a statement by the majority court in
14  <u>Canan</u> where they make a reference to those cases com-
15  monly heard in law school and otherwise, about no one
16  would speak--leave this earth with a lie upon their
17  lips, and the fact that those facing imminent death,
18  there is a presumption under law that statements made at
19  that time would tend not to be false because one was
20  about to quote, meet their maker.
21      So, your Honor, I think that a suicide note may
22  best express the very guarantees of trustworthiness that
23  are spoken about in a hearsay statement to be offered,
24  it's the statement against penal interest.
25      Finally, your Honor, the examining court at the

30

1   district court did, I believe, ultimately rely at least

2   in great part on the catch-all provisions, I believe

3   that was 804(b)(6) in admitting this item.

4          Your--your Honor, while I personally don't think

5   it is necessary to get to that point because I think

6   there are other clearcut hearsay exceptions that are

7   well founded and, your Honor, it is worth note that this

8   whole indicia of trustworthiness really comes into play

9   in the catchall more than it does the statement against

10  penal interest because the general rule of law is that

11  in the alternative when confrontation clauses are at is-

12  sue, it either has to be a well-found hearsay exception

13  or have other indicia of reliability and

14  trustworthiness.

15         So I would state that under penal interest that

16  really isn't a requirement even though it is there, but

17  under the catchall, your Honor, for the reasons I have

18  already stated, I believe this statement does show under

19  the totality of circumstances the indicia reliability

20  and guarantees of trustworthiness that would allow the

21  examining Court to admit this under the catchall provi-

22  sions of the court rule.

23         If I could have one second, your Honor?

24         THE COURT:  All right, certainly.

25         MR. PLUMMER:  Your Honor, Ms. Mabry points out

1    to me something that is worth note, and that is that at

2    the time Poole was decided actually there wasn't the

3    catchall provision, and there was some note in that ref-

4    erence to that case that if there had been such a catch-

5    all provision that it might also have applied in that

6    case, but that's why it wasn't specifically dealt with

7    in Poole.

8          THE COURT:  Maybe I'll just make this comment

9    initially now.  I don't think the catchall is a particu-

10   larly good theory for you or me, any of us to rely on

11   since there is even a Michigan case, People v Wells that

12   says it's not a, quote, firmly rooted exception to the

13   hearsay rule.  And there's numerous federal cases that

14   say the same thing, and so, if you're looking at reli-

15   ability, all the way back to Ohio v Roberts they talk

16   about the need for a firmly-rooted exception or in the

17   alternative other particularized guarantees of trustwor-

18   thiness, so I really kind of thought we should just

19   probably leave that one out.  That's my basic view on it

20   and just save a lot of time arguing about it today.

21         MR. PLUMMER:  Thank you, your Honor.

22         THE COURT:  Unless you have some other cases

23   that I haven't seen.

24         MR. PLUMMER:  Well, your Honor, the only--the

25   only other reference--

1      THE COURT:  On that issue--

2      MR. PLUMMER:  Okay.  The only--the only refer-

3  ence I would make in that regard is the--that was the

4  very distinction I was trying to make at the end of my

5  argument is that this whole idea of independent indicia

6  of reliability and trustworthiness really only comes

7  into play more with the catchall than the other firmly

8  rooted exceptions.  Thank you.

9      THE COURT:  Okay, great, thank you.

10     Now, briefly, if you have something else on this

11 particular exhibit, Mr. Nickola.

12     MR. NICKOLA:  Yes, Judge.

13     And again, Judge, maybe I was wrong, I--I

14 thought we were talking about as it relates to the Mo-

15 tion to Quash.

16     THE COURT:  We are.

17     MR. NICKOLA:  Okay.

18     THE COURT:  You have the Motion to Quash and the

19 basis for the motion is if there is no evidence you

20 can't bind it over, isn't that right?

21     MR. NICKOLA:  Right, Judge.

22     THE COURT:  So we will take the two, I guess the

23 two critical--

24     MR. NICKOLA:  The only--

25     THE COURT:  --but certainly--

33

1       MR. NICKOLA:  Yeah--

2       THE COURT:  --the other items were introduced

3  and we will cover all of them, I hope, today.

