UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHAREE PAULETTE MILLER,

                Petitioner,              CASE NUMBER:  05-73447
                                       HONORABLE VICTORIA A. ROBERTS

v.

CLARICE STOVALL, Warden,
Robert Scott Correctional Facility,

                Respondent.

_____/

### ORDER DENYING RESPONDENT'S MOTION TO STAY AND GRANTING PETITIONER'S MOTION TO SET BAIL

## I.    INTRODUCTION

This case is before the Court on motion by Clarice Stovall ("the Warden") to Grant Stay of Writ of Habeas Corpus Pending Appeal, and Sharee Miller's Motion to Set Bail.  The Warden's motion is **DENIED**; Ms. Miller's motion is **GRANTED**.

## II.   BACKGROUND

On November 9, 1999, Sharee Miller's husband, Bruce Miller, was shot and killed at B&D Auto, his auto shop business in Mt. Morris, Michigan.  Three months later, Miller's lover, Jerry Cassaday, committed suicide at his home in Odessa, Missouri. Miller was charged with conspiracy to commit murder and murder in the second degree after evidence emerged linking her and Mr. Cassaday to Mr. Miller's killing.

Miller was tried in Genesee County, from December 13 to 22, 2000.  At trial, Jerry Cassaday's brother Michael testified that, three months before his death, Jerry told him, "look, Mike, anything ever happens to me there is – there is a briefcase under – under the bed at home. . . . [G]et a hold of the briefcase and you will know what to do

with it then." (Trial Tr. vol. II, 356, Dec. 14, 2000.) When he learned of his brother's

death, Michael Cassaday went to his apartment, looked under the bed and found the

briefcase, with four sealed envelopes attached to it. One envelope carried the name of

an attorney, with address and telephone numbers, and a handwritten instruction: "Mike,

do not open alone." (*Id.* at 347.) Another letter was addressed to Jerry Cassaday's

mother and father. Michael Cassaday arranged a meeting with the family and the

attorney, at which the briefcase and letters were opened. (*Id.* at 348.) Inside the

briefcase were, among other things, print-outs of electronic "instant messages" between

Miller and Jerry Cassaday, in which they discussed killing Bruce Miller.

Over the defense's objection, the trial court admitted into evidence the letter

addressed to Mr. Cassaday's mother and father ("the suicide note"). The note

described Mr. Cassaday's relationship with Miller and explained that she had twice

gotten pregnant with his children, but each time Bruce Miller beat her and caused her to

miscarry. Mr. Cassaday also claimed he murdered Mr. Miller with Sharee Miller's

assistance, stating: "I drove there and killed him. Sharee was involved and helped set it

up, I have all the proof and I am sending it to the police, she will get what's coming. . . .

[S]he just wanted all her money and no more husband, well she got her wish, but she is

soon to learn that she can't do that to people." (Pet. Ex. A.)

The remaining facts are summarized by the Michigan Court of Appeals:

[N]umerous email communications between Miller and Cassaday were
recovered from Cassaday's computer hard drive. Cassaday and Miller
wrote the emails between August and November 1999 and they reveal the
extent of their relationship, their future plans to marry, Miller's false claim
that she was pregnant, and her desire to kill her husband.
At trial, Miller denied any involvement in her husband's murder. However,

2

based on the above evidence, prosecutors argued that Miller manipulated Cassaday into killing her husband by claiming that her husband abused her. Prosecutors also presented evidence that, on two occasions, Miller falsely told Cassaday that she was pregnant with his children, but that the unborn babies died from her husband's abuse.

*People v. Miller*, No. 233018, 2003 Mich. App. LEXIS 1495, at *2-3 (Mich. Ct. App. June

24, 2003) (unpublished).

The Court of Appeals's summary omits reference to an important circumstance,

which Miller details in her statement of facts:

> Within 24 hours of Bruce Miller's death the police had a suspect: John Hutchinson. Both Hutchinson and Bruce Miller were the targets of an ongoing criminal investigation by the Genesee County Auto Investigation Network for tampering with Vehicle Identification Numbers (VIN). Though Hutchinson denied any involvement with the VIN switching, he was ultimately charged with two felony counts before pleading guilty to a misdemeanor charge. Harold Hutchinson, John Hutchinson's brother and an employee at B&D, testified that prior to the murder, John Hutchinson had threatened to "dispose of" Bruce Miller because of both the criminal investigation and a dispute over a loan. Harold Hutchinson also testified that around 7:00 p.m. on the night of the murder, John Hutchinson told Harold Hutchinson on the phone that he had "disposed of Bruce Miller." Harold Hutchinson understood John to mean that John had killed Bruce Miller.
>
> The morning after the murder, before learning of Bruce Miller's death, John Hutchinson's step-son Anthony Birch told police that, on the night of the murder, John Hutchinson was not home between 5:30 and 7:30, and that when John Hutchinson returned home he was acting "strange."
>
> The prosecution successfully barred Mrs. Miller from introducing into evidence results of a polygraph test that indicates that John Hutchinson was "deceptive" when denying his involvement in Bruce Miller's murder.

