UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHAREE MILLER,

                    Petitioner,              CASE NUMBER: 05-73447
                                             HONORABLE VICTORIA A. ROBERTS
v.                                           Magistrate Judge Paul J. Komives

CLARICE STOVALL,

                    Respondent.
_____/


## ORDER: (1) DENYING PETITION FOR WRIT OF HABEAS CORPUS; (2) GRANTING IN PART A CERTIFICATE OF APPEALABILITY; AND (3) CANCELLING BOND

**I.    INTRODUCTION**

This matter is before the Court for the second time on Petitioner Sharee Miller's application for writ of habeas corpus. (Doc. # 1). A jury convicted Miller of conspiracy to commit first-degree murder and second-degree murder. Miller challenges the admission of a suicide note into evidence at her trial.

The Court heard oral arguments on July 26, 2012.

The Court holds:

(1)    The Michigan Court of Appeals decided Petitioner's Confrontation Clause[1] claim on the merits;

(2)    This Court applies the deferential standard contained in the Antiterrorism and

---

[1] The Confrontation Clause, contained in the Sixth Amendment, states: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const. amend. VI.

Effective Death Penalty Act of 1996 ("AEDPA") to its review of Miller's habeas petition;

(3)     The Michigan Court of Appeals made no decision that was contrary to clearly established federal law, as determined by the Supreme Court of the United States;

(4)     The Michigan Court of Appeals' decision was not based on an unreasonable determination of the facts in light of the evidence presented in Miller's trial proceeding;

(5)     The Michigan Court of Appeals did not unreasonably apply *Ohio v. Roberts*, 448 U.S. 56 (1980), *rev'd*, *Crawford v. Washington*, 541 U.S. 36 (2004), which was the controlling law at the time it made its decision on the merits; the suicide note bore sufficient indicia of reliability to be admissible into evidence; and

(6)     Even if this Court applied a *de novo* standard of review, Miller loses; she does not meet her burden to prove the suicide note lacked the particularized guarantees of trustworthiness required by *Roberts*.

Accordingly, the Court **DENIES** the writ; a Certificate of Appealability issues; and, Miller's bond is cancelled.

## II.     BACKGROUND AND PROCEDURAL HISTORY

The factual background leading to Miller's petition was thoroughly recited in *Miller v. Stovall*, 608 F.3d 913, 915-18 (6th Cir. 2010), *vacated*, *Stovall v. Miller*, 132 S.Ct. 573 (2011) (mem.).  Thus, a brief history will do.

On December 22, 2000 Miller was convicted in state court of second-degree

murder and conspiracy to commit first-degree murder.  The prosecution alleged, and the jury found, that Miller plotted with her former lover, Jerry Cassady, to murder her husband Bruce.  Miller started dating Cassady while she was married to Bruce.  During that time she lied to Cassady; she told him that she was pregnant with his children, but Bruce abused her, causing her to have miscarriages.  She also told Cassady that Bruce was involved in organized crime and that her life was in danger.

On November 7, 1999, Cassady told his brother Mike that he was leaving town and that if he did not return in a couple of days, Mike should look for a briefcase under Cassady's bed.  The next day Bruce was murdered.  By December, Miller left Cassady and started dating someone else.

On February 11, 2000, Cassady committed suicide in his bedroom.  While cleaning Cassady's home following his brother's death, Mike found a briefcase and four notes.  Cassady left three notes: to his youngest son, his ex-wife, and his parents.  The notes were on top of the briefcase Cassady mentioned to his brother on November 7. Taped to the briefcase was a note directing Mike not to open it alone; the briefcase was addressed to an attorney.

Mike opened the briefcase in the presence of an attorney; it contained emails and America Online ("AOL") Instant Messages ("IMs") between Cassady and Miller. These communications revealed the pregnancies, miscarriages and Bruce's abuse, all of which proved to be lies.  The evidence implicated Miller in Bruce's murder.  This briefcase evidence was offered against Miller at her trial.

Cassady's parents gave the police the suicide note he wrote them.  Over Miller's objection, the note was admitted at trial and is the subject of this Court's review of her

3

habeas petition.

The suicide note reads:

Mom and Dad,

I'm sorry for all the pain I caused you, but I had to do this, here is why. After Sharee and I got together I found out she was married. She lied to me and lied to me. Made promises as you well know and I believed them all. She got pregnant with my baby, but her husband beat the crap out of her and killed my baby. She told me that there was nothing she could do because he was involved in organized crime and was afraid of being killed if she left him or tried to prosecute him. She got pregnant again with the twins and this time he had some of his people gang rape her and beat the crap out of her some more 'til they killed my babies again. The man taunted me and taunted me. He threatened me. He sent me letters saying she was going to have a miscarriage again, then he did it. I'm sorry, mom, those were my babies, I loved them, I wanted them. I drove there and killed him. Sharee was involved and helped set it up. I have all the proof and I'm sending it to the police. She will get what is coming. I have been so stupid, but now you know the real story of why I went into such a state of depression. Nothing has helped, not the booze, the drugs or counseling because I just couldn't tell anyone the truth. I was so blind and so stupid and so much in love, little did I know she never meant any of it. She just wanted all her money and no more husband. Well, she got her wish, but she is soon to learn that she can't do that to people. I know that doing this is the coward's way out but I am at my end. Please, please see that Jimmy is taken care of. Everything I own goes to him, I'm not sure if Harrah's will honor my life insurance since I am on leave, but they might. Please put it in a trust fund for him and only him. I love him so much, everything I have done I have done for him, but now I know it was all just more lies and games from Sharee. She didn't care what it took or who she hurt to get what she wanted. I'm sorry I let you down, I love you with all my heart and you were always there for me, but I was so stupid I couldn't see. You were the best parents a guy could ever ask for. Thank you for all you have done all my life. I'm sorry I had to do it this way, but an ex-cop can't go to prison, I'm not strong enough to do it that way. I'm sorry I let you down. I love you. I want to be cremated, I don't deserve anything better. Please take my ashes to my favorite hunting tree, Jimmy knows where it is, it's the only place I really had true peace in my heart. I love you both so much. I wish I could have been able to make you proud of me. Please take care of Jimmy, he was all I had left and I'll never be able to live up to his expectations and love for me. I'm so sorry, mom, I love you. I love you, Jerry.

4

(Doc. # 17-2 at 353).

At the state level, Miller argued that Cassady's statements in the suicide note were inadmissible hearsay and that admission of the note would violate her Sixth Amendment Confrontation Clause rights.  The circuit court admitted the note under "at least two possible theories."  (Doc. # 14, 12/02/00 Tr. 36).  It held that the statements were admissible as dying declarations or under the "catchall" (or residual) exception to the rule barring hearsay.  (*Id.* at 36-39).  It concluded that the statements bore adequate indicia of reliability to satisfy Miller's Sixth Amendment right to confront the witnesses against her under *Roberts*.  (*Id.* at 36).  At the time of Miller's trial, *Roberts* was the controlling authority on the Confrontation Clause's application to hearsay statements; however, the Supreme Court's decision in *Crawford* replaced the *Roberts*' reliability test with respect to testimonial hearsay, which stood for the proposition that a defendant's right to confront an unavailable witness could be overcome if the hearsay statement "[bore] adequate 'indicia of reliability.'" 448 U.S. at 66.

Miller appealed her conviction to the Michigan Court of Appeals.  She argued: (1) the trial court violated the rules of evidence and her Sixth Amendment Confrontation Clause right by allowing the State to introduce the suicide note, IM transcripts, and various e-mails between her and Cassady; (2) the trial court violated her due process right to a fair trial by admitting e-mails, including semi-nude and erotic photographs and videotape of her, which the court said in front of the jury was "pornographic"; (3) the prosecutor and trial court violated her due process right to a fair trial by admitting gruesome photographs of Cassady depicting a bullet hole in his head while sitting in a recliner with an open Bible in his lap.  (Doc. # 1 at 2-3).