4       MR. NICKOLA:  Thank you, Judge.

5       In response, your Honor, at least there is the

6  discussion about this dying declaration.  That is not I

7  believe at issue with this particular motion.  Judge

8  Hughes--

9       THE COURT:  Why not--

10      MR. NICKOLA:  --did not rely upon--

11      THE COURT:  Okay.  But let me tell you, we have

12  a huge body of Michigan law, the right result for the

13  wrong reason.  So if he concludes they're sufficient

14  evidence to bind it over, I'm really not concerned

15  whether he addressed the correct or what I might con-

16  sider the correct prong of the Michigan Rule of Evidence

17  in getting it over here, just that--

18      MR. NICKOLA:  Well--

19      THE COURT:  --he did find there was a valid rea-

20  son and I might disagree on which reason he chose.

21      MR. NICKOLA:  I understand, your Honor.

22      I--I just wanted to respond because it was a

23  question that the Court had asked him about and he given

24  some argument about it, and I did not address it in my

25  initial argument because the judge didn't use it as a

34

1    basis, I understand what the Court is indicating.

2         I would simply say, Judge, that I have attached

3    case law and Mr. Plummer can speculate what may or may

4    not be *dicta*, but he certainly has centuries worth of

5    law to look at, they have attached nothing, no federal,

6    no state, Supreme Court, Michigan or otherwise, that

7    would support their position as it related to that dying

8    declaration.  I believe that's why Judge Hughes didn't

9    address it because I think what is clear is not only in

10   the cases that I cited, Parney and also in the Siler

11   case as well, you've got to be an extremist at the time

12   you make this particular statement, and Mr.--at the time

13   of the statement.  And in this particular case Mr. Cas-

14   saday was harmed physically in no way whatsoever at the

15   time he made these statements.  And here is the problem

16   as well, Judge, as a part of the reliability aspect of

17   this document.

18        It's not dated, we have no idea when he wrote

19   it.  Alls(sic) we can assume, Judge, is that his signa-

20   ture is bared on it.  So whether he wrote it way back

21   when, when he claims he did this or three months later

22   after he comprehended it, whether he was in a drunken

23   stupor or using his prescription drugs as testified to

24   during the preliminary exam.  There was no autopsy done

25   so we have no idea whether this man was delusional or

35

1    not.  I think that that's important issues to look at

2    because when we--again we talk about what is this person

3    about, who--who they are about, there is nothing that

4    would suggest that he has got any credibility whatsoever

5    and simply because he has got this suicide note, that

6    doesn't mean that he is an extremist at the time.  So,

7    Judge, I'm not going to reiterate my arguments, but I

8    would indicate to the Court that at least as the Court

9    may have had an inquisitive line of questioning regard-

10   ing the dying declaration, there is nothing that sup-

11   ports their position in--in a case of this particular

12   magnitude.  And I don't think that Judge Hughes gave it

13   any weight for a good reason.