(Pet. 9-10 (internal citations omitted)).

The jury convicted Miller of conspiracy to commit first-degree murder and

second-degree murder as an aider and abettor. The trial court sentenced her to life in

prison on the conspiracy conviction, and a concurrent term of 54 to 81 months for the

second degree murder conviction, which she has entirely served.

After exhausting state court remedies, Miller filed for habeas corpus.  The Court conditionally granted the writ on August 27, 2008, and gave the State 60 days to initiate steps to retry Miller, or release her.  *Miller v. Stovall*, 573 F. Supp. 2d 964, 983 (E.D. Mich. 2008).

On September 25, the Warden filed a timely notice appealing the Court's Order to the Sixth Circuit.  On November 14, the Warden filed this motion for stay pursuant to Fed. R. App. P. 23, asking the Court to keep Miller in custody pending resolution of the appeal (Doc. #47).  Miller opposes the stay request, but argues that if the Court is inclined to find in the Warden's favor, the Court should grant her bond (Doc. #50). Concurrently, Miller moved on November 17 for the Court to set bail for the duration of the appeal (Doc. #48).  The Warden filed its opposition on November 21 (Doc. #49).

## III.   ANALYSIS

Although this matter is pending before the Sixth Circuit, this Court retains jurisdiction to enter a stay or set bail, pursuant to Fed. R. App. P. 23(c):

> While a decision ordering the release of a prisoner is under review, the prisoner must--unless the court or judge rendering the decision, or the court of appeals, or the Supreme Court, or a judge or justice of either court orders otherwise--be released on personal recognizance, with or without surety.

Rule 23(c) creates a presumption that a prisoner granted habeas relief will be released. *Hilton v. Braunskill*, 481 U.S. 770, 774 (1987).  This presumption may be overturned, however.

The Supreme Court holds that the same standards governing stays of civil judgments apply to the release of habeas petitioners pending appeal.  *Id.* at 776.

4

Miller's motion to set bail and the Warden's motion for stay both concern her potential release; therefore, the same analysis applies to both.

The traditional factors to review when determining whether to stay an order pending appeal are:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Id.*; *Workman v. Tate*, 958 F.2d 164, 166 (6th Cir. 1992). In addition, courts must consider whether the petitioner poses a risk of flight, the potential danger to the public if she is released, and "[t]he State's interest in continuing custody and rehabilitation." *Braunskill*, 481 U.S. at 777. The Supreme Court advises that, in general,

> The interest of the habeas petitioner in release pending appeal . . . will be strongest where the factors mentioned [above] are weakest. The balance may depend to a large extent upon determination of the State's prospects of success in its appeal. Where the State establishes that it has a strong likelihood of success on appeal, or where, failing that, it can nonetheless demonstrate a substantial case on the merits, continued custody is permissible if the second and fourth factors in the traditional stay analysis militate against release. Where the State's showing on the merits falls below this level, the preference for release should control.

*Id.* at 777-78, (citations omitted).

On appeal, the district court's ruling benefits from a presumption of correctness, which "may be overcome in the appellate court 'for special reasons shown.'" *Workman*, 958 F.2d at 166 (*quoting Braunskill*, 481 U.S. at 774).

The first order of business is to determine whether to stay habeas pending appeal. If the Court decides to release Miller, it must consider whether to set bail.

**A.    The Warden's Motion for Stay**

5

The Warden argues the *Braunskill* factors support staying Miller's release until the Sixth Circuit decides the appeal. Miller counters the motion is untimely, because the Warden filed it after the writ's conditions expired. In the alternative, Miller requests the Court to release her on bond.

When granting petitions for habeas corpus, courts often make their rulings contingent on certain conduct, or absence of conduct, by the respondent. The Sixth Circuit considered such a conditional habeas grant in *Satterlee v. Wolfenbarger*, 453 F.3d 362, 364-65 (6th Cir. 2006), *cert. denied*, 549 U.S. 1281 (2007). In *Satterlee*, the petitioner was convicted of conspiring to deliver cocaine and received 20 to 30 years. *Id.* at 364. He applied for habeas on ineffective assistance grounds, claiming his attorney failed to tell him, before trial, that the State had made a more favorable plea offer. *Id.* The district court granted a conditional writ ordering the petitioner's release unless the State reinstated the offer within 60 days. *Id.* at 365. The State appealed, but did not restore the plea deal. *Id.* After the deadline passed, the petitioner applied for immediate release, and the State filed a motion for stay pending appeal. *Id.* The district court denied the stay and ordered the petitioner released. *Id.*

On appeal, the State argued the district court could not grant such remedy, but the Sixth Circuit affirmed, stating:

> "[c]onditional [writs] are essentially accommodations accorded to the state. They represent a [habeas] court's holding that a[n] . . . infirmity justifies petitioner's release. The conditional nature of the order provides the state with a window of time within which it might cure the . . . error." *Phifer v. Warden*, 53 F.3d 859, 864-65 (7th Cir. 1995). When the state fails to cure the error, i.e., when it fails to comply with the order's conditions, "[a] conditional grant of a writ of habeas corpus *requires* the petitioner's release from custody." *Fisher v. Rose*, 757 F.2d 789, 791 (6th Cir. 1985) (emphasis added); *accord, e.g., Wilkinson v. Dotson*, 544 U.S. 74, 87, 125

6

> S. Ct. 1242, 161 L. Ed. 2d 253 (2005) (Scalia, J., concurring) ("Conditional writs enable habeas courts to give States time to replace an invalid judgment with a valid one, and the consequence when they fail to do so is always release."); *Henderson v. Frank*, 155 F.3d 159, 168 (3d Cir. 1998); *Phifer*, 53 F.3d at 864-65; 2 RANDY HERTZ & JAMES S. LIEBMAN, FEDERAL HABEAS CORPUS PRACTICE AND PROCEDURE § 33.3, at 1684 (5th ed. 2005) ("If the state fails to act within the time set for retrial (or for some other proceeding) to occur, the petitioner must be released from custody immediately.").

*Id.* at 369 (footnote omitted) (alterations in original).  The Sixth Circuit upheld the writ and remanded to the district court to determine whether the petitioner could be prosecuted again after his release.  *Id.* at 370.

This case is indistinguishable from *Satterlee*.  In granting habeas, the Court ordered Miller to be released only if the Warden failed to take measures to retry her within 60 days.  *Miller*, 573 F. Supp. 2d at 983.  The Warden filed its motion for stay 18 days after deadline; it mentions no steps taken to retry Miller, nor does it state any reason for failing to do so.

The Warden does not claim the September 25 notice of appeal sufficed to meet its obligation to initiate a retrial, or that it had the effect of a stay.  Thus, the Court does not address these arguments, except to note that they are not supported by the rules, and have been rejected by others.  *See* Fed. R. App. P. 8 & 23; *United States ex rel. Barnwell v. Rundle*, 461 F.2d 768, 769-70 (3d Cir. 1972) ("The filing of a notice of appeal does not operate as a stay of judgment."); *Manley v. Ross Corr. Inst. Warden*, No. 3:04 CV 7351, 2008 U.S. Dist. LEXIS 54579, at *6 (N.D. Ohio July 17, 2008) (unpublished) ("In a habeas proceeding, the mere pendency of an appeal does not stay the district court's decision granting a writ."); *Burdine v. Johnson*, 87 F. Supp. 2d 711, 713 (S.D. Tex. 2000) (*citing Barnwell*) (a notice of appeal does "not automatically stay

the Order or relieve the State of its obligation to comply with the Order." ). *Cf. Jago v. United States Dist. Court*, 570 F.2d 618, 623 (6th Cir. 1978) (holding that district courts maintain authority over the custody or enlargement of prisoners while habeas decisions are appealed).

The Warden was ordered by this Court to take steps to retry Miller within 60 days, or release her. The condition lapsed; hence, the Warden can no longer keep Miller confined. The Court need not address Miller's request for bond.

**B.    Miller's Motion to Set Bail**

Miller asks to be released on bail pending decision on the State's appeal of this Court's Order granting habeas. The Warden bears the burden to overcome the presumption favoring Miller's release. *Braunskill*, 481 U.S. at 778.

**1.    Likelihood of Success on the Merits**

The Warden challenges the Court's determination that the admission of Jerry Cassaday's suicide note at Miller's trial was an unreasonable application of clearly established federal law. The Warden also argues that even if the trial court erred in admitting the note, the error was harmless.

**a.    Unreasonable Application of Clearly Established Law**

Among the issues raised on direct appeal, Miller argued that Mr. Cassaday's suicide note was testimonial hearsay, and that its admission violated her rights under the Sixth Amendment's Confrontation Clause. The Michigan Court of Appeals rejected this claim, but while the appeal was pending in the Michigan Supreme Court, the United States Supreme Court issued *Crawford v. Washington*, 541 U.S. 36 (2004), which

significantly altered Confrontation Clause jurisprudence.

In *Crawford*, the Supreme Court held that testimonial statements by witnesses absent from trial are admissible only where the declarant is unavailable, and the defendant had prior opportunity to cross-examine the declarant.  541 U.S. at 68.  The Court refused to issue a comprehensive definition of "testimonial," but provided three "formulations of th[e] core class of 'testimonial' statements":

> [1] *ex parte* in-court testimony or its functional equivalent--that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; [2] extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; [and] [3] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

*Id.* at 51-52 (internal quotations and citations omitted); *United States v. Hadley*, 431 F.3d 484, 499 (6th Cir. 2005).