5

The Michigan Court of Appeals rejected these arguments. It held: (1) the statements in Cassady's suicide note were sufficiently reliable to fit within the parameters of the residual exception to the hearsay rule and to satisfy Miller's constitutional confrontation right; (2) Miller's portions of the IM conversations were not hearsay and Cassady's portions, though hearsay, were admissible as statements against penal interest and did not violate Miller's right of confrontation; (3) the sexually graphic emails, photographs, and videotape and the photographs depicting Cassady after his suicide were relevant and not unduly prejudicial; (4) Miller was not denied a fair trial by the trial court's reference to the videotape as "pornographic"; (5) the trial court did not abuse its discretion in conducting voir dire; and (6) the trial court did not abuse its discretion by finding substantial and compelling reasons to depart from the sentencing guidelines range. *People v. Miller*, No. 233018, 2003 WL 21465338, at *2-10 (Mich. App. June 24, 2003) (per curiam).

With respect to the admissibility of the suicide note – the only issue on which this Court must rule – the state court concluded,

> Here, the totality of the circumstances surrounding the making of the suicide note indicate that the statements possessed sufficient guarantees of trustworthiness to satisfy defendant's constitutional right of confrontation. As noted by the trial court, Cassady's statements were (1) spontaneous and voluntary because he made them without prompting or inquiry, (2) consistent, (3) made fairly contemporaneously to his impending death, and (4) made from personal knowledge. In addition, Cassady directed the statements to family members, i.e., his mother and father, people to whom Cassady would likely speak the truth. Also, the reason Cassady could not testify, because he had committed suicide, militates in favor of admissibility and supports a lack of motive to fabricate.

*Id.* at *2.

Miller sought leave to appeal to the Michigan Supreme Court. On March 8, 2004,

6

while her application for leave to appeal was pending, the United States Supreme Court decided *Crawford*. The Michigan Supreme Court denied leave on April 1, 2004. Miller moved for reconsideration based on *Crawford*. The court denied the reconsideration motion on June 30, 2004; Miller's conviction became final on September 28, 2004.

On September 7, 2005, Miller petitioned this Court for writ of habeas corpus. (Doc. # 1). She claimed: (1) she was denied her Sixth Amendment Confrontation Clause right when the Michigan Court of Appeals decided contrary to, and unreasonably applied, *Crawford,* to uphold the admission of the suicide note and IM transcripts and (2) the cumulative effect of prejudicial evidence improperly introduced at trial – including sexually graphic e-mails, a pornographic video, sexually explicit photographs, a graphic photograph of Cassady's suicide, and testimony that he died with a Bible in his lap – violated her right to a fair trial under the Due Process Clause.

The Court referred the matter to Magistrate Judge Paul Komives for Report and Recommendation ("R & R"). The Magistrate Judge recommended that the Court deny the petition. *Miller v. Stovall*, 573 F. Supp. 2d 964, 984 (E.D. Mich. 2008) (Report and Recommendation). Noting that the Supreme Court provided "inconsistent guidance on the precise time to which a federal court should look to assess what was [clearly established federal law]," the Magistrate Judge concluded that the Court should apply *Crawford* rather than *Roberts* to Miller's claim, because *Crawford* was decided before her conviction became final. *Id.* at 990-91 (citing *Williams v. Taylor*, 529 U.S. 362 (2000)).

Applying *Crawford*, Judge Komives concluded that the suicide note constituted testimonial hearsay and its admission resulted from an unreasonable application of

7

*Crawford. Id.* at 993-94. However, the Magistrate Judge held that this error was

harmless in light of the IM conversations, which were properly admitted:

> Viewed in isolation, Cassady's suicide note implicating petitioner was
> certainly damaging. However, in the context of the trial, the statement
> was cumulative of, and less significant than, petitioner's own statements
> describing her role in the crimes as reflected in the instant messages
> between her and Cassady. Significantly, Cassady's suicide note states
> only that petitioner was involved, without providing any details of that
> involvement. The instant messages, on the other hand, show in detail
> petitioner's active involvement in the instigation and planning of the
> murder. In these circumstances, where the improperly admitted evidence
> is cumulative of more damaging evidence which was properly admitted, it
> cannot be said that the admission of the note had a substantial and
> injurious effect on the jury's verdict.

*Id.* at 997.

With respect to the IMs, the Magistrate Judge concluded that Cassady's

statements fell into the co-conspirator exception to the hearsay rule and therefore, did

not constitute testimonial hearsay. *Id.* at 997-98 (citing cases). Likewise, the

Magistrate Judge concluded that Petitioner's own statements were co-conspirator

statements and admissions by a party-opponent. *Id.* at 997. The Magistrate Judge

then held that Cassady's instructions to Mike were non-hearsay declarations which did

not implicate the Confrontation Clause. *Id.* at 998-99. Finally, the Magistrate Judge

concluded that Petitioner was not entitled to relief on her evidentiary claims. *Id.* at 999-

1001.

On May 29, 2007, Petitioner filed objections to the R & R. (Doc. # 34). She

argued: (1) in addition to being an "unreasonable application of clearly established

federal law," the State's admission of the suicide note was "contrary to" clearly

established law; (2) the State waived any objection that the state court's error in

8

admitting the suicide note was harmless by not raising the issue in the Response to the habeas petition; (3) admission of the suicide note was not harmless given the lack of other evidence against the petitioner and the compelling evidence against another suspect; (4) the Magistrate Judge erred in concluding that the IMs and Cassady's instructions to his brother were not testimonial; and (5) the Magistrate Judge erred in concluding that the State's admission of irrelevant but highly inflammatory evidence did not violate Miller's right to a fair trial.

The Court held oral arguments on Petitioner's motion on August 7, 2008.  On August 27, 2008, the Court (1) granted in part and denied in part Petitioner's objections to the R & R; (2) adopted in part and rejected in part the reasoning of the R & R; (3) rejected the recommendation of the R & R; and (4) conditionally granted the Petition for Writ of Habeas Corpus.  *Miller*, 573 F. Supp. 2d at 971.

The Court agreed with the Magistrate Judge that *Crawford* provided the relevant "clearly established" law with respect to the Confrontation Clause claim.  *Id.* at 975.  It held that the Michigan Court of Appeals' decision to uphold the admission of the suicide note was an unreasonable application of *Crawford*.  *Id.* at 977.  The Court then held that the State waived any harmlessness argument by not raising it in its Response.  *Id.* at 977-78.  Even if Respondent did not waive a harmless error argument, the admission of the suicide note was not harmless.  *Id.* at 978-82.

This was the only ground on which the Court provided relief, and the only ground still at issue.  On July 15, 2009, the Court ordered Miller released on bond.  (Doc. # 51).

Respondent appealed this Court's decision to the United States Court of Appeals for the Sixth Circuit, which held oral arguments on October 15, 2009.  On June 22,

9

2010, the Sixth Circuit affirmed the Court's grant of habeas corpus. *Miller*, 608 F.3d at 915. It held that *Crawford* applied to Miller's habeas petition. *Id.* at 919 ("We conclude that when the governing law changes between a state court's ruling and the date on which a petitioner's conviction became final, a federal habeas court reviewing the state-court judgment must apply the law that controlled 'at the time his state-court conviction became final.'" (quoting *Williams*, 529 U.S. at 390)). It concluded that because no state court ever decided whether the suicide note was testimonial, there was no "adjudication on the merits" to which to defer, therefore, *de novo* review was appropriate. *Id.* at 921-22. The court then held that the suicide note was testimonial and its admission at trial was constitutional error. *Id.* at 923-26. It agreed with this Court that the State waived its harmless error argument. *Id.* at 926-28.