14          THE COURT:  All right.  Well, regarding this

15   particular document only then, which has been referenced

16   as the suicide note, and alternative theories have been

17   advanced for the admissibility because obviously it's

18   hearsay.  And the Court believes there are at least two

19   possible theories and that the judge did not abuse his

20   discretion in this regard, and I will indicate that the

21   dying declaration argument seems to be to the court--to

22   this Court, the preferable theory under which this docu-

23   ment should be admitted, and that would be 804(b)(2) of

24   the Michigan Rules of Evidence, effective 3/1/78.  And

25   that might be significant because as pointed out today

36

1    most cases, I believe virtually all of the cases keep
2    going back to the four requirements from People v Schin-
3    zel and People v Parney which is 98 Mich App 571, but
4    those predate, the rulings in those cases predate the
5    Michigan Rules of Evidence, and the particular language
6    of the Michigan Rules of Evidence have been addressed in
7    the commentary to Courtroom Handbook on Evidence by Pro-
8    fessor Robinson and Longhofer, and they suggest, as I am
9    thinking today, that the rule really has not been looked
10   at in light of the specific language of the Michigan
11   Rule of Evidence, and the Court believes that that is
12   the reason why this particular document will be admissi-
13   ble.  That it is admissible as a dying declaration.
14   This is a prosecution for homicide.  The statement ap-
15   pears to be made by a declarant while believing that the
16   declarant's death was imminent.  This is addressed to
17   the parents of the declarant expressing to the parents
18   certain personal matters, but an explanation in a nut-
19   shell of why he reached this point in his life, and con-
20   cerning therefore the cause or circumstances of what the
21   declarant believed to be impending death and referenced
22   therein is his own intent to take this way out, shall we
23   say.  And I recognize that that may not be Judge Hughes'
24   thinking, but in any event, that is what I consider the
25   preferable theory, and then alternatively, of course, as

37

has been argued by the prosecutor today, certain parts
of it may be admissible under different theories and
some of the statement itself or some of the document,
let's put it that way, may not be offered to prove the
truth of anything.  So if we were going to do an analy-
sis under Canan, I think that it would be agreed by eve-
rybody that, frankly, very little of it is offered to
prove the truth of it, and the significant parts would
certainly include the phrase or the sentence, I drove
there and killed him, which certainly could be admissi-
ble and I believe Judge Hughes so indicated.  A state-
ment against interest under 404(b)(3), a statement which
was at the time of its making so far contrary to the de-
clarant's, I'm sorry, a statement which was at the time
of its making intended to subject the declarant to civil
or criminal liability.  Certainly, had he lived and had
this statement been found, it would certainly subject
him or have subjected him to criminal liability, and the
fact that he chose the other way out does not detract in
this Court's opinion from the viability of that particu-
lar exception to the hearsay rule as a theory of
admissibility.

     And going to the second prong of the admissibil-
ity, Judge Hughes was well familiar with the Poole case
at 444 Michigan 151, and we have all talked today about

38

1   the indicia of reliability necessary to establish that a

2   hearsay statement should be admitted.  Going back to

3   Ohio v Roberts, reliability can be inferred without more

4   in a case where the evidence falls within a firmly-

5   rooted hearsay exception.  In other cases, the evidence

6   must be excluded absent a showing of particular--

7   particularized guarantees of trustworthiness.

8         If the People were to rely on and the Court were

9   to rely on, for example, the catchall exception, cer-

10  tainly the factors set forth in Poole favoring admissi-

11  bility, set forth at page 165, would be present in this

12  situation.  Certainly, it was voluntarily given, it was

13  made contemporaneously from everything I can glean from

14  reading the transcript and reviewing the exhibits, con-

15  temporaneously with the events referenced, that is, his

16  own impending death.  It was made to family members, mom

17  and dad, that is, to someone to whom the declarant would

18  likely speak the truth, and certainly, it was uttered

19  spontaneously in the sense it's without prompting or in-

20  quiry by anybody.

21        So I think that there are sufficient guarantees

22  of trustworthiness so that Judge Hughes did not err ei-

23  ther in finding exceptions within the Michigan Rules of

24  Evidence and in finding there were particularized

25  guarantees of trustworthiness from the quote, totality

39

1   of the circumstances, end quote.

2          And the Court is fully aware that those are

3   those that surround the making of this statement and we

4   have just discussed the circumstances surrounding the

5   making of the statement.

6          So moving on now then to I guess you wanna go to

7   the instant message of November 8, is that correct,

8   which has now been marked as Exhibit 2?

9          (No verbal response)

10         Mr. Nickola, regarding instant message, Exhibit

11  2, do you wish to make your argument now, please?

12         MR. NICKOLA:  Judge, as it relates to the Motion

13  to Quash with Judge Hughes?

14         THE COURT:  It's--I thought that is what all

15  this was?