The Sixth Circuit explains that, when reviewing whether a statement is "testimonial" for Confrontation Clause purposes, "[t]he proper inquiry . . . is whether the declarant intends to bear testimony against the accused.  That intent, in turn, may be determined by querying whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting the crime."  *United States v. Cromer*, 389 F.3d 662, 675 (6th Cir. 2004).

The Court agreed with the Magistrate Judge that Mr. Cassaday's suicide note fell within the third *Crawford* category of testimonial statements, because an objective witness would reasonably believe it would be available for use at trial.  The Court concluded the note's admission was an unreasonable application of *Crawford*'s clearly-

9

established rule that the Confrontation Clause bars testimonial hearsay in the absence
of a prior opportunity for cross-examination.  Because *Crawford* became law while
Miller's appeal was pending before the Michigan Supreme Court, the decision of the
Court of Appeals should have been reversed.

The Magistrate Judge cited several reasons why Mr. Cassaday's suicide was
testimonial in nature:

> Cassaday was a former police officer who clearly intended his letter to be
> found, a chain of evidence preserved (that is, through his instructions to
> his brother) and for the letter to be used as evidence against petitioner.
> He states his intention in the note itself, and planned in advance for his
> brother to find the letter and deliver it to the authorities.  Indeed, apart from
> the formalized testimonial materials described by *Crawford*'s first category
> of statements, it is difficult to conceive of testimonial hearsay which is
> more consciously designed to provide incriminating evidence than
> Cassaday's suicide note.  And the clarity with which the note itself reveals
> its testimonial character renders a contrary conclusion unreasonable in
> light of *Crawford*.

(Report and Recommendation of Magistrate Judge Paul J. Komives 18 (Doc. #33)
[hereinafter R&R] (footnote omitted).)

The Warden argues Mr. Cassaday's suicide note was not testimonial in nature,
and thus its admission did not violate Miller's Sixth Amendment rights.  The Warden
emphasizes that Mr. Cassaday addressed the note to his parents, and included the
words: "I have all the proof and I am sending it to the police."  The Warden contends the
word "proof" refers to the briefcase only, not to the letters that were attached to it.
According to the Warden, this shows Mr. Cassaday intended to preserve the chain of
custody only as relating to the briefcase and its contents.  Thus, the Warden concludes,
it would not have been unreasonable for the Michigan Court of Appeals to conclude that
Mr. Cassaday did not intend his suicide note to be used at trial.

10

The Warden's arguments would be more persuasive were it not for the fact that Mr. Cassaday deliberately attached the note to the briefcase containing his evidence against Miller.  Had the note been found on Mr. Cassaday's lap, or elsewhere in the apartment, an objective witness might reasonably conclude Mr. Cassaday meant for it to be read by his parents and family, not to be used at trial.  Instead, Mr. Cassaday slid the briefcase and envelopes under his bed, where he told his brother to look in case something happened to him.  A reasonable witness in Mr. Cassaday's position (with his experience as police officer), would undoubtedly anticipate that the suicide note would be "used against the accused in investigating and prosecuting the crime." *Cromer*, 389 F.3d at 675.  In fact, when Michael Cassaday found the briefcase and his brother's instruction not to open it alone, he reasonably decided to keep the briefcase and the attached envelopes sealed, and to open them only with an attorney present.

Under *Crawford*, Mr. Cassaday's suicide note was testimonial, and its admission at trial was an unreasonable application of Supreme Court precedent.  The Court concludes the Warden is unlikely to succeed on the merits.

However, even if Mr. Cassaday's suicide note should not have been admitted at trial, Miller is not entitled to habeas relief if the error was harmless.  *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986); *Hill v. Hofbauer*, 337 F.3d 706, 718 (6th Cir. 2003).

### b.      Harmless Error – Waiver

In granting habeas, the Court found the Warden waived the harmless error argument by failing to raise it in responding to the Petition.  The Warden argues only an explicit waiver by the State can discharge a petitioner of the obligation to prove harmfulness.

11

The Warden contends that a prisoner seeking habeas is obligated to show the error was harmful; therefore, mere silence by the State is not enough to satisfy the petitioner's burden.  In support, the Warden cites *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) ("habeas petitioners . . . are not entitled to habeas relief based on trial error unless *they* can establish that it resulted in 'actual prejudice.'") (emphasis added).