Respondent petitioned the United States Supreme Court for writ of certiorari. On November 14, 2011, the Supreme Court granted the writ, vacated the judgment of the Sixth Circuit, and remanded the case for further consideration in light of *Green v. Fisher*, 565 U.S. ----, 132 S.Ct. 38 (2011). *Miller*, 132 S.Ct. at 573. On February 16, 2012, the Sixth Circuit remanded to this Court "for further consideration in light of *Green*, *Ohio v. Roberts*, 448 U.S. 56 (1980), and any other relevant matter," leaving the question of supplemental briefing to this Court. (Doc. # 62).

Recently, the parties each filed two supplemental briefs; they addressed only whether the introduction of Cassady's suicide note violated the Confrontation Clause under *Roberts*. (Doc. #s 69, 70, 73, 75). The Court held a hearing on July 26, 2012.

## III. ARGUMENTS

After the Supreme Court's remand, the parties agree that *Roberts* – not *Crawford*

10

– applies to Miller's habeas claim.  However, they disagree on (1) this Court's standard
of review and (2) whether Miller is entitled to relief applying *Roberts*.

### A.    Petitioner

Petitioner says it is not clear whether the state court adjudicated Miller's
Confrontation Clause claim on the merits, and the Court should, therefore, apply *de
novo* review rather than the highly deferential standard of the AEDPA.  (Doc. # 69 at 6).
She argues the Michigan Court of Appeals focused on the admissibility of the suicide
note under the "catchall" exception to the hearsay rule, rather than the Confrontation
Clause.  In addition, she contends the appeals court erroneously reviewed the trial court
decision under an "abuse of discretion" standard, when it should have applied a *de novo*
standard since constitutional questions were at issue.  If the state court failed to reach
the federal constitutional claim, Petitioner contends that AEDPA deference would be the
inappropriate standard of review because there is no analysis or conclusion on the
central legal question to which to defer.

Next, Miller argues the state court "applied a rule that allowed it to consider
whether the statements at issue were 'consistent' with other statements or evidence, a
rule that is 'contrary to' clearly established U.S. Supreme Court precedent." (Doc. # 69
at 8).  She argues, when determining whether the suicide note bore adequate indicia of
reliability under the totality of the circumstances, the court considered its "consistency"
with other evidence.  *See Miller*, 2003 WL 21465338, at *2.  Miller cites Supreme Court
precedent for the proposition that comparing the consistency of the statements with
other evidence in the record, to determine whether the statements are reliable for Sixth
Amendment purposes, is forbidden.  (Doc. # 69 at 8).  Miller says, "[t]here is no

11

possibility that the court meant that the [suicide note] was internally consistent, nor are there other statements made at the same time by Cassady which were compared to the letter, as there are in some cases" (*id.* at 8, n. 5); rather, it improperly "evaluated the letter statements in light of other declarations in evidence, including the IM printout." (*Id.* at 8).

Miller next says the admission of the suicide note simply violated the Confrontation Clause.  She argues that Cassady's statements do not fall within a firmly rooted hearsay exception.  If they do not, the statements must bear particularized indicia of trustworthiness under *Roberts* to be admitted into evidence.

Miller contends that the Supreme Court developed a consistent line of cases in addition to *Roberts* addressing the inherent unreliability of accomplice statements. Miller argues the state court ignored: (1) the presumption that accomplice confessions which incriminate defendants are unreliable and (2) the presumption that Cassady's statements must be excluded absent sufficient indicia of reliability.  She says:

> [The applicable Supreme Court precedent] create[s] two related presumptions that should have been applied in this case; both of which were ignored or glossed over by the state court.  First, absent a "firmly rooted hearsay exception," the out-of-court statement "*must be excluded*, at least absent a showing of particularized guarantees of trustworthiness." *Roberts*, 448 U.S. at 66 (emphasis added).  Second, in the more specific case in which the evidence sought to be presented is an extrajudicial statement of a codefendant – admitting culpability and also implicating the defendant – as was the case here, there is a "weighty presumption of unreliability" of this statement.

(*Id.* at 12 (citation and footnote omitted)).

Miller says, instead of examining the facts under the relevant precedent, the Michigan Court of Appeals "unreasonably engaged in a truncated Confrontation Clause

12

analysis" in contravention of Supreme Court law.  (*Id.*).  Miller goes through the factors

the state court relied on to uphold the admissibility of the note, and argues that these

factors actually militate against a finding of admissibility, or have no real bearing on the

inquiry.

> Miller concludes:

> The statement in the letter used in this case, while asserting the
> declarant's involvement, deflects the blame from the declarant and
> spreads the blame to Ms. Miller: "I drove there and killed him;" and
> "Sharee was involved and helped set it up."  Cassady is undeniably
> asserting that he had a role in the death of Bruce Miller and is, equally
> undeniably, asserting that the blame for the killing should be at a
> minimum, spread to, or even largely placed on, Ms. Miller.  This statement
> –spreading and shifting blame to Ms. Miller – is a textbook example of a
> statement that, under clearly established law, is not trustworthy and whose
> admission violated the Confrontation Clause rights of the accused.

(*Id.* at 17 (citing *Lilly v. Virginia*, 527 U.S. 116, 133 (1999))).

## B.     Respondent

Stovall argues that the Court should apply the AEDPA standard of review.

Stovall observes that the Michigan Court of Appeals relied on *People v. Lee*, 243 Mich.

App. 163, 622 N.W.2d 71 (2000), which was based on the *Roberts* line of cases

interpreting the Confrontation Clause.  Thus, Stovall says there was a decision on the

merits.

Stovall argues that the state court's decision is not objectively unreasonable,

emphasizing that courts have much leeway to consider the appropriate factors under

*Roberts*.  She says the presumption of unreliability which attaches to accomplice

confessions can be rebutted, pointing out that the suicide note written by Cassady and

addressed to his parents "bears little resemblance to the confessions that have been

found to be unreliable by the United States Supreme Court." (Doc. # 70 at 30).

That the suicide note was not written at the behest of the police weighs strongly in favor of reliability and distinguishes this case from *Lilly* and *Lee v. Illinois*, 476 U.S. 530 (1986), says Stovall. She suggests that since Cassady did not: (1) place the note in the briefcase with the evidence he explicitly indicated was to be given to the police, or (2) attempt to preserve the note in the same way he did the other evidence, Cassady did not intend for it to reach the police.

In addition, Respondent says, "[t]he conclusion that the decision of the Michigan Court of Appeals was not objectively unreasonable is underscored by the fact that there are no cases that have examined a case analogous to this one in the Supreme Court in applying the principles of *Roberts* in the admission of a written document." (*Id.* at 33). Finally, Respondent contends that even if this Court finds that the Michigan appellate court unreasonably applied *Roberts*, any error is harmless.

## IV.    ANALYSIS

### A.    Standard of Review

The Court agrees with Respondent that the Michigan Court of Appeals adjudicated Miller's Confrontation Clause claim on the merits. Accordingly, the standard of review the Court applies to Petitioner's habeas application is the AEDPA's deferential standard.

The Michigan Court of Appeals acknowledged its obligation to review Miller's constitutional claim *de novo*, and on the merits: "[W]here an evidentiary issue implicates

14

the Confrontation Clause of the federal and state constitutions, we review the constitutional issue de novo." *Miller*, 2003 WL 21465338, at *1.  It then held, "Here, the totality of the circumstances surrounding the making of the suicide note indicate that the statements possessed sufficient guarantees of trustworthiness to satisfy defendant's *constitutional right of confrontation*." *Id.* at *2 (emphasis added).  It was not necessary for the state court to cite *Roberts* to adjudicate the constitutional claim on the merits. *See Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam) (state court does not need to cite, or even be aware of, Supreme Court case law to adjudicate a claim on the merits).