16         MR. NICKOLA:  Yes.

17         THE COURT:  Yeah.

18         MR. NICKOLA:  I--I thought I made arguments con-

19  cerning both--

20         THE COURT:  You wanna respond then to that one,

21  I think if there is anything else in that regard, Mr.

22  Plummer--

23         MR. NICKOLA:  Judge, I thought that--

24         THE COURT:  --that you didn't--he spent most of

25  his time I thought on dying declaration, so--

40

1          MR. PLUMMER:  Your Honor, excuse me, I thought

2     that those arguments had been divided--divided and I re-

3     frained from any other than the suicide note--

4          THE COURT:  All right.

5          I think I will make one other reference.  There

6     was another case that dealt with the situation on a dy-

7     ing declaration in this context, I'll just put in the

8     record, State of West Virginia case that I had happened

9     to find the other day, it's at 457 Southeast 2d 440, re-

10    garding a suicide note, so.

11         In any event, whatever else you wanna say about

12    the instant message which I believe is now Exhibit Num-

13    ber 2 please, let's do that.  Anything else if you wish,

14    Mr. Nickola, if not, we will let them finish whatever

15    argument they wanna make.

16         MR. NICKOLA:  Judge, I don't have anything else

17    other than what I have already put on the record.

18         THE COURT:  All right.  Then which everyone

19    wants to comment on that issue, I wanna find it again

20    here.  There it is.

21         MR. PLUMMER:  Thank you, your Honor.

22         My comments now will be in reference to People's

23    Proposed Exhibit Number 2 which we have referred to as

24    an instant message or instant chat.

25         Your Honor, the preliminary examination

41

1    transcript I think can stand for a general explanation

2    of the nature of--of what this is and I'll simply re-

3    strict my comments today as to as matters of law its ad-

4    missibility into this court proceeding.

5         Your Honor, of course I do need to indicate that

6    it is a statement from what was testified at the pre-

7    liminary examination as an account, owner-controlled by

8    Sharee Miller which included the--what is known as a

9    screen name, Sharee 1013, and it was a chat between that

10   account and an account owned by Jerry Cassaday wherein

11   the screen name, one of the screen names listed was JLC

12   1006, and your Honor--

13        THE COURT:  Do we not wanna make a clear comment

14   today that the portions of this message that come from

15   Sharee Miller, obviously, come in under possibly differ-

16   ent theories than those portions attributable to the de-

17   ceased, Jerry Cassaday?

18        MR. PLUMMER:  Yes, your Honor.

19        Would the Court want me to speak about those

20   individually?

21        THE COURT:  Well, I just wanna make sure we are

22   all clear because if we need to put that on the record

23   if there is any issue about it.

24        Mr. Nickola, hers obviously come in under a

25   different theory perhaps than his.  Do you see what I'm

42

1    saying?  The document has statements attributable to the

2    defendant, statements attributable to the deceased Cas-

3    saday, and obviously the statements attributable to her

4    can be offered by the People under 801(d)(2), and that's

5    not what we're doing with regard to the portions attrib-

6    utable to Jerry Cassaday, correct?

7          MR. PLUMMER:  That's correct from the People's

8    position, your Honor.

9          THE COURT:  All right.

10         MR. PLUMMER:  I don't know if the Court was

11    waiting for a comment from Mr. Nickola or not.

12         THE COURT:  I didn't know if there was any

13    other, I just wanna be sure we're all understanding

14    we're speaking of today I thought the real key would be,

15    well, maybe I'm wrong.

16         MR. PLUMMER:  That's what I thought the--

17         THE COURT:  The entirety of the document is one

18    thing, the technical foundations that's not the issue,

19    it's the admissibility, as I understand it, of the sub-

20    stance of these documents under the hearsay rules be-

21    cause obviously they're hearsay.  Her statements are in-

22    cluded in this exhibit and her statements are one thing

23    under 801(d)(2) and it is going to be offered by your

24    office, I assume, against the party defendant Ms.

25    Miller--

43

1      MR. PLUMMER:  Correct--

2      THE COURT:  --to the extent her statements are

3  included in any of the documents we are looking at here

4  today.