The Warden is incorrect.  Regardless of who bears the burden of proof, the initial inquiry is which party bears the burden of pleading harmlessness.  Most courts hold that harmless error is a defense to habeas: if the State does not raise the issue in a manner both timely and unequivocal, the defense is waived.  *See, e.g., Sanders v. Cotton*, 398 F.3d 572, 582 (7th Cir. 2005) ("[State] did not make [harmless error] argument in the district court, so it is waived."); *Gibbs v. Frank*, 387 F.3d 268, 277 n.7 (3d Cir. 2004) ("The state does not contend that admitting [the] testimony did not have "'a substantial and injurious effect or influence in determining the jury's verdict.'"); *Saldano v. Roach*, 363 F.3d 545, 554-55 (5th Cir.), *cert. denied*, 543 U.S. 820 (2004) (district court did not ignore Supreme Court authority in holding State waived harmless error); *United States v. Vallejo*, 237 F.3d 1008 (9th Cir. 2000), *reprinted as amended*, No. 99-50762, 2001 U.S. App. LEXIS 7367, at *47 (9th Cir. Apr. 23, 2001) ("The Government does not argue that this error was harmless and thus waives that argument.").  *See also* 2 Randy Hertz & James S. Liebman, *Federal Habeas Corpus Practice and Procedure* § 31.2a & n.1 (5th ed. 2005) ("Like other defenses to habeas corpus relief, the 'harmless error' obstacle does not arise unless the state asserts it; the state's failure to do so in a timely and unequivocal fashion waives the defense.") (citing cases).

The Sixth Circuit has neither explicitly adopted nor rejected the rule that failing to

12

raise harmless error amounts to waiver.  In *Hargrave v. McKee*, the court held the

defense waived, in part because the State's appeals brief contained a fact sheet with a

checked box indicating it did not seek to pursue the issue.  248 Fed. Appx. 718, 728

(6th Cir. 2007).  *See also Payne v. Bell*, 399 F.3d 768, 784 n.5 (6th Cir. 2005) (State

waived harmless error by checking "No" on the fact sheet filed with its response brief),

*withdrawn on other grounds and substituted by Payne v. Bell*, 418 F.3d 644 (6th Cir.

2005).

The Warden contends *Hargrave* stands for the proposition that direct evidence is

necessary to find waiver, and that simply failing to raise the issue does not suffice.

However, *Hargrave* itself shows Sixth Circuit law is less rigid than the Warden would

have it.

The *Hargrave* court did not rely solely on the State's fact sheet to find waiver.

After noting the checked box, the court added: "the state did not argue elsewhere in its

brief that the state trial court's decision was harmless error.  'Even appellees waive

arguments by failing to brief them,' and, accordingly, the state has waived any

harmless-error argument."  *Hargrave*, 248 Fed. Appx. at 728 (*quoting United States v.*

*Ford*, 184 F.3d 566, 578 n.3 (6th Cir. 1999), *cert. denied*, 528 U.S. 1161 (2000)).  The

court's language indicates the argument would be deemed waived even without the fact

sheet, simply because the State neglected to brief the issue.

The best discussion of harmless error waivers in this circuit can be found in

Judge Cole's concurrence to *Calvert v. Wilson*, 288 F.3d 823 (6th Cir. 2002).  In *Calvert*,

the majority skipped the waiver discussion under the reasoning that, since it determined

the error was not harmless, the issue of whether the State had waived the argument

13

was of no consequence.  *Id.* at 833 n.1.  Judge Cole criticized this approach, stating:

> While a petitioner has the responsibility of ensuring that all claims in
> support of a petition for writ of habeas corpus are timely raised, so too
> does the warden bear the responsibility of ensuring all defenses, including
> harmless error, are timely raised. . . .  Just as a defendant may not "save"
> claims for strategic purposes, the state may not place the harmless error
> defense in an arsenal for safekeeping in the event that its substantive
> constitutional arguments fail.  Both parties must present their cards at the
> outset; as [a] matter of fundamental fairness and judicial economy, hidden
> hands should not be encouraged.

*Id.* at 835-36 (Cole, J., concurring) (*citing Hitchcock v. Dugger*, 481 U.S. 393, 399

(1987) ("Respondent has made no attempt to argue that this error was harmless . . . in

the absence of such a showing our cases hold that the exclusion of mitigating evidence

of the sort at issue here renders the death sentence invalid.")) (other internal citations

omitted).  Judge Cole said the argument should be deemed waived, since the State's

appeal brief only mentioned harmless error in a footnote, in cursory terms and without

analysis.  *Id.* at 836-37.

Compared to the *Calvert* majority opinion, which explicitly declines to address the

issue, Judge Cole's analysis is more persuasive, and it comports with the law in other

circuits.  Together with the Sixth Circuit's statement in *Hargrave*, the Court is satisfied

that by failing to argue harmless error when opposing the petition, the Warden waived

the issue.

### c.     Harmless Error – Analysis

Even if the Warden did not waive the defense, Miller is entitled to habeas relief if

she can demonstrate that admitting Mr. Cassaday's suicide note at trial was not

harmless error.  The Warden argues admitting the note was harmless error, because it

was cumulative to other evidence properly introduced at trial.

14

On collateral review under 28 U.S.C. § 2254, an error is deemed harmless unless it "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993) (*quoting Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).  *See also Fry v. Pliler*, 551 U.S. 112, 121-22 (2007) (reaffirming *Brecht* as the correct standard on § 2254 review); *Wilson v. Mitchell*, 498 F.3d 491, 502-03 (6th Cir. 2007).  If an error generates "grave doubts" as to its harmlessness, the reviewing court should treat it "not as if it were harmless, but as if it affected the verdict.'" *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995); *Hamilton v. Morgan*, 474 F.3d 854, 867 (6th Cir. 2007).  The Supreme Court defines "grave doubt" as a judge's state of mind when "the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error."  *O'Neal*, 513 U.S. at 435; *Forensic v. Birkett*, 501 F.3d 469, 481 (6th Cir. 2007).

In *Van Arsdall*, the Supreme Court explained that whether an error is harmless depends upon a "host of factors," including:

(1) the importance of the witness' testimony in the prosecution's case;
(2) whether the testimony was cumulative;
(3) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points;
(4) the extent of cross-examination otherwise permitted; and
(5) the overall strength of the prosecution's case.

475 U.S. at 684.  *See also Vasquez v. Jones*, 496 F.3d 564, 574 n.8 (6th Cir. 2007); *Hill*, 337 F.3d at 718 (specifically addressing second degree murder under Michigan law).  The Court notes the important distinction in *Van Arsdall* between the cumulative nature of erroneously admitted hearsay evidence, and the existence of properly-admitted corroborating evidence.

15

The Court need not repeat the analysis in its Order granting habeas, which addresses each element of the crimes for which Miller was convicted and explains why admitting the suicide note was not harmless error.  Instead, the Court reviews the four *Van Arsdall* factors, addressing in particular the Warden's contention that the note was cumulative to other evidence properly introduced at trial.

### i.      Importance of Testimony in Prosecution's Case

The suicide note was an important element of the State's case, but less so than the instant messages between Miller and Mr. Cassaday.  As the Magistrate Judge noted, "Cassaday's suicide note states only that petitioner was involved, without providing any details of that involvement.  The instant messages, on the other hand, show in detail petitioner's active involvement in the instigation and planning of the murder."  (R&R 23-24.)  However, the suicide note's importance was enhanced due to the overall weakness of the State's case, which relied only on circumstantial evidence. In particular, the note was the only evidence confirming that Mr. Cassaday, not a different viable suspect, actually carried out the murder.  As such, it not only corroborated the statements in the instant messages, it also helped establish their authenticity for the jury.

The suicide note may not have been the cornerstone of the State's case, but it was an important element in its own right, and for its role in reinforcing other evidence against Miller.  This factor weighs mildly against finding harmless error.

### ii.     Cumulative Nature of Testimony

The Warden contends admitting the note was harmless error, because the

16

statement implicating Miller in her husband's murder was cumulative to other evidence properly introduced at trial.  The Court disagrees.

It is easy to confuse the "cumulative" and "corroborative" elements of the *Van Ardsall* test; in fact, the Court and the Magistrate Judge are both guilty of this mistake. *See Miller*, 573 F. Supp. 2d at 980.  For this reason, it is best to refer to the definition of "cumulative" set forth by the Advisory Committee on Evidence Rules:

> Evidence is "cumulative" when it adds very little to the probative force of the other evidence in the case, so that if it were admitted its contribution to the determination of truth would be outweighed by its contribution to the length of trial, with all the potential for confusion, as well as prejudice to other litigants, who must wait longer for their trial, that a long trial creates.

Fed. R. Evid. 403 advisory committee's note (*quoting United States v. Kizeart*, 102 F.3d 320, 325 (7th Cir. 1996)).

In *Kizeart*, a witness denied giving a taped statement to the police identifying the defendant as taking part in an armed robbery.  102 F.3d at 324-25.  The Government had detectives testify that the witness inculpated the defendant, and also introduced the taped statement.  *Id.*  The court held the tape was not cumulative of the detectives' testimony, because it "added considerable probative force on the issue of [the witness'] veracity because it addressed the contradictions between the statements of [the witness] and the detectives."  *Id.* at 325.  The Advisory Committee noted that, in *Kizeart*, "the tape provided useful corroboration where it was the witness' word against that of the officers; if the government had offered the tape together with corroborating testimony of twelve officers, *that* would have been cumulative."  Fed. R. Evid. 403 advisory committee's note (emphasis in original) (*citing F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250 (2d Cir. 1987) (court properly excluded expert

17

testimony on excessive fees since at least four other witnesses testified on the issue)).

*See also United States v. Miles*, 207 F3d 988, 991-93 (7th Cir. 2000) (ballistics expert's

notes and final report were properly excluded, since he testified at length on the

contents of both documents during direct and cross-examination).

Mr. Cassaday's suicide note is clearly not cumulative to the instant messages

introduced at trial.  First, the fact that two pieces of evidence attest to the same fact

does not render the second cumulative to the first.  *Vasquez*, 496 F.3d at 576 ("The

mere fact that one other witness . . . testified to a particular fact . . . does not render

other testimony on that point 'cumulative.'")  The suicide note does more than

corroborate the instant messages; it tends to reinforce their probative value.  "This

potential bolstering weighs against finding harmless error."  *Id.* (*citing Arizona v.*

*Fulminante*, 499 U.S. 279, 299 (1991) (overlapping details between confessions did not

render one cumulative of the other, where "the jury might have believed that the two

confessions reinforced and corroborated each other.")).  Furthermore, there is no

indication that the note's contribution to the determination of truth was outweighed by its

effect on the length of the trial.

This factor weighs against finding harmlessness.

### iii.  Corroborative and Contradicting Evidence

Corroborating evidence is irrelevant to the determination of whether hearsay

evidence is admissible at trial.  *See Lilly v. Virginia*, 527 U.S. 116, 137-38 (1999) ("We

have squarely rejected the notion that 'evidence corroborating the truth of a hearsay

statement may properly support a finding that the statement bears particularized

guarantees of trustworthiness.'") (*quoting Idaho v. Wright*, 497 U.S. 805, 822 (1990)

18

(internal quotes omitted)).  However, corroborating evidence is a relevant factor under the harmless error analysis.  *Hill*, 337 F.3d at 715-16 (*citing Cruz v. New York*, 481 U.S. 186, 194 (1987)).

The hearsay evidence of the suicide note is corroborated by the instant messages and by other properly-admitted circumstantial evidence.  However, there was contradicting evidence as well, most notably the defense's allegation that John Hutchinson was the true murderer.

Overall, this factor supports finding harmless error.

### iv.      Extent of Cross-Examination Otherwise Permitted

"Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested."  *Davis v. Alaska*, 415 U.S. 308, 316 (1974); *Rockwell v. Yukins*, 341 F.3d 507, 512 (6th Cir. 2003).

Without exception, Mr. Cassaday provided the State with its strongest evidence against Miller, either in the documents he kept in his briefcase or in his suicide note. However, given Mr. Cassaday's death, it was impossible for Miller to cross-examine him concerning his allegations and motives.  Therefore, this factor weighs strongly in Miller's favor.

### v.      Balance of *Van Arsdall* Factors

Of the four *Van Arsdall* factors, three weigh either moderately or strongly in Miller's favor.  The Court acknowledged in granting habeas that this is a close question; nevertheless "grave doubt" exists about the harmlessness of the error.

### 2.      Irreparable Harm

19

Miller argues she will suffer irreparable harm if she remains incarcerated.  In particular, she cites the potential damage to her relationship with her two children, ages 13 and 15, who are in Miller's mother's care.  The Warden fails to address this issue.

"The interest of the habeas petitioner in release pending appeal, [is] always substantial . . ." *Braunskill*, 481 U.S. at 777.  Sixth Circuit courts hold that continued imprisonment in violation of the United States Constitution constitutes irreparable harm. *See Newman v. Metrish*, 300 Fed. Appx. 342, 344 (6th Cir. 2008) (unpublished)  ("[the petitioner] suffered a continuing injury while incarcerated"); *Leatherman v. Palmer*, No. 4:06-cv-121, 2008 U.S. Dist. LEXIS 98641, at *12 (W.D. Mich. Nov. 26, 2008) (unpublished) ("It is nearly impossible to compensate for time lost in prison."); *Cristini v. McKee*, No. 01-CV-74483, 2006 U.S. Dist. LEXIS 58413, at *7 (E.D. Mich. Aug. 21, 2006) (unpublished) ("A petitioner suffers irreparable harm each day the petitioner remains imprisoned in violation of the United States Constitution."); *Ward v. Wolfenbarger*, 340 F. Supp. 2d 773, 778 (E.D. Mich. 2004) (same); *Taylor v. Withrow*, No. 00-CV-72292, 2001 U.S. Dist. LEXIS 11688, at *7 (E.D. Mich. Aug. 2, 2001) (unpublished) (same).  *Accord Toney v. Miller*, No. 06-1111, 2008 U.S. Dist. LEXIS 62273, at *5 (E.D. La. July 24, 2008) (unpublished) ("This Court has concluded that the Petitioner was wrongly convicted and his continued incarceration certainly is injurious to him."); *Burdine*, 87 F. Supp. 2d at 717 ("Remedying [the irreparable harm caused by each day of unconstitutional detention] is the very essence of the writ of habeas corpus."); *Harrison v. Ryan*, Civ. A. No. 87-7439, 1990 U.S. Dist. LEXIS 4302, at *5-6 (E.D. Pa. Apr. 12, 1990) (unpublished) ("the liberty interest of an improperly convicted prisoner is stronger than any injury that may be caused to the [State] in releasing

20

petitioner from custody pending retrial.").

Miller served her second degree murder sentence, but remains in prison for life for conspiracy to commit first degree murder.  In reviewing the petition, the Court considered the effect of Mr. Cassaday's suicide note on Miller's conspiracy conviction, and expressed"grave doubt" that allowing the note into evidence was harmless error. *Miller*, 573 F. Supp. 2d at 981.  Miller has already served more time than she would have if convicted solely of second degree murder; continued detention constitutes irreparable harm.

### 3.    Substantial Injury to Others

Miller submits she poses no danger to the community, and argues her release would in fact benefit her two young children.  The Warden cites its duty and interest in "preserving the integrity of its convictions" and protecting the general public from convicted murderers.

The Court is not sure what the Warden means by "preserving the integrity of its convictions."  The validity of the state court's judgment does not rest on Miller's continued detention, but on the ultimate ruling on her habeas petition.  The Warden's concern for the integrity of its convictions would have been better served if she had moved for stay within the deadline.

Without a doubt, the State has "a strong interest in enforcing its criminal judgments and in defending the integrity of its judicial system."  *House v. Bell*, No. 3:96-cv-883, 2008 U.S. Dist. LEXIS 28115, at *6 (E.D. Tenn. Apr. 7, 2008) (unpublished), *aff'd*, 276 Fed. Appx. 437 (6th Cir. 2008), *vacated in part on other grounds*, 2008 U.S. Dist. LEXIS 42326 (E.D. Tenn. May 29, 2008) (unpublished).  *See*

21

*also McCleskey v. Zant*, 499 U.S. 467, 491 (1991) ("Our federal system recognizes the independent power of a State to articulate societal norms through criminal law; but the power of a State to pass laws means little if the State cannot enforce them.").

At the same time, however,

> the public also has a compelling interest in the State not continuing to incarcerate individuals who have not been accorded their constitutional right to a fair trial.  Citizens will not have confidence in the criminal justice system unless they are convinced that the system is compliant with constitutional norms.  The federal writ of habeas corpus monitors the State's compliance with constitutional law; this, in turn, inspires the public's confidence in the criminal justice system.

*House*, 2008 U.S. Dist. LEXIS 28115, at *6.

The Warden provides no evidence to substantiate its argument that Miller's release could pose a danger to the public.  Miller's only prior conviction is a shoplifting misdemeanor in Florida over 15 years ago, and she has no record of violent behavior.  The Court agrees the risk Miller poses to the public is minimal.

### 4.    Public Interest

Miller argues this factor weighs in her favor, because she has a better chance than the Warden of prevailing in the Sixth Circuit.  The Warden contends the public interest is better served by keeping Miller in custody pending a ruling on its appeal.

According to the Supreme Court, the State's interest in continuing custody and rehabilitation is "strongest where the remaining portion of the sentence to be served is long, and weakest where there is little of the sentence remaining to be served." *Braunskill*, 481 U.S. at 777.  Miller's case is a hybrid which does not fit into either category: she served her sentence for second degree murder, but by definition, her life sentence for conspiracy to commit murder remains unfulfilled.  Without more guidance

22

on how to apply this factor, the Court is inclined to hold that it does not weigh significantly in either direction.

Other factors, however, favor release. Miller's risk of flight, which the Warden does not address, is limited. She has two young children, currently in their grandmother's care; if released, Miller states she intends to live a few minutes away from them and play a daily role in their lives. Miller also states she is engaged, and maintains close relations to her friends and family. Miller has substantial ties to the local community, which provide a strong incentive not to abscond during the appeals process.

Miller also appears to have a solid support network. The Court received a signed affidavit of a friend of 14 years, who pledges to give Miller room and board until she can support herself. (Affidavit of Laura Ewald, Pet'r's Mot. Ex. 1.) According to Miller, many people, including her fiancé, family and friends, have offered to help support her financially until she finds a job. The Court believes that, even if Miller is to spend the rest of her days in prison, having her contribute to her children's lives and lead a productive existence will serve the State's interest in rehabilitation and in limiting custody expenses until resolution of its appeal.

The Court finds Miller poses a relatively low risk of flight, and that the public interest supports releasing Miller pending a final ruling from the Sixth Circuit.

## IV.   CONCLUSION

The Court **DENIES** Clarice Stovall's Motion to Grant Stay of Writ of Habeas Corpus Pending Appeal and **GRANTS** Sharee Miller's Motion to Set Bail.

23

FURTHERMORE, the Court **ORDERS** Sharee Miller's immediate release on

$20,000 surety bond at 10%, and **ORDERS** Ms. Miller to report to Pretrial Services

within 72 hours of release.

**IT IS ORDERED**.

S/Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated:  July 15, 2009

The undersigned certifies that a copy of this
document was served on the attorneys of
record by electronic means or U.S. Mail on
July 15, 2009.

s/Carol A. Pinegar
Deputy Clerk