Under the AEDPA, this Court must uphold the state court decision unless it "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

Under the "unreasonable application" clause, a federal court may grant habeas relief if the state court identifies the correct governing principle but unreasonably applies that principle to the facts involved.  *Dorchy v. Jones*, 398 F.3d 783, 787 (6th Cir. 2005) (citing *Williams*, 529 U.S. at 407-08).  An unreasonable application of federal law is different from an incorrect application of federal law.  *Harrington v. Richter*, 131 S.Ct. 770, 775 (2011).  And, a state court's decision precludes federal habeas review as long as "'fairminded jurists could disagree' on the correctness of the state court's decision." *Id.* at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  AEDPA "tells federal courts: Hands off, unless the judgment in place is based on an error grave

15

enough to be called 'unreasonable.'" *Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir. 1998) (quoting *Lindh v. Murphy*, 96 F.3d 856, 870-71 (7th Cir. 1996), *rev'd on other grounds*, 521 U.S. 320 (1997)). When assessing whether a rule was unreasonably applied, courts must look to the rule's specificity; the more general the rule, the more leeway courts have. *Harrington*, 131 S.Ct. at 786.

"Under the 'contrary to' clause, a federal court may grant habeas relief if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has decided on a set of materially indistinguishable facts." *Dorchy*, 398 F.3d at 787 (citing *Williams*, 529 U.S. at 405-06). In addition, "'[a] state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court *applies a rule* that contradicts the governing law set forth in [Supreme Court] cases.'" *Fulcher v. Motley*, 444 F.3d 791, 799 (6th Cir. 2006) (quoting *Williams*, 529 U.S. at 405) (alteration and emphasis in *Motley*).

"Legal determinations made by state courts are entitled to substantial deference under AEDPA." *Dorchy*, 398 F.3d at 787. "As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Harrington*, 131 S.Ct. at 786. "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 332, n. 5 (1979) (Stevens, J., concurring in judgment)). In addition, a federal habeas court must presume the correctness of state court factual determinations. 28 U.S.C. § 2254(e)(1). A petitioner shoulders the burden

16

to rebut this presumption with clear and convincing evidence of incorrectness. *Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998).

In reviewing the state court decision, this Court looks to the last reasoned opinion and, where a higher state court has ruled on a petitioner's motion on grounds different than those of the lower court, this Court reviews the higher court's decision alone. *Salts v. Epps*, 676 F.3d 468, 479 (5th Cir. 2012). The Michigan Court of Appeals' decision was the last reasoned state court opinion in this case. It was decided on the merits, and is the focus of this Court's review under the AEDPA's deferential standard.

Although only Supreme Court case law is relevant to determining what law is "clearly established," the decisions of the United States Courts of Appeals may be helpful to the extent they review and interpret Supreme Court case law to determine whether a legal principle is clearly established by the Supreme Court. *Hill v. Hofbauer*, 337 F.3d 706, 716 (6th Cir. 2003).

## B.   Applicable Law

According to the Sixth Amendment to the United States Constitution, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const. amend. VI. The Confrontation Clause is applicable to the states through the Fourteenth Amendment Due Process Clause. *See Pointer v. Texas*, 380 U.S. 400, 406 (1965). The Court in *Roberts* recognized that a fundamental value protected by the Sixth Amendment is face to face confrontation at trial, and that this right "'forms the core of the values furthered by the Confrontation Clause.'" 448 U.S. at 63, n. 5 (quoting *California v. Green*, 399 U.S. 149, 157 (1970)). "The central concern of the Confrontation Clause is to ensure the reliability of the

17

evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig*, 497 U.S. 836, 845 (1990).

But, the Clause does not guarantee criminal defendants the absolute right to a face to face meeting with the witnesses against them; instead, it permits, where necessary, the admission of certain hearsay despite a defendant's inability to confront the declarant at trial. *Id.* at 845, 847-48.

In *Greene v. Fisher*, --- U.S. ----, 132 S.Ct. 38, 44-45 (2011), the Supreme Court held that clearly established federal law, for AEDPA purposes, is the law at the time of the state-court adjudication on the merits, not the law at the time the petitioner's conviction becomes final. Relying on its decision in *Cullen v. Pinholster*, 563 U.S. ----, 131 S.Ct. 1388 (2011), the Court explained, "§ 2254(d)(1) requires federal courts to 'focu[s] on what a state court knew and did,' and to measure state-court decisions 'against this Court's precedents *as of* '*the time the state court renders its decision.*'" *Id.* at 44 (citing *Cullen*, 131 S.Ct. at 1399) (alteration in original).

Thus, it was error for this Court and the Sixth Circuit to address Miller's claim under *Crawford*, decided on March 8, 2004; this was eight months after the Michigan Court of Appeals affirmed Miller's conviction, but before the Michigan Supreme Court ruled on Miller's request for leave to appeal. The distinction between *Crawford*, and *Roberts*, the controlling Confrontation Clause case before *Crawford*, is important. *Crawford* overruled *Roberts*' holding with respect to testimonial hearsay. In fact, *Roberts* drew no distinction between what was testimonial and what was not, and focused instead on testing reliability. *Crawford* held that out-of-court statements which are

18

testimonial in nature are barred by the Confrontation Clause unless the witness is

unavailable and the defendant had a prior opportunity to cross-examine the witness,

regardless of whether such statements are deemed reliable.  *See Crawford*, 541 U.S. at

53-69.

     *Roberts* held that as long as the government shows that: (1) a witness against the

accused is unavailable for cross-examination at trial and (2) his statement bears

"adequate indicia of reliability," the prosecution's use of that statement does not violate

the defendant's Sixth Amendment right to confront his accuser.  *Id.* at 66.  The Supreme

Court explained that reliability could be inferred without more where the evidence falls

within a firmly rooted exception to the rule barring hearsay.  *Id.*  Otherwise, the evidence

must be excluded absent a showing of "particularized guarantees of trustworthiness."  *Id.*

 *Roberts* established a "'general approach' [to] determin[e] when incriminating

statements admissible under an exception to the hearsay rule also meet the

requirements of the Confrontation Clause."  *Idaho v. Wright*, 497 U.S. 805, 814 (1990)

(quoting *Roberts*, 448 U.S. at 65).  As Respondent points out, "[t]he more general the

rule, the more leeway courts have in reaching outcomes in case-by-case

determinations."  *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).

     The Supreme Court declined to endorse a mechanical test for determining

whether particularized guarantees of trustworthiness exist.  *Wright*, 497 U.S. at 822.

Instead, "the unifying principle is that these factors relate to whether the . . . declarant

was likely to be telling the truth when the statement was made."  *Id.*  In *Wright*, the

Supreme Court listed some of the factors courts can consider to determine whether

hearsay statements are reliable.  *Id.*  These include: the spontaneity and consistent

19

repetition of statements; the mental state of the declarant; and, a lack of motive to fabricate, among others. *Id.* at 821-22. "These factors are, of course, not exclusive, and courts have considerable leeway in their consideration of the appropriate factors." *Id.* at 822.

The *Wright* Court warned that corroborating evidence should not be used to support a hearsay statement's reliability. *Id.* at 822-23. "To be admissible under the Confrontation Clause, hearsay evidence used to convict a defendant must possess indicia of reliability by virtue of its inherent trustworthiness, not by reference to other evidence at trial. *Id.* at 822; *see also Lilly v. Virginia*, 527 U.S. 116, 137-38 (1999) ("We have squarely rejected the notion that 'evidence corroborating the truth of a hearsay statement may properly support a finding that the statement bears particularized guarantees of trustworthiness.'" (quoting *Wright*, 497 U.S. at 822)).

Finally, as Petitioner points out, presumptive unreliability often attaches to accomplices' confessions which incriminate defendants. *Lee v. Illinois*, 476 U.S. at 541-42; *see also Lilly*, 527 U.S. at 131 ("[W]e have over the years 'spoken with one voice in declaring presumptively unreliable accomplices' confessions that incriminate defendants.'" (quoting *Lee*, 476 U.S. at 541) (citations omitted)). That presumption may be rebutted, however, if the statement bears sufficient indicia of reliability under *Roberts*. *Lee*, 476 U.S. at 543.