5      MR. PLUMMER:  Correct, your Honor.

6      THE COURT:  And then it's perhaps his that

7  you're really concerned about, so that's why I wanna to

8  make the distinction because both persons appear to

9  speak here, we have Sharee at 1013 and then we have, as

10  you put it, JLC at 1006.

11      MR. PLUMMER:  Thank you, your Honor, and re-

12  stricting my comments to his portion of this instant

13  message, your Honor, the People were of the position and

14  are of the position that his portions would come in un-

15  der anyone of three particular exceptions starting with

16  the least, I'm trying to look for the right term, that--

17  that we would rely upon the least but still believe ap-

18  ply, your Honor, would be the catchall provisions of

19  804(b)(6) and we have already discussed the legal as-

20  pects of that, and we think that that would equally ap-

21  ply to the statement.

22      Secondly, more strongly, your Honor, we submit

23  that taken *in toto*, Mr. Cassaday's portion of this

24  statement would come in under 804(b)(3), a statement

25  against interest.  While he doesn't say as clearly as he

44

1      did in his suicide note, I killed Bruce Miller, I'm go-

2      ing to kill--kill him, this sets out an entire plan,

3      scheme, and design to effectuate the death of Sharee

4      Miller's husband, Bruce Miller.  Your Honor, we think

5      that that could come in as not hearsay because it does

6      show that scheme, plan, or design under 803(3), but we

7      think it also is a statement against penal interest when

8      --when if you take the logical consequences of these

9      statements they are setting out a method of murder.

10             Finally, your Honor, we believe that his portion

11     of this would be totally admissible under 801(d)(2)(E)

12     statement by a co-conspirator.  Your Honor, the--that

13     rule requires independent source of some evidence of

14     that conspiracy and we would submit that that suicide

15     note does exactly that, and once we have shown that,

16     that this statement comes in *in toto* as a statement by a

17     co-conspirator about the nature of the conspiracy.

18     Thank you, your Honor.

19             THE COURT:  Just if I could ask you while you're

20     there, Mr. Plummer.  As you can see, if you look at the

21     document, let me see how many pages it is here, one,

22     two, it seem to have ten pages, correct, is that what

23     everyone agrees--

24             MR. NICKOLA:  Yes, your Honor--

25             THE COURT:   --that is printed out here.

45

1    MR. PLUMMER:  Yes, your Honor.

2    THE COURT:  Just to clarify in my mind, are you

3    planning or is your thinking that you would be wanting

4    to offer all ten pages?

5    MR. PLUMMER:  Correct, your Honor.

6    THE COURT:  The document.

7    Just assuming we didn't have the conspiracy ex-

8    ception available, are you trying to suggest to the

9    Court under the statement against interest that each and

10   every time that we have a communication from Mr.

11   Miller(sic) that it would qualify as a statement against

12   interest, I guess I'm still in the Canan mode here?

13   MR. PLUMMER:  Well, your Honor, I'm more in the

14   Poole mode myself--

15   THE COURT:  All right.

16   MR. PLUMMER:  --but I understand what the Court

17   is stating and I don't think it would apply at each and

18   every time, now we picked out, these are two of the Peo-

19   ple's exhibits and they happen to be exhibits wherein in

20   the suicide note he just blankly states I killed him,

21   and in the number two, the instant message, they are

22   talking about how to kill him.  I think that those two

23   situations--statements against that penal interest do

24   apply.  If--if Mr. Cassaday were alive, your Honor,

25   there would be every reason to believe that he would be

46

1   aware that this conversation would be used against him

2   to prove his participation and the fact of the murder of

3   Bruce Miller, and it's for that reason, your Honor, I'd

4   submit they were--this is just as weighty as the suicide

5   note in that regard.  But if there are--

6   THE COURT:  Well, just let me take both of you

7   to look at page 2 for a minute, while we are all to-

8   gether, because if you would look at it, I think the

9   first time we truly get into what might be a statement

10   against interest would be on page 2 and it is about a

11   third of the way down and it is a question actually,

12   what is the fastest way into the yard from 75.  That's

13   really a question, so it is not even a statement, so we

14   don't even--

15   MR. PLUMMER:  Excuse me, your Honor, what was

16   that again, I'm having trouble--

17   THE COURT:  Page 2, about the third of the way

18   down, it looks like the first time he is speaking on

19   this detailed plan about the murder, is his question,

20   What is the faster way into the yard from 75, do you see

21   that?