### C.   The Michigan Court of Appeals did not apply a rule that was "contrary to" Supreme Court precedent when it held that the suicide note was admissible.

The Michigan Court of Appeals correctly recognized that the residual hearsay exception under which Cassady's note was admitted at trial, is not a firmly-rooted

hearsay exception for Confrontation Clause purposes.  *See Wright*, 497 U.S. at 817.

Therefore, the state court considered whether the suicide note bore adequate indicia of

reliability under the totality of the circumstances to determine whether it was admissible.

The court listed several factors on which it relied to conclude that the note was

admissible.  One factor was the statements' consistency.  The court said, "As noted by

the trial court, Cassady's statements were . . . consistent . . . ."  *Miller*, 2003 WL

21465338, at *2.  The court does not explain what it means by "consistent."

Petitioner contends that the state court did not rely on the internal consistency of

the note; rather, it compared the statements in the note to other evidence in the record,

such as the IMs.  This is an important distinction because if the state court meant that

the note was consistent with other evidence in the record, it applied a rule contrary to

Supreme Court precedent as announced in *Wright*.  There, the Supreme Court

admonished,

> the use of corroborating evidence to support a hearsay statement's
> 'particularized guarantees of trustworthiness' would permit the admission
> of a presumptively unreliable statement by bootstrapping on the
> trustworthiness of other evidence at trial, a result we think at odds with the
> requirement that hearsay evidence admitted under the Confrontation
> Clause be so trustworthy that cross-examination of the declarant would be
> of marginal utility.

*Wright*, 497 U.S. at 823; *see also Motley*, 444 F.3d at 805-06 (concluding that the

Kentucky Supreme Court contradicted *Wright* by applying a rule that required it to

consider whether extrinsic evidence corroborated a hearsay statement to determine

whether the statement bore the "particularized guarantees of trustworthiness" necessary

to support its admissibility); *Brown v. Uphoff*, 381 F.3d 1219, 1225 (10th Cir. 2004) (a

state court applies a rule contrary to clearly established federal law where it relies on

21

corroborating evidence to bolster the reliability of a hearsay statement that does not fall within a firmly rooted hearsay exception).

However, if the court meant that the note was internally consistent, that is, Cassady repeated the same or similar statements throughout the narrative, and did not rely on outside evidence to corroborate the statements there, it did not directly contravene *Wright*.  In fact, the *Wright* Court expressly identified the "spontaneity and consistent repetition" of "hearsay statements" as an appropriate consideration when determining whether the statements possess adequate indicia of reliability.  497 U.S. at 821.

The Court disagrees with Petitioner's contention that the state court could have only meant the consistency of the note with other evidence in the record, including the emails and IMs.  Several factors lead to the conclusion that the court referred to the internal consistency of the suicide note.

The state court relies on *Lee*, 243 Mich. App. at 171-73, when discussing the factors it assesses to determine whether there were sufficient indicia of reliability to allow the suicide note into evidence.  *Miller*, 2003 WL 21465338, at *2 .  In doing so, it expressly states, "[t]he court may not consider whether evidence produced at trial corroborates the statement."  *Id.* at *2 (citing *Lee*, 243 Mich. App. at 178).  The *Miller* court observes that "[i]n determining whether a statement possesses adequate indicia of reliability, the trial court must consider the 'totality of the circumstances *surrounding the making of the statement*'. . . ."  *Miller*, 2003 WL 21465338, at *2 (emphasis added). Thus, the court recognized that the only circumstances that mattered were those surrounding the making of the statement, not those outside of the making of the statement that

22

tended to corroborate its veracity.

It is clear that the *Lee* court's reference to "consistency" refers not to the consistency of the statements with other evidence in the record, but to the *consistent repetition* by the declarant of the same or similar statements identifying his attacker as a man who did yard work for him. 243 Mich. App. at 179-81 ("The victim consistently maintained at all times that the 'yard boy' committed the crime. . . . When he was fading in and out of sleep, he maintained that identification. The consistency and lucidity of the identification demonstrates its trustworthiness."). The *Miller* court, having cited to and relied on *Lee*, presumably understood this.

A common sense reading of the language of the opinion leads to the same result. The court says, "As noted by the trial court, Cassady's statements were . . . consistent . . . ." *Miller*, 2003 WL 21465338, at *2. It said the statements were themselves consistent not that they were consistent with anything else in the record. This reading of the court's opinion is certainly plausible. For example, Cassady's statement that Sharee was involved in and helped set up the murder is consistent with the statement that she "just wanted all her money and no more husband." (Doc. # 17-2; 12/14/00 Tr. 352). Likewise, his warning that "she is soon to learn that she can't do that to people" is consistent with his earlier admonition that "[s]he will get what is coming." (*Id.*). He also repeats that Miller lied to him and he felt "taunted" by Bruce.

This reading of the state court's opinion is bolstered by the fact that the court does not explicitly compare the statements to other declarations in evidence, such as those between Cassady and Miller during their IM sessions and emails back and forth. In fact, the court reserves its discussion of the IMs for the next section of the opinion.

23

Accordingly, the Michigan Court of Appeals did not apply a rule contrary to that stated in *Wright* when it referenced the suicide note's "consistency."

     **D.**     **The Michigan Court of Appeals' decision did not involve an unreasonable application of *Ohio v. Roberts*.**

Petitioner also argues that the state court unreasonably applied *Roberts* to the facts of this case. The "unreasonable application" and "contrary to" prongs of § 2254(d) are independent tests with different meanings; thus, even if a state court does not directly contravene governing law, a federal habeas court can still find that the state court unreasonably applied clear law. *See Bell v. Cone*, 535 U.S. 685, 694 (2002).

The Court concludes, however, that the Michigan Court of Appeals did not unreasonably apply *Roberts*. The Court reiterates that *Roberts* set forth a general, nonmechanical test of admissibility. This makes Petitioner's burden eminently more difficult to satisfy. *See Renico v. Lett*, 130 S.Ct. 1855, 1864 (2010) (noting that the more general the rule, the greater the potential for reasoned disagreement among fair-minded judges).

Turning to the factors that the Michigan Court of Appeals considered to determine that Cassady's statements were reliable, it is clear that its decision was reasonable.

     **1.**     **Spontaneous and Voluntary**

First, the court said the statements were "spontaneous and voluntary because [Cassady] made them without prompting or inquiry." *Miller*, 2003 WL 21465338, at *2. This factor indeed weighs in favor of admissibility. While Petitioner argues that suicide notes are by nature deliberative and planned rather than spontaneous, the state court explained what it meant by using the terms "voluntary" and "spontaneous." It said the

24

note was voluntary in the sense that no one prompted Cassady to write it.  *See id.*  It understood the term "voluntary" to mean the statements "were [not] made in response to leading questions of made under undue influence."  *Id.*  It is a reasonable inference for this Court to conclude the Michigan Court of Appeals meant that Cassady's suicide note was his choice to write, making it, in a sense, both spontaneous and voluntary.  This is a finding of fact that Miller has not attempted to rebut and is supported by the record.  28 U.S.C. § 2254(e)(1).

Several cases support the proposition that statements made without questioning – especially leading questioning – or pressure, are more reliable than those that result from interrogation.  *See, e.g.*, *Bruton v. Phillips*, 64 F. Supp. 2d 669, 681 (E.D. Mich. 1999) (holding that declarant's hearsay statements implicating the petitioner were admissible at petitioner's state court trial in part because the statements were "spontaneous," "voluntary," and were not made in a "coercive atmosphere"); *United States v. Accetturo*, 966 F.2d 631, 635 (11th Cir. 1992) (one indicator that declarant's statement was reliable was the fact that he gave it after "voluntarily" coming to the police station and it was not made in response to "leading questions or undue police influence"); *United States v. Barrett*, 8 F.3d 1296, 1300 (8th Cir. 1993) (courts may consider the "spontaneity of the statement" when assessing reliability (citing *Wright*, 497 U.S. at 819)).

There are circumstances in which voluntariness must not be considered.  Courts must not rely on the fact that a legally voluntary, uncoerced statement was made to police after *Miranda* rights were waived to support the reliability of a custodial confession.  *See Lee*, 476 U.S. at 544 (voluntariness for Fifth Amendment purposes

25

does not bear on the question of whether a confession is also free from any desire, motive or impulse to fabricate); *Brown v. Upoff*, 381 F.3d 1219, 1225 (10th Cir. 2004) (holding the Wyoming Supreme Court contravened *Lee* by relying on the voluntariness of statements given by the habeas petitioner's codefendant, after his *Miranda* rights were read, to find those statements reliable).  But, there was no custodial confession here. The Fifth Amendment inquiry is simply not applicable.  Further, the state court made clear that it considered Cassady's statements voluntary in the sense that they did not result from formal questioning; it did not reference *Miranda* or the Fifth Amendment.

### 2.   Repetition

The court relied on the fact that the statements were "consistent."  As already noted, the Supreme Court endorsed the applicability of this factor in some circumstances.  *See Wright*, 497 U.S. at 821; *see also Barrett*, 8 F.3d at 1300 ("Some of the factors that are appropriate to consider include the spontaneity of the statement, *the consistent repetition*, and the child's lack of motive to fabricate." (citing *Wright*, 497 U.S. at 821-22) (emphasis added)).

The Michigan Court of Appeals did rely, in part, on the internal consistency of the suicide note to support its reliability.  While Cassady's statements in the suicide note are somewhat consistent and repetitive (for example, he says multiple times Miller will learn her lesson and that she "lied to me"), this factor is not particularly relevant to the reliability inquiry in this case.  Courts that rely on the consistency of statements to support their admission typically refer to the same or similar statements *repeated at different times to different people.  See, e.g.*, *Lee*, 243 Mich. App. at 168, 179 (holding that a nontestifying declarant's identification of his attacker was reliable in part because

26

he told several people the same thing, the "yard boy" committed the crime); *State v. Robinson*, 153 Ariz. 191, 201, 735 P.2d 801, 811 (1987) ("Nicole's spontaneous revelations of Robinson's acts were consistent.  Her statement to Carol Decker in late September was essentially the same as her statement to Danielle Parr in August.") (cited in *Wright*).

Cassady consistently repeats the same or similar statements throughout his note; however, these statements are made at the same time and to the same people, his parents.  When a factor relied on is not clearly contrary to Supreme Court precedent but does not support the state court's ruling, this Court is to ignore the factor, analyzing only those that provide support.  *See generally Dorchy*, 398 F.3d at 788-91.  Therefore, the consistency of Cassady's statements does not support reliability and admissibility under *Roberts*.

### 3.   Contemporaneous

The Michigan Court of Appeals next considers that the statements were made fairly contemporaneously to Cassady's death.  Bruce Miller was murdered on November 8, 1999; Cassady committed suicide on February 11, 2000.  Courts have observed that the time frame within which hearsay statements are made impacts the reliability analysis.  *See, e.g.*, *United States v. Holland*, 880 F.2d 1091, 1094 (9th Cir. 1989) ("Answers to the following questions are relevant to reliability . . . whether [the statement] was contemporaneous with the matters described."); *United States v. Colon-Miranda*, 992 F. Supp. 82, 85 (D.P.R. 1997) ("Though declarant had previously been arrested and was cooperating with the police and the statement was not given under oath subject to cross-examination, and *despite the fact that declarant made the statement four days after the*

27

*incident*, we find that the other circumstances surrounding the statement are sufficient indicia of trustworthiness for purposes of satisfying [the residual hearsay exception]." (emphasis added)).

The relevant inquiry is whether the suicide note was contemporaneous to the homicide (the matter described in the note), not to Cassady's death. The passage of time dulls memories; the closer in time Cassady's statements were to the murder, the more reliable they are.

The Michigan Court of Appeals did not analyze this question. It is unclear exactly when Cassady wrote the suicide note although presumably it was after the murder; obviously it was before his own death. Thus, it was written sometime in that three month period. Assuming Cassady wrote the note immediately before he committed suicide, the statements were made about three months after the murder. This is not a terribly long time, but, it is much longer than the "four days" the *Colon-Miranda* court found cut against reliability. Moreover, Cassady's statements were not detailed; he simply implicated Petitioner in the orchestration of the murder; he did not describe how she was involved or what she did. The note primarily spoke of his anger toward her because of her duplicity. Thus, passage of time is not relevant to the reliability analysis and does not support the state court's ruling.

### 4.   Personal Knowledge

The fourth factor the state court relied on was "personal knowledge." It observed that Cassady was a witness to the events he described in the note. Petitioner argues that this is not a good factor to use because "more or less *every* statement made by an unavailable party offered for the truth will be from the declarant's 'personal knowledge,'

28

otherwise there would be additional hearsay problems."  (Doc. # 69 at 14).

The Sixth Circuit endorses this as a relevant factor to the trustworthiness analysis. *See Dorchy v. Jones*, 398 F.3d 783, 790-91 (6th Cir. 2005) ("With regard to the fact that Knox was an eyewitness, many courts, including this one, have indeed concluded such a factor supports a finding of trustworthiness." (citing *United States v. Barlow*, 693 F.2d 954, 962 (6th Cir. 1982))).  However, this factor is typically used in the context of an eyewitness to a crime – someone uninvolved in the crime himself – making a statement about what the defendant(s) did.  *See, e.g.*, *Dorchy*, 398 F.3d at 786, 790-91; *Barlow*, 693 F.2d at 962.

Relying on Cassady's personal knowledge of the events described in the suicide note is circular.  The Court would have to presume that Cassady's statements are reliable, but only because he was an eyewitness to the crime.  The Court cannot make this presumption.  The purpose of analyzing these factors is to determine how reliable his statements are, that is, if there is a sufficient likelihood that they are true.  Thus, "personal knowledge" does not support the state court's holding.

### 5.      Statements to Family as Opposed to Law Enforcement

Next, the Michigan Court of Appeals says, "In addition, Cassady directed the statements to family members, i.e., his mother and father, people to whom Cassady would likely speak the truth."  *Mille*r, 2003 WL 21465338, at *2.  Cassady's note was addressed to his parents and was placed on top of the briefcase of evidence for the police.  Cassady did not tell his brother or parents to give the note to the police, as he did with the other evidence.  This factor weighs heavily in favor of reliability.

The Sixth Circuit, along with others, recognizes that statements to friends and

29

family are more reliable than those made to law enforcement as part of a custodial interrogation. *United States v. Franklin*, 415 F.3d 537, 548 (6th Cir. 2005); *United States v. Gibson*, 409 F.3d 325, 337-38 (6th Cir. 2005); *United States v. Manfre*, 368 F.3d 832, 842 (8th Cir. 2004); *United States v. Tocco*, 200 F.3d 401, 406 (6th Cir. 2000); *Bruton v. Phillips*, 64 F. Supp. 2d 669, 680-81 (E.D. Mich. 1999); *Latine v. Mann*, 25 F.3d 1162, 1167 (2d Cir. 1994); *United States v. York*, 933 F.2d 1343, 1362 (7th Cir. 1991), *rev'd on other grounds en banc*, 182 F.3d 562 (7th Cir. 1999); *United States v. Katsougrakis*, 715 F.2d 769, 776 (2d. Cir. 1983), *cert. denied*, 464 U.S. 1040 (1984); *cf. United States v. Seeley*, 892 F.2d 1, 2 (1st Cir. 1989) (holding that the statement against interest exception to the hearsay rule is "firmly rooted" in a case involving statements made to the declarant's girlfriend and stepfather).

The Supreme Court holds a presumption of unreliability attaches to *custodial confessions* by accomplices. *See Lilly*, 527 U.S. at 131 (a statement inculpating the declarant and his alleged accomplices is not trustworthy when made as a part of a custodial confession to law enforcement officers); *Lee*, 476 U.S. at 541 (same). The rationale is that when an accomplice makes statements to investigators, he has a motive to shift the blame to another in order to curry favor with law enforcement. *Lee*, 476 U.S. at 545 (focusing on the motives a *codefendant* might have to implicate another defendant in the crime); *see also Katsougrakis*, 715 F.2d at 776 ("[T]he principal danger of hearsay statements that implicate both the declarant and the accused is that the declarant may have some ulterior motive for volunteering evidence against both parties – the declarant may confess hoping to gain immunity or a reduced sentence in return for his cooperation in convicting the accused."). However, when the declarant makes

30

statements to friends and family he lacks a similar motive to fabricate.  *E.g.*, *Hill v. Hofbauer*, 337 F.3d 706, 717 (6th Cir. 2003) (distinguishing between a confession given to law enforcement and one made to "an acquaintance or a fellow accomplice," stating in the latter situation the declarant is "not motivated by a desire to curry the favor of law enforcement officials"). Cassady was not a codefendant, was not under investigation, and was not attempting to curry favor with law enforcement.

In *Franklin*, a nontestifying codefendant, Jamaal Clarke, told longtime friend Walter Wright that he and defendant Marcus Franklin robbed an armored vehicle.  415 F.3d at 543.  Clarke's statement was admitted at Franklin's trial through Wright.  *Id.* Franklin argued that the testimony violated his confrontation right.  *Id.*  The Sixth Circuit disagreed, concluding that "Clarke's statements to Wright bear particularized guarantees of trustworthiness . . . ."  *Id.* at 545.

The court reasoned:

In contrast to cases in which a declarant confesses to law enforcement but additionally implicates his accomplice in the crime, this case involves statements the declarant (Clarke) made in confidential exchanges with a long-time friend – a friend he had no reason to conclude would reveal those statements to law enforcement.  Moreover, in his statements to Wright, Clarke did not minimize his role in the robbery; the most plausible conclusion to draw from the content of the statements is that Clarke and Franklin each played substantial roles in the commission of the offense. As we recently reiterated, the admission into evidence of statements such as these does not offend the confrontation clause.

*Id.* at 548 (citing *Gibson*, 409 F.3d at 338 ("Griffin's testimony was admissible . . . . Gibson's statements were not made to the police or in the course of an official investigation.  Nor was Gibson attempting to curry favor or shift the blame from himself to Mallicoat.")); *see also Tocco*, 200 F.3d at 416 ("We find that the circumstances

surrounding Polizzi's statements in this case indicate that the statements were trustworthy, particularly in light of the fact that Polizzi's statements were made to his son in confidence, rather than to the police or to any other authority for the purpose of shifting the blame to Tocco.").

In a habeas case from this district, the district court reached the same conclusion. In *Bruton*, the codefendant declarant, Perry Davis, made statements to "various civilian witnesses" implicating the petitioner, Paul Steven Bruton, in two murders. 64 F. Supp. 2d at 678. Those statements were admitted at petitioner's state court trial and he was convicted on two counts of first degree murder. *Id.* at 673, 674. In holding that the admission of these statements did not violate the petitioner's Sixth Amendment right to confront witnesses against him, the district court stated, "First, and perhaps most importantly, the statements were made to friends and personal acquaintances, not to law enforcement officers." *Id.* at 680. The court relied on the Second and Seventh Circuit opinions in *Latine* and *York*. *See id.*

*Latine* and *York* both support the Michigan Court of Appeals' conclusion that this factor weighs in favor of admissibility. In *Latine*, the Second Circuit opined,

> As a general matter, if a declarant's statement results from a formal police interrogation, it cannot be introduced against a defendant as evidence of his guilt unless other evidence demonstrates that the defendant adopted or authorized the statement. The admission of such a statement may not violate the Confrontation Clause, however, if the declarant makes the statement to someone he believes is an ally, and "if the circumstances surrounding the portion of the statement that inculpates the defendant provide no reason to suspect that that inculpatory portion is any less trustworthy than the part of the statement that directly incriminates the declarant."

25 F.3d at 1166-67 (citations omitted). The court later held that the statement bore

32

adequate indicia of reliability.  It said, in relevant part, "Saldana made the statement to a perceived ally, not to law enforcement officials, and thus it cannot be said that he made the statement in an effort to curry favor in a coercive atmosphere."  *Id.*

The *York* court held that the district court did not violate the appellant's confrontation right by admitting hearsay statements of a nontestifying witness into evidence.  933 F.2d at 1362-63.  It stated, "The circumstances surrounding Maher's statements inculpating York – speaking to acquaintances unconnected to law enforcement – make them eminently trustworthy . . . ."  *Id.* at 1362.  It said, the declarant's statements were "so trustworthy, in fact, that the advisory committee used that scenario as an example of an inculpatory statement that 'would have no difficulty in qualifying' for admission under 804(b)(3)."  *Id.* at 1363 (quoting Rule 803(b)(4) Adv. Comm. N. ("[A] statement admitting guilt and implicating another person, made while in custody, may well be motivated by a desire to curry favor with the authorities and hence fail to qualify as a statement against interest. . . . On the other hand, the same words spoken under different circumstances, e.g., to an acquaintance, would have no difficulty in qualifying."))

Cassady's statements are not the result of a formal interview with law enforcement.  He had no apparent reason to curry favor; he believed his fate was either prison or death and said he was choosing the latter.  Moreover, he did not shift blame to Miller or try to exonerate himself.  Although Cassady accused Miller of manipulating and deceiving him, he acknowledged his very important role in the murder, revealing, "I drove there and killed [Bruce Miller]."  (Doc. # 17-2 at 352).

That Cassady accepted responsibility weighs in favor of reliability and

admissibility.  *See Franklin*, 415 F.3d at 548 (concluding the fact that the declarant did not minimize his role in the crime when he made statements to his close friend made those statements more reliable); *Bruton*, 64 F. Supp. 2d. at 681 (declarant's statements trustworthy in part because he did not attempt to diminish his role in the crimes, shift blame to the petitioner, or accuse petitioner of forcing him to commit the crimes or being the "ringleader of the nefarious activities"); *Latine,* 25 F.3d at 1167 ("Finally, Saldana actually inculpated himself in the statement.  Rather than simply stating that the petitioner fired the shot that struck Pellicano, Saldana tied himself directly to the crime by stating that he forced the petitioner at gunpoint to fire upon Pellicano."); *York*, 933 F.2d at 1363 ("[W]hen, as here, the inculpatory portion of a statement is also against the declarant's interest, or when it is neutral because the declarant has not attempted to diminish his own role, there is little reason to suspect that portion of an otherwise reliable statement is untrustworthy." (citing *Lee*, 476 U.S. at 551-52)).

Further, in his plurality opinion in *Lilly*, Justice Rehnquist said confessions made to law enforcement should be treated differently than those made to family members or friends.  527 U.S. at 147 (Rehnquist, J., concurring).  He observed that the Supreme Court, in *Dutton v. Evans*, 400 U.S. 74, 89 (1970), "recognized that statements to fellow prisoners, like confessions to family members and friends, bear sufficient indicia of reliability to be placed before a jury without confrontation of the declarant."  *Id.*  He noted that several federal courts reached the same conclusion.  *Id.*  (citing *York*, *Seely*, and *Katsougrakis*).

Accordingly, the fact that Cassady directed the suicide note to his parents rather than law enforcement, and treated the note differently than the evidence directed to the

34

police, weighs in favor of admissibility.

For the same reasons, Petitioner's argument that introduction of Cassady's confession was contrary to or involved an unreasonable application of the line of cases applying a weighty presumption against the admissibility of accomplice confessions, fails.  *See, e.g.*, *Hill*, 337 F.3d at 716-17.

### 6.   Lack of Motive to Fabricate Because of Sense of Impending Death

The final factor the state court cites is "motive to fabricate."  The court says, "Also, the reason Cassady could not testify, because he had committed suicide, militates in favor of admissibility and supports a lack of motive to fabricate."  *Miller*, 2003 WL 21465338, at *2.  Petitioner suggests that by relying on the reason for Cassady's unavailability to bolster the trustworthiness of the note, the state court conflates the distinct inquiries under *Roberts* "of whether the declarant is unavailable and whether the statement has guarantees of trustworthiness . . . ." (Doc. # 69 at 14).

While the Court agrees with Petitioner that these inquiries are distinct, it is not true that they can never be related or that one can never inform the decision on the other. For example, in *Barrett*, the Eight Circuit said, "Another factor to consider in determining whether [the declarant's] hearsay statements contain particularized guarantees of trustworthiness is the reason for [the declarant's] inability to testify at trial."  8 F.3d at 1300.  The court observed that a child declarant's inability to communicate "may be relevant to whether the hearsay statements possessed particularized guarantees of trustworthiness."  *Id.*

The fact of Cassady's suicide supports a lack of motive to fabricate.  In *Wright*,

the Supreme Court noted that the "dying declaration" exception to the hearsay rule is "based on the belief that persons making such statements are highly unlikely to lie."  497 U.S. at 820 (citing *Mattox v. United States*, 156 U.S. 237, 244 (1895) ("[T]he sense of impending death is presumed to remove all temptation to falsehood, and to enforce as strict an adherence to the truth as would the obligation of oath.")).

It is clear that when Cassady wrote the note, he knew his death was near.  While it does not fit the dying declaration test, this factor was a reasonable one for the state court to apply.

> **7.      The factors supporting the state court's ruling demonstrate that the court did not unreasonably apply *Roberts* to the admission of the suicide note**

The Court's review of these factors leads it to conclude that the state court did not unreasonably apply *Roberts* or any other Supreme Court precedent.  The state court reasonably relied on the facts that the statements were made without prompting or inquiry to family members – people to whom Cassady would likely speak the truth – and while he believed his death was near.  The admission of the suicide note did not violate Miller's Sixth Amendment Confrontation Clause right.  In fact, it becomes clear that fair-minded jurists could disagree over the correctness of the state court's decision – they, too, would not have unreasonably applied the law.

> **E.      Even if the Court applies *de novo* review, the Michigan Supreme Court did not err in admitting the suicide note.**

Assuming, for the sake of argument, that the Michigan Court of Appeals applied a rule contrary to clearly established federal law by comparing the consistency of the statements in Cassady's suicide note to corroborating evidence in the record – although

there is no evidence of this – the Court would still hold that Petitioner is not entitled to relief under a *de novo* standard of review.

When a state court adjudication is contrary to, or involves an unreasonable application of, clearly established federal law, a writ does not automatically issue; instead, the federal court is authorized to issue the writ, but may do so only if, applying *de novo* review, it determines the petitioner is "in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a); *see also Motley*, 444 F.3d at 806; *Rose v. Lee*, 252 F.3d 676, 691 (4th Cir. 2001) ("Neither *Williams* nor § 2254(d) requires issuance of a writ before determining the critical question of whether a prisoner is being held in violation of the Constitution or laws of the United States. Thus, the proper interpretation of the role of § 2254(d)(1) in habeas corpus review is that it establishes a threshold by which we determine whether we are authorized to issue a writ, but it does not compel the issuance of a writ once the standard set forth therein has been satisfied.").

While at the trial stage the State had the burden to show that Cassady's statements were sufficiently reliable to be admissible, at the federal habeas stage, Petitioner must prove that the state court erred, not the other way around.  *See Motley,* 444 F.3d at 806-07.  Therefore, if this Court applied *de novo* review, Miller has the burden to prove that Cassady's statements lacked the particularized guarantees of trustworthiness required by *Roberts* given the totality of the circumstances.

She can not do this.  The state court did not err in admitting the suicide note.  Of primary import is the fact that the note was addressed to, and clearly written for, Cassady's parents.  The law is clear that there is a distinction between confessions that

37

are the result of police interrogation, where there is a real possibility that the declarant will implicate a co-defendant in an attempt to secure prosecutorial immunity or a less severe sanction for his role in the crime, and this situation, where the declarant confesses to friends and family for some reason other than to curry favor with the government.

Furthermore, the suicide note in its entirety does not suggest that Cassady expected or wanted his parents to give it to the police. Instead, the majority of the note explained to his parents why he was going to commit suicide, and why he killed Bruce Cassady. Only one sentence of the somewhat lengthy narrative directly implicates Petitioner in the crime. Although some of the statements indicate a desire to seek revenge against Petitioner, Cassady wrote that he was sending "all the proof" he had against Petitioner to the police; it appears he did not consider the note to be proof of the crime. Indeed, Cassady left the suicide note outside of the briefcase containing the carefully preserved evidence he directed his brother to open in front of an attorney.

Context is important. As observed by the Michigan Court of Appeals, the circumstances in which Cassady wrote the note include his impending suicide. This context suggests that Cassady sought to explain his actions, apologize to his family for hurting them, and provide instructions for the future (i.e., the care of his son), not shift the blame to Miller or otherwise minimize his own role in the crime. Indeed, the majority of the note does these things.

Petitioner cannot meet her burden to show that the state court erred by holding that the suicide note bore sufficient "particularized guarantees of trustworthiness" to satisfy Petitioner's Sixth Amendment confrontation right.

38

## V.    CERTIFICATION OF APPEALABILITY

Before Petitioner may appeal this decision, a certificate of appealability ("COA") must issue. *See* 28 U.S.C. § 2253(c)(1)(A); Fed. R. App. P. 22(b).  Otherwise, the federal court of appeals lacks jurisdiction to entertain an appeal.  *Miller-El v. Cockrell*, 537 U.S. 332, 336 (2003).  A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  *Id.* § 2253(c)(2).  "The [COA] under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2)."  *Id.* § 2253(c)(3).

When a district court rejects a habeas claim on the merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong" to be entitled to a COA.  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  A COA does not require a showing that the appeal will succeed; however, a petitioner must establish more than the absence of frivolity or the existence of mere good faith on her part.  *Miller-El*, 537 U.S. at 337-38.

A COA is appropriate in this case; the Court believes that reasonable jurists would debate this Court's resolution of the Confrontation Clause question.  Specifically, Petitioner is entitled to appellate review of her claims that: (1) the Michigan Court of Appeals applied a rule contrary to Supreme Court precedent when it relied on the "consistency" of the statements in Cassady's suicide note to uphold admission of the note; (2) the court's decision involved an unreasonable application of *Roberts*; and (3) the court erred in ruling the note did not violate her Sixth Amendment confrontation right. The Court does not find the remaining issues raised in the petition debatable by jurists of reason.

39

VI.     **BOND**

Because Miller does not prevail, the Court cancels her bond.

VII.    **CONCLUSION**

The Michigan Court of Appeals held that Cassady's suicide note "possessed sufficient guarantees of trustworthiness to satisfy defendant's constitutional right of confrontation."  *Miller*, 2003 WL 21465338, at *2.  The court's factual determinations, particularly that the statements were spontaneous, voluntary, made directly to Cassady's parents and less likely to be fabricated because he was about to kill himself, were reasonable findings; reliance on these facts to uphold the admission of the suicide note is supported by Supreme Court precedent.  The state court's decision was not contrary to, nor did it involve an unreasonable application of, *Roberts* or any other Supreme Court precedent.  Even applying *de novo* review, Petitioner fails to meet her burden to show that the state court erred.

The Court **DENIES** Miller's petition for writ of habeas corpus, **GRANTS** a certificate of appealability with respect to the issues identified above, and **CANCELS** her bond.

**IT IS ORDERED**.

s/Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated:  August 2, 2012

40

The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on August 2, 2012.

s/Carol A. Pinegar
Deputy Clerk