22   MR. PLUMMER:  Yes, your Honor.

23   THE COURT:  Page 2.

24   Now, that's a question, so obviously questions

25   and commands are among the categories that aren't

47

1    statements, so they're not involved in hearsay anyway.

2            MR. PLUMMER:  Your Honor, I would ask the Court

3    to consider the--the next exchange up from that as being

4    the beginning of something relating--

5            THE COURT:  Let's see now--

6            MR. PLUMMER:  --it says, How do we hook up to-

7    morrow.  There are other--there are other e-mails

8    where--

9            THE COURT:  How do we hook up t-o-m-m, mine

10   says?

11           MR. PLUMMER:  Yes, yes.  And it says I need a

12   little time in the morning to come up with a plate--

13           THE COURT:  Again that's a question.

14           MR. PLUMMER:  Um-mm.  But I'm just asking the

15   Court to consider one--

16           THE COURT:  To move up a little bit--

17           MR. PLUMMER:  --two lines up, yes.

18           And, your Honor, I apologize but I didn't quite

19   follow the Court--what the Court was saying that the

20   significance of the fact that it was a question.

21           THE COURT:  Questions aren't statements within

22   the meaning of the hearsay rule, nor are commands, like

23   turn left, jump over the cliff.  Questions aren't state-

24   ments either.

25           MR. PLUMMER:  Okay.

1    THE COURT:  So anyway, the first two things that

2    are on here where it is suppose to be Jerry Cassaday are

3    questions, and you keep going down the line and the

4    next, Is that closer to the yard; another question,

5    which is best for, it's hard to tell, Which is best for

6    less being seen, I guess that is what it says.

7         First time you really get to an affirmative

8    statement by Cassaday you're on page 3 when he says, I

9    can get it from there.

10        MR. PLUMMER:  Correct, your Honor.

11        And he does say I'm with you just above that,

12   but I think that's just a confirmation.

13        THE COURT:  That's state of mind, I suggest.

14        MR. PLUMMER:  Yes.

15        THE COURT:  All right, Mr. Plummer, I just

16   wanted to have you understand my thinking a little bit,

17   so go ahead, anything else?

18        MR. PLUMMER:  Nothing from the People, your

19   Honor.

20        THE COURT:  Okay.  Mr. Nickola, please.

21        MR. NICKOLA:  Judge, if I just--in response to

22   an indication is, I believe, that the instant message

23   formulates the basis of their contentions in this par-

24   ticular case.  I believe that admittance under the law

25   that was provided at the district court denies my client

1    an opportunity to confront Mr. Cassaday.

2         I would also indicate that it is quite clear

3    that there was a very small amount of evidence that even

4    suggested or could be relied upon by the Court, this was

5    something that was actually done at the time, and in

6    fact, certainly could be manipulated and fabricated and

7    for anyone to argue that my ability based upon this

8    statement because I believe even the police testified,

9    Sergeant Potrafka, that there is some inconsistencies in

10   terms of what actually happened in that particular docu-

11   ment, that to make a contention that my opportunity to

12   cross-examine Mr. Cassaday concerning this, if in fact

13   it was as the prosecutor alleges, Judge, I think would

14   be nonsensical.  That it would have--not add anything to

15   a jury's decision in this particular case.

16        THE COURT:  All right.  Well, starting out with

17   the ten-page instant message that seems to be dated at

18   the bottom November 8, 1999.

19        The Court understands the theory of the People

20   that the entirety of the document should come in.  Cer-

21   tainly the portions attributable to the Defendant Miller

22   come in under the party admissions, so-called party ad-

23   mission exception.

24        The responding communications from JLC 1006 can

25   be dissected, I suspect, either as a whole and come in